FILED
2014 Jul-21  PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **THOMAS DALE FERGUSON,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | ) **Case No.  3:09-cv-0138-CLS-JEO** |
| | ) |
| **RICHARD F. ALLEN, Commissioner,** | ) |
| **Alabama Department of Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION

Petitioner, Thomas Dale Ferguson ("Ferguson"), seeks *habeas corpus* relief

from his state court capital murder conviction and death sentence.  *See* 28 U.S.C. §

2254.

### Table of Contents

I.      PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     THE OFFENSE OF CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    THE SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.     INTRODUCTION OF DISCUSSION OF FERGUSON'S SUBSTANTIVE CLAIMS:
        *The Scope Of Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      **Exhaustion of State Court Remedies**: *The First Condition Precedent to*
                *Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.      **The Procedural Default Doctrine**: *The Second Condition Precedent to*
                *Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1.      *General principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2.      *Overcoming procedural default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     a.      *The "cause and prejudice" standard* . . . . . . . . . . . . . . . . . . . . . 27

          i.      *"Cause"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

          ii.      *"Prejudice"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     b.      *The "fundamental miscarriage of justice" standard* . . . . . . . . . 30

**C.      The Statutory Overlay**: *The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . 31

1.      *28 U.S.C § 2254(e)(1)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.      *28 U.S.C § 2254(d)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     a.      *The meaning of § 2254(d)(1)'s "contrary to" clause* . . . . . . . . . 36

     b.      *The meaning of § 2254(d)(1)'s "unreasonable application" clause* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     c.      *The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"* . . . . . . . . 40

     d.      *Evaluating state court factual determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)* . . . . . . . . . . . . . . . . . . . . . . . 41

**D.      The Burden of Proof and Heightened Pleading Requirements For** *Habeas* **Petitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**E.      Introduction To Ineffective Assistance of Counsel Claims** . . . . . . . . . 45

1.      *The performance prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2.      *The prejudice prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

3.      *Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2

**V.    FERGUSON'S CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    **A.    The Trial Judge Violated Ferguson's Constitutional Rights to Due Process and Equal Protection When He Disregarded the Jury's Nearly Unanimous 11-1 Verdict Recommending a Sentence of Life Without Parole** . . . . . . . . . . 55

        1.    *Brief summary of the twofold claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        2.    *The proper constitutional standard and* habeas *standard of review* .. . . . . 59

        3.    *Analysis of Ferguson's twofold* habeas *claim* . . . . . . . . . . . . . . . . . . . . . 59

            a.    *The trial judge unreasonably discounted Mrs. Ferguson's penalty phase testimony as an "emotional appeal," and overrode the jury's life recommendation on the basis of that finding, resulting in an arbitrary and discriminatory death sentence* . . . . 59

                i.    *The decision of the Alabama Court of Criminal Appeals on direct appeal* . . . . . . . . . . . . . . . . . . . . . . . 63

                ii.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

            b.    *The sentencing judge did not afford the jury's recommendation the weight it was due under* Ex parte Carroll *and* Ex parte Tomlin; *and, as a result, Ferguson's death sentence was arbitrary and capricious* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

                i.    *The decision of the Alabama Court of Criminal Appeals on collateral review* . . . . . . . . . . . . . . . . . . . . . 70

                ii.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    **B.    Ferguson's Constitutional Rights Were Violated When He Was Involuntarily Medicated by the State and, Thereby, Rendered Incompetent to Stand Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

        1.    *The procedural posture of Ferguson's contention that he was incompetent at trial due to the involuntary administration of Haldol* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2. *The law applicable to the claim of drug-induced incompetency to stand trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

3. *Analysis of Ferguson's behavior and mental state at the time of trial as it bears upon his claim under the substantive component of the Due Process Clause that the administration of antipsychotic medications by state officials prior to trial rendered him incompetent at trial.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    a. *The report of the court-appointed psychologist, Dr. C. Van Rosen.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    b. *The report of Ferguson's retained psychologist, Dr. James F. Chudy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    c. *Analysis of evidence bearing upon Ferguson's behavior and mental state at the time of trial.* . . . . . . . . . . . . . . . . . . . . 103

4. *Analysis of Ferguson's claim that the administration of medications by state officials without his consent violated his "substantive due process" rights* . . . . . . . . . . . . . . . . . . . . . . . . . 105

**C.** **Ferguson's Trial Counsel Denied Him Effective Assistance During the Sentencing Phase of Trial, Before the Trial Judge** . . . . . . . . . . . . . . . . . . . . 107

1. *The trial evidence of physical abuse by Ferguson's stepfather* .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

2. *Additional allegations of physical abuse by Ferguson's stepfather included in the Rule 32 petition* . . . . . . . . . . . . . . . . . . . . . . 108

3. *The adjudication of Ferguson's physical abuse allegations by the Alabama Court of Criminal Appeals on collateral review.* . . . . . . . . . . 110

4. *Analysis of the claim that counsel was ineffective during the sentencing phase of trial, for failing to investigate and present additional evidence of physical abuse of Ferguson by his stepfather* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

5. *The claim that counsel was ineffective during the sentencing phase of trial for failing to investigate and present additional evidence of childhood sexual abuse of Ferguson* . . . . . . . . . . . . . . . . . . 123

          a.     *The trial evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

          b.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

**D.**    **Ferguson's Trial Counsel Denied Him Effective Assistance During the Guilt Phase** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

**E.**    **Ferguson's Pre-Trial Counsel Denied Him Effective Assistance** . . . . . . . . 132

     1.    *Was the opinion of the Alabama Court of Criminal Appeals an adjudication on the merits?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

     2.    *Ferguson's claim that counsel provided ineffective representation during the time period surrounding Ferguson's statements to law enforcement* . . . . . . . . . . . . . . . . . . . . . . 137

     3.    *Ferguson's claim that Tony Glenn breached a duty of loyalty to Ferguson, and "arguably" harbored an actual conflict of interest* . . . . . . . . . . . . . . . . . . . . . . . . . . 142

**F.**    **Ferguson Was Improperly Denied a Hearing on His Mental Capacity Under** ***Atkins v. Virginia*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

     1.    *Historical  development and presentation of this claim in state court* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

          a.     *Direct review pre-*Atkins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

               i.     *Ferguson's mental health expert* . . . . . . . . . . . . . . . . 148

               ii.    *The State's mental health expert* . . . . . . . . . . . . . . . . . . 157

          b.     *The Rule 32 proceedings conducted after* Atkins v. Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

          c.     *Collateral Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

     2.    *The* habeas *claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

          a.     *Intellectual functioning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

               i.     *The Flynn Effect* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

ii.      *Standardized malingering test* . . . . . . . . . . . . . . . . . . . 179

   b.     *Adaptive Functioning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

   c.     *Onset before age eighteen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

3.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

G.   **The Trial Judge Violated Ferguson's Constitutional Rights by Refusing to Consider Undisputed Mitigating Evidence** . . . . . . . . . . . . . . . . . . . . . . 189

H.   **Execution by Lethal Injection Constitutes Cruel and Unusual Punishment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

# I. PROCEDURAL HISTORY

Thomas Dale Ferguson was indicted for four counts of capital murder on September 24, 1997.[1] Attorneys Kenneth Millican and J. Tony Glenn were appointed as defense counsel on December 12, 1997, and March 2, 1998, respectively.[2] Glenn

---

[1] Rule 32 C.R. Vol. 1, Tab. 1, at 1, 8-9. **NOTE**: The court will utilize the following method of citation to the record. References to specific pages of the court record on direct appeal are designated "C.R.___", and references to the transcript on direct appeal are designated "R.___." References to the record of the Rule 32 proceedings in state court will be designated "Rule 32 C.R. ___." *The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document* (*i.e.*, the original pagination), if those numbers are the most readily discoverable for purposes of an expedient examination of that part of the record. Otherwise, the page numbers will those stamped at the top of each page by the court's Electronic Case Filing system ("ECF"), which allows parties to file and serve documents electronically. *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009). Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)). Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5. Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, the citation will precede the page number with the letters "ECF."

[2] *Id.* at 1-2. Although Tony Glenn was not formally appointed as one of Ferguson's defense

subsequently became ill, however, and both attorneys were allowed to withdraw. Attorneys Greg Hughes and Arthur Madden were appointed as successor defense attorneys on March 18, 1998.[3]  Trial commenced on June 22, 1998,[4] and Ferguson was found guilty of four counts of capital murder three days later.[5]  A penalty hearing followed, and the jury, by a vote of 11 to 1, recommended that he be sentenced to life in prison without the possibility of parole.[6]  The formal sentencing hearing required by Alabama Code § 13A-5-47 (1975) was conducted on September 8, 1998, and the trial court judge sentenced Ferguson to death.  Attorneys Greg Hughes and Arthur Madden continued to represent Ferguson following the sentencing, and throughout the remainder of the direct appeal process.

Ferguson appealed his conviction and sentence to the Alabama Court of Criminal Appeals, and that court entered a published opinion, affirming Ferguson's conviction and death sentence, on June 30, 2000.  *See Ferguson v. State*, 814 So. 2d 925 (Ala. Crim. App. 2000).

The Supreme Court of Alabama found no reversible error, plain or otherwise, and affirmed the conviction and sentence on July 6, 2001.  *See Ex parte Ferguson*,

---

attorneys until March 2, 1998, he began acting as such during August of 1997.  Doc no. 9, at 41.

[3] *Id.* at 2.

[4] *Id.* at 2 & 4.

[5] *Id.* at 10.

[6] *Id.* at 11.

814 So. 2d 970 (Ala. 2001).

The United States Supreme Court denied Ferguson's petition for writ of *certiorari* on March 4, 2002. *See Ferguson v. Alabama*, 535 U.S. 907 (2002).

Ferguson filed a *pro se* petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on February 24, 2003.[7] Soon thereafter, attorneys T. Thomas Cottingham and Vance Salter entered notices of appearance and were appointed to represent Ferguson.[8] The State filed an Answer on May 19, 2005.[9] Ferguson's petition was summarily denied by the trial court on October 18, 2006.[10] Thomas Cottingham and Vance Salter continued to represent Ferguson after the trial court's judgment was entered and throughout the remainder of the state post-conviction review process.

Ferguson filed a notice of appeal on November 15, 2006.[11] The Alabama Court of Criminal Appeals affirmed the trial court's decision on April 4, 2008. *See Ferguson v. State*, 13 So. 3d 418 (Ala. Crim. App. 2008).

The Supreme Court of Alabama denied *certiorari* review on January 16, 2009. *See Ex parte Ferguson*, No. CR-06-0327 (Ala. Jan. 16, 2009). Ferguson filed the

---

[7] *See* Rule 32 C.R. Vol. 12, Tab. 40.

[8] *Id.* at 163-82.

[9] *Id.*, Vol. 12, Tab. 41, at 185-200; Vol. 13, at 201-73.

[10] *Id.*, Vol. 16, Tab. 51, at 1-65.

[11] *Id.*, Vol. 14, at 507-15.

8

present *habeas* petition pursuant to 28 U.S.C. § 2254 on January 22, 2009.  T.

Thomas Cottingham represents Ferguson in these proceedings.

## II.  THE OFFENSE OF CONVICTION

The following summary of the offense of conviction is copied from the opinion

of the Alabama Court of Criminal Appeals on direct appeal.  *See Ferguson v. State*,

514 So. 2d 925 (Ala. Crim. App. 2000).

> The appellant, Thomas Dale Ferguson, was indicted for four
> counts of capital murder in connection with the shooting deaths of
> Harold Pugh and his 11-year-old son Joey Pugh.  The jury found
> Ferguson guilty of all counts charged in the indictment: two counts of
> murder made capital because the killings were committed during the
> course of a robbery in the first degree, *see* § 13A-5-40(a)(2), Ala. Code
> 1975; one count of murder made capital because it involved the murder
> of two or more persons by one act or pursuant to one scheme or course
> of conduct, *see* § 13A-5-40(a)(10), Ala. Code 1975; and one count of
> murder made capital because the victim was less than 14 years old, *see*
> § 13A-5-40(a)(15), Ala. Code 1975.  The jury recommended, by a vote
> of 11-1, that Ferguson be sentenced to life imprisonment without the
> possibility of parole.   The trial court overrode the jury's
> recommendation and sentenced Ferguson to death by electrocution.
>
> . . . .
>
> The State's evidence tended to show the following.  On July 21,
> 1997, Harold Pugh and his 11-year old son Joey Pugh were reported
> missing to the Colbert County Sheriff's Department.  Mike Sennett, a
> friend of the Pughs, testified that in the early evening hours of July 21,
> after hearing that the Pughs were missing, he and several friends went
> looking for the Pughs at Cane Creek in Colbert County.  The local
> authorities and a rescue squad were also searching for the Pughs in this
> same area.   Sennett testified that Harold and his son were avid

9

fishermen.  Making one more pass up Cane Creek in his boat before
going home, Sennett found the bodies of Harold and Joey Pugh floating
in the creek.  Autopsies conducted the following day revealed that each
victim had been shot twice in the head.

Several days later, on July 26, 1997, a boat was found in a
clearing in a remote wooded area in neighboring Franklin County.  In
the boat were rods and reels, a tacklebox, life jackets, a baseball-style
cap with a wristwatch inside it (on the boat's front seat), and another
baseball-style cap on the backseat.  At Ferguson's trial, the individual
who found the boat testified that because he had heard television and
radio reports that the sheriff's department was looking for a boat, a
description of which matched that of the boat he found in the wooded
area, he telephoned the sheriff's department.

Oscar Hood of the Colbert County Sheriff's Department testified
that he received the call concerning the boat and that when he arrived at
the location, the boat appeared to be the boat that the authorities were
looking for in connection with the Pughs' murders.  Hood ran a
registration check on the boat and determined that it was in fact Harold
Pugh's boat.  Other testimony at trial showed that a pedestal-type seat
had been removed from the boat and that two spent 9mm shell casings
were found inside the boat.

Further testimony revealed that on the day the victims' bodies
were found, two armed men wearing dark-colored army fatigues, hooded
shirts, sunglasses, and gloves had robbed the Deposit Guaranty National
Bank in Belmont, Mississippi.  An employee at the bank testified that
she could not identify the men, but that she could identify the truck the
men had fled in after the robbery.  She described the truck as a black
Chevrolet Z-71 pickup truck with a chrome toolbox in the rear bed.
Shortly after the robbery, a truck matching that description was found
by an officer of the Belmont Police Department five miles from the
bank, in a heavily wooded area.  The truck, which had been set on fire,
was discovered after the police saw the smoke from the fire.  On the
front passenger-side floorboard of the truck, the police found a
pedestal-type seat, which, according to testimony, was typical of the

10

seats found in the front of bass-fishing boats.

Following his arrest, Ferguson gave police a statement concerning his involvement in the robbery and murders of Harold and Joey Pugh and in the robbery of the bank in Mississippi. Ferguson told police that he and his four codefendants — Mark Moore,[FN1] Michael Craig Maxwell,[FN2] Donald Risley, and Kino Graham — had conspired to rob banks to get money. According to Ferguson, they bought clothing matching that described by the employee of the bank robbed in Belmont, Mississippi, to wear during the robberies, and Moore also bought guns, handheld radios, and other items to use in the robberies. Ferguson told police that Moore was the "leader" of the group.

> FN1. Moore was Ferguson's wife's stepfather.

> FN2. Maxwell was also convicted and sentenced to death for the capital murders of Harold and Joey Pugh. We affirmed his conviction and death sentence in *Maxwell v. State*, [Ms. CR-97-2150, May 26, 2000] __So. 2d __ (Ala. Cr. App. 2000).

In addition, Ferguson told police that on the day of the murders, he and the others were looking for two cars to steal to use in the Belmont bank robbery. According to Ferguson, while he, Moore, Maxwell, Graham, and Risley were looking for a car to steal, they saw the Pughs' truck parked near the boat landing at Cane Creek. When the Pughs arrived at the landing in their boat, Ferguson said, Harold Pugh got out of the boat and into his truck. According to Ferguson, before he knew it, Maxwell was holding a gun to the Pughs and was ordering the Pughs to get back into the boat. Ferguson said that Maxwell jumped into the boat, along with Moore, and that Moore then ordered Ferguson to get into the boat. According to Ferguson, Maxwell was armed with a 9mm pistol and Moore was armed with a .357 pistol. Ferguson maintained that he did not have a weapon. Ferguson stated that they then left in the boat with the victims, heading downstream, while Risley and Graham waited with the truck. According to Ferguson, he heard a shot and saw that Maxwell had shot Harold Pugh. Ferguson claimed that he did not know who shot Joey Pugh, but he did say that Maxwell and Moore threw the victims' bodies into the creek.

11

Ferguson stated that after the shooting he became physically ill and that he was throwing up and very upset. Ferguson further stated that after the murders, Moore threatened him, telling Ferguson that if he told anyone about what had happened, he would kill Ferguson and Ferguson's family.

Ferguson stated that after returning the boat to the landing where Graham and Risley were waiting, he and the others then loaded the boat onto the trailer and drove the Pughs' truck and the boat to a clearing in the woods in Franklin County. Ferguson said that he removed a pedestal-type seat from the boat and threw it inside the victims' truck.

The following morning, according to Ferguson, Moore came to his house and the two left together to pick up Risley. Then, Ferguson said, they went to Maxwell's apartment where everyone, except Graham, who did not come to Maxwell's apartment, discussed plans to rob the bank in Belmont, Mississippi. Ferguson stated that Maxwell and Risley, who, according to Ferguson, were going to be the ones to go inside the bank, left Maxwell's apartment in Maxwell's car, followed by him and Moore in Moore's truck, and drove to where they had left the victims' truck and boat. From that location, Ferguson said, Risley drove the victims' truck to Belmont, and Maxwell drove his own car, while he and Moore followed in Moore's truck. Maxwell stated that he and the other men then drove to a location in Belmont, near the bank, where they left Maxwell's car. From there, Ferguson said, Maxwell and Risley drove the victims' truck to the bank as he and Moore, who were to act as "covers" while the bank was being robbed, followed in Moore's truck. Ferguson stated that after Maxwell and Risley had committed the robbery, Maxwell drove the victims' truck back to the location where they left Maxwell's car, and he and Moore met them at that location. Ferguson said that they put their guns in Moore's truck, and put the clothes they had worn in the robbery in the victims' truck. According to Ferguson, Risley then poured gasoline on the victims' truck and set it on fire. Ferguson stated that he and the others then returned to Maxwell's apartment, where they divided the proceeds of the bank robbery — approximately $40,000.

12

Shortly after the questioning ended and Ferguson had completed his statement, Ferguson told Investigator Frank Brians that he had something else he wanted to say. Ferguson then stated that he had lied in his earlier statement when he said that Moore was at Cane Creek and on the boat when the Pughs were murdered. Ferguson now said that Moore was not at Cane Creek and that Moore was not on the boat when the victims were shot, but that only Ferguson and Maxwell were on the boat with the victims. Ferguson, who still maintained that he was not armed while on the boat, now claimed that Maxwell shot both victims.

Donald Risley, one of Ferguson's codefendants, testified at Ferguson's trial and corroborated most of Ferguson's statement to police. Risley's wife and Ferguson's wife were first cousins, and Risley had been friends with Ferguson for approximately eight years. Risley testified that Ferguson had approached him and asked him if he wanted to get involved in the plan to rob banks to get some "easy money." (R. 510.) Risley stated that Moore and Maxwell were the "leaders of the group." (R. 514.) Risley, like Ferguson, testified concerning the circumstances surrounding the murders at Cane Creek and the bank robbery in Belmont. Risley testified that on the afternoon of the murders, Ferguson picked him up at a friend's, Daryl May's, house and that he and Ferguson then went to Maxwell's apartment. From there, Risley said, they went to Cane Creek where they saw the victims' truck parked at the boat landing. Risley stated that he was armed with a .357 pistol, that Maxwell had a 9mm pistol, that Graham had a Colt .45 pistol, and that Ferguson was carrying a .357 pistol. Testifying to essentially the same facts as Ferguson did concerning how they approached the Pughs and ordered them into the boat, Risley further testified that Maxwell and Ferguson got into the boat with the victims and Maxwell drove the boat downstream. Risley said that the victims were sitting in the back of the boat, while Ferguson was standing near the front and was pointing a gun at the Pughs. Risley testified that neither he nor Ferguson were threatened into robbing the Pughs and that no one threatened Ferguson to get him to get into the boat. According to Risley, when Ferguson and Maxwell returned in the boat, approximately 10 minutes after they had left, neither victim was in the

boat and Ferguson was sitting on a pedestal-type seat in the front of the boat.

Risley continued to testify to the events that occurred after the murders up until the time of the robbery of the bank in Mississippi. Risley testified to essentially the same facts as did Ferguson in his statement to police. Risley stated that Ferguson took the pedestal-type seat out of the boat and put it in the truck because, Risley said, Ferguson was afraid that he might have touched it and left his fingerprints on it. Risley also stated that while he was at Cane Creek, Ferguson never appeared to be sick or upset, and he never saw Ferguson throw up. Risley further told police that several days after the murders, Ferguson, in response to Risley's question whether he had shot the Pughs, said that he had and further told Risley that he and Maxwell had shot them because they did not want any witnesses. Ferguson also told Risley that he shot Harold Pugh and that Maxwell shot Joey Pugh. Maxwell, who was also present during Risley's and Ferguson's conversation about the shooting, told Risley that Harold was not dead after the first shot, so he shot him again and he made Ferguson shoot Joey again.

Other evidence at trial showed that the 9mm pistol police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body. The two spent shell casings found in the boat were also fired by the 9mm pistol recovered from Moore's house. The evidence further showed that one of the bullets recovered from Harold's body and one of the bullets recovered from Joey's body were lead semi-wad cutter bullets that could be loaded in either a .38 or .357 pistol. Although the State's firearms expert could not conclusively state that a .357 pistol taken from Moore's house was the weapon that fired two of the bullets recovered from the victims' bodies, he was able to say that the pistol was the type of pistol that could fire that particular type of bullet. The State's firearms expert also testified that a bag of ammunition, which had been taken from Ferguson's house and submitted to him for evaluation, contained ammunition that was capable of being fired through the .357 pistol recovered from Moore's house.

There was also testimony that Ferguson, Maxwell, Graham, and

14

Moore had all worked together at a furniture distribution center in Russellville, in Franklin County, Alabama. All of the men, except Graham, quit their jobs, or failed to return to work, in the early to middle part of July 1997, just several weeks before the Pughs' murders and the bank robbery in Belmont. Graham last reported to work on August 20, 1997. Also, Daryl May, a friend and coworker of Ferguson's, testified that on the afternoon of the murders, Maxwell came to his house to pick up Ferguson, who was watching television there. May also testified that because Risley did not have a car, he drove him to work every morning, except the morning of July 21, the day after the murders. May said that Risley did not show up for work that morning. Testimony also showed that in late July 1997, shortly after the bank robbery in Belmont, Ferguson paid $1,750 in cash for a used car, using "new" $20 bills.

*Ferguson v. State*, 814 So. 2d at 933-37 (bracketed alteration in original).

## III.  THE SENTENCE

The following portion of the opinion of the Alabama Court of Criminal Appeals on direct appeal is an affirmation of the trial judge's sentence of death,[12] and an independent examination of the propriety of the death sentence, as required by Alabama law.

We have also reviewed Ferguson's sentence in accordance with § 13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Ferguson's capital murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is

---

[12] The trial judge's comprehensive, 47-page sentencing order is found at C.R. Vol. 16, Tab. 47, at 1-47.

15

the appropriate sentence in the case.  Section 13A-5-53(b) requires that, in determining whether death is a proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

After the jury convicted Ferguson of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975.  After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 11-1, that Ferguson be sentenced to life imprisonment without the possibility of parole.

Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence Ferguson to death or to life imprisonment without parole as the jury recommended.  The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b).  After the hearing, the trial court entered specific written findings concerning each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Ferguson's participation in the offense.

In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murders were committed while Ferguson was engaged in the commission of a robbery, see §

16

13A-5-49(4), Ala. Code 1975.  The trial court found the existence of one statutory mitigating circumstance: that Ferguson had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975. The trial court also heard testimony regarding Ferguson's character or record and any of the circumstances of the offense that Ferguson offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975.  In this regard, the trial court found the following evidence to be mitigating: (1) that Ferguson surrendered to the authorities and that he confessed to his involvement in the murders (although, as the trial court noted in its sentencing order, he did not do so immediately after the murders but instead waited until one month after the murders); and (2) that the jury recommended life imprisonment without the possibility of parole.

The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances.  Accordingly, the trial court sentenced Ferguson to death.  The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.

Ferguson was convicted of the offenses of murder committed during a robbery, murder of two or more persons by one act or pursuant to one scheme or course of conduct, and the murder of a child less than 14 years of age.  These offenses are defined by statute as capital offenses.  See § 13A-5-40(2), (10), and (15), Ala. Code 1975.  We take judicial notice that similar crimes have been punished capitally throughout the state.  *See, e.g.*, cases dealing with murders committed during a robbery: *Sneed v. State*, 783 So. 2d 841 (Ala. Crim. App. 1999); *Hardy v. State*, 804 So.2d 247 (Ala. Crim. App. 1999); [seven additional citations omitted]; *see also, e.g.*, cases dealing with the murder of two or more persons pursuant to one course of conduct: *Wilson v. State*, 777 So. 2d 856 (Ala. Crim. App. 1999); *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999) [six additional citations

omitted]; cases dealing with the murder of a child under 14 years of age: *Ward v. State,* 814 So. 2d 899 (Ala. Crim. App. 2000); *Dunaway v. State*, 746 So. 2d 1021 (Ala. Crim. App. 1998).

> After carefully reviewing the record of the guilt phase and the sentencing phase of Ferguson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.   We conclude that the findings and the conclusions of the trial court are amply supported by the evidence.  We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case.  Considering Ferguson and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

*Ferguson v. State*, 814 So. 2d at 968-70 (alterations supplied).

## IV. INTRODUCTION TO A DISCUSSION OF FERGUSON'S SUBSTANTIVE CLAIMS:
### *The Scope of Federal* Habeas *Review*

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'"  *Wilson v. Corcoran*, — U.S. —, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  As such, this court's review of claims seeking *habeas* relief is limited to questions of federal constitutional and statutory law.  Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254.  *See Alston v.*

18

*Department of Corrections*, 610 F. 3d 1318, 1326 (11th Cir. 2010) (holding that a claim addressing either "an alleged defect in a collateral proceeding," or a state court's "interpretation of its own law or rules," does not provide a basis for federal *habeas* relief) (citations omitted).

A.    **Exhaustion of State Court Remedies**:  *The First Condition Precedent to Federal* Habeas *Review*

A *habeas* petitioner is required to present his federal claims to the state court, and to exhaust all of the procedures available in the state court system, before seeking relief in federal court.  28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal *habeas* relief only on claims that have been exhausted in state court").  That requirement serves the purpose of ensuring that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights.  As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . .  The role of federal

19

habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t][13] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103

---

[13] The phrases "fairly presented" and "properly exhausted" are synonymous. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly exhausted* those remedies, *i.e.*, whether he has *fairly presented* his claims to the state courts") ("properly" emphasized in original, all other emphasis supplied).

S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first and third alterations

and redactions in original) (footnote supplied).

**B.     The Procedural Default Doctrine**: *The Second Condition Precedent to Federal* Habeas *Review*

**1.** *General principles*

It is well established that, if a *habeas* petitioner fails to raise his federal claim

in the state court system at the time and in the manner dictated by the state's

procedural rules, the state court can decide the claim is not entitled to a review on the

merits.  Stated differently, "the petitioner will have *procedurally defaulted* on that

claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis supplied).

This so-called "procedural default" doctrine was explained by the Supreme Court in

*Woodford v. Ngo,* 548 U.S. 81 (2006), as follows:

> In habeas, the sanction for failing to exhaust properly (preclusion of
> review in federal court) is given the separate name of procedural default,
> although the habeas doctrines of exhaustion and procedural default "are
> similar in purpose and design and implicate similar concerns," *Keeney
> v. Tamayo–Reyes*, 504 U.S. 1, 7 (1992). See also *Coleman v. Thompson*,
> 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991).  In habeas, state-court
> remedies are described as having been "exhausted" when they are no
> longer available, regardless of the reason for their unavailability.  See
> *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d
> 457 (1996).   Thus, if state-court remedies are no longer available
> because the prisoner failed to comply with the deadline for seeking
> state-court review or for taking an appeal, those remedies are technically

> exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford,* 548 U.S. at 92-93.

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, *and*, and that procedural bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Cone v. Bell,* 556 U.S. 449, 465 (2009); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("When a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.") (alteration supplied).

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief. See id.* at 262, 109 S. Ct. at 1042-43;

*Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis supplied).[14]

Federal deference to a state court's clear finding of procedural default under its own rules is so strong that:

"[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a

---

[14] "When the last state court rendering judgment affirms without explanation, [the federal court will] presume that it rests on the reasons given in the last reasoned decision." *Mason v. Allen*, 605 F.3d 1114, 1118 n.2 (11th Cir. 2009) (alteration supplied). As the Supreme Court observed in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991):

The problem we face arises, of course, because many formulary orders are not meant to convey *anything* as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: *Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.* If an earlier opinion "fairly appear[s] to rest primarily upon federal law," we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Id*. at 803 (first emphasis and alteration in original, second emphasis supplied) (citation omitted).

23

state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in original).

The Supreme Court defines an "adequate and independent" state court decision as one that "'rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)) (emphasis in *Lee*)). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "'is itself a federal question.'" *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001)

24

(quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).  Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is *not* independent of federal law.  *Id.*

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "'firmly established and regularly followed.'"  *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).  In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as "adequate."  *James*, 466 U.S. at 346 (alteration supplied).  That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule "inadequate."  "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' — even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009) (alterations supplied).  Rather, the "adequacy" requirement

25

means only that the procedural rule "must not be applied in *an arbitrary or unprecedented fashion*." *Judd,* 250 F.3d at 1313 (emphasis supplied).

In summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered "adequate," and the state court decision based upon such a rule can be reviewed by a federal court. *Card,* 911 F.2d at 1517. Conversely, if the rule is deemed "adequate," the decision will not be reviewed by this court.

**2.** *Overcoming procedural default*

There are basically three circumstances in which an otherwise valid state-law ground will *not* bar a federal *habeas* court from considering a constitutional claim that was procedurally defaulted in state court: *i.e.,* (*i*) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, *and*, that he was actually "prejudiced" by the alleged constitutional violation; *or* (*ii*) where the state procedural rule was not "firmly established and regularly followed"; *or* (*iii*) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or

26

demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.") (alteration supplied); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray*, 477 U.S. at 496)).

      **a**.    *The "cause and prejudice" standard*

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default *and* actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis supplied). This so-called "cause *and* prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both parts.

      *i*.    *"Cause"*

To show "cause," a petitioner must prove that "some objective factor external

to the defense impeded counsel's efforts" to raise the claim in the state courts.

*Carrier*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . [on direct review] is cause." Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (citations omitted) (first alteration in original, all other alterations supplied).

While "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as "cause" to overcome a procedural default, the constitutional ineffectiveness of *post-conviction counsel on collateral review* generally will not support a finding of cause and prejudice to overcome a procedural default. *Coleman,* 501 U.S. at 754 (alterations supplied). That is because "[t]here is no right to counsel in state post-conviction proceedings." *Id.* at 752 (alteration supplied) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).

Even so, in two recent landmark cases, the Supreme Court extended its prior decision in *Coleman* when it decided that, as a matter of *equity, and, under specific,*

28

*limited circumstances*, errors by counsel on post-conviction, collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim.  In the first such case, *Maples v. Thomas*, — U.S. —, 132 S. Ct. 912 (2012), the Supreme Court found that post-conviction counsel's gross professional misconduct (*e.g.* abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id.* at 922.

In the second case, *Martinez v. Ryan*, 569 U.S. —, 132 S. Ct. 1309 (2012), the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process.[15]  *Id.* at 1317.

### ii.      "Prejudice"

In addition to proving the existence of "cause" for a procedural default, a

---

[15] The court finds that, in this case, an ineffective assistance of trial counsel claim must have been procedurally defaulted in the state Rule 32 court before the *Martinez* cause and prejudice standard can even be applied.  Moreover, the court is aware that T. Thomas Cottingham, one of Ferguson's post-conviction attorneys, also represents Ferguson in the present *habeas* action.  If there is a claim of ineffective assistance of trial counsel that was procedurally defaulted before the Rule 32 court, and further examination shows that resolution of the claim will necessarily create a conflict of interest as to Cottingham's further representation, the court will separately address that matter.

*habeas* petitioner must show that he was actually "prejudiced" by the alleged constitutional violation.  He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis supplied); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*).  If the "cause" is of the type described in the Supreme Court's 2012 decision in *Martinez v. Ryan, supra*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  *Martinez*, 132 S. Ct. at 1318-19 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

**b**.   *The "fundamental miscarriage of justice" standard*

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default if *either*:  (a) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38 (quoting *Carrier*, 477 U.S. at 496); *or* (b) the petitioner shows "by *clear and convincing*

evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323-27 & n.44 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)) (emphasis in *Schlup*, alteration supplied); *see also*, *e.g.*, *Smith*, 477 U.S. at 537-38.

**C.     The Statutory Overlay:** *The Effect of* "*the Antiterrorism and Effective Death Penalty Act of 1996*" *on* Habeas *Review*

The writ of *habeas corpus* "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts are asked to engage in *habeas* review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, *is secondary and limited. Federal courts are not forums in which to relitigate state trials*."

*Id*. (emphasis and redaction supplied) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). "Those few who are ultimately successful [in obtaining federal *habeas* relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963) (alteration supplied).

"Accordingly, . . . an error that may justify reversal on direct appeal will not

31

necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted).  That is due to the fact that, under the federal system of governments created by the United States Constitution,

> [t]he States possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982) (alteration supplied).[16]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting *habeas* law.[17]  Among other things, several provisions of the AEDPA require federal courts to give greater deference to state court determinations of federal constitutional claims than before.

**1.** *28 U.S.C. § 2254(e)(1)*

---

[16] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey*, 499 U.S. at 491; and *Wainwright*, 433 U.S. at 90).

[17] The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law by President Clinton on April 24, 1996.  *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996).  The present petition was filed after that date.  Accordingly, the *habeas* statutes as amended by AEDPA apply to the claims asserted in this case.  *See id*. § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to *habeas* petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same).  *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254).  *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to *habeas* petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

Section 2254(e)(1) requires district courts to *presume* that a state court's factual determinations are correct, unless the *habeas* petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also, e.g., Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

The deference that attends state court findings of fact pursuant to Section 2254(e)(1) applies to all *habeas* claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the *habeas* claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012) (acknowledging the federal court's obligation to accept a state court's factual findings as correct, *if* unrebutted by clear and convincing evidence, and proceeding to conduct a *de novo* review of the *habeas* claim)

The presumption of correctness also applies to *habeas* claims that were

33

adjudicated on the merits by the state court and, therefore, are claims subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2) discussed in the following section.

**2.**     *28 U.S.C. § 2254(d)*

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, — U.S.—, 131 S. Ct. 770, 784 (2011).  It does not matter whether the state court decision contains a lengthy analysis of the claim, or is a summary ruling "unaccompanied by explanation."  *Id.*

Further, the "backward-looking language" of the statute requires an examination of the state-court decision *on the date it was made. Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011).  That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* at 1399 (alterations supplied) (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)).

Finally, "review under §[§] 2254(d)(1) [and (d)(2)] is limited to the *record* that was before the state court that adjudicated the claim on the merits." *Id.* at 1398, 1400 n.7 (alterations and emphasis supplied).  Therefore, a federal *habeas* court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de*

34

*novo.*" *Id.* at 1399.

A closer look at the separate provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) reveals that, when a state court has made a decision on a petitioner's constitutional claim, *habeas* relief cannot be granted, *unless* it is determined that the state court's adjudication of the claim *either*:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or*

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).[18]

The "contrary to" and "unreasonable application" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis."  *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams,* 529 U.S. at 405-07).[19]  When

---

[18] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the *holdings*, as opposed to the *dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis and alteration supplied); *see also, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted) (alteration supplied).

[19] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal *habeas* relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of *habeas* corpus if the relevant state-court decision was either (1) *'contrary to . . .*

considering a state court's adjudication of a petitioner's claim, therefore, the *habeas* court must not conflate the two modes of analysis.

> **a**.   *The meaning of § 2254(d)(1)'s "contrary to" clause*

A state-court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  *Second*, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied).  *See also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above.[20]  Instead, the statutory language "simply implies that 'the state

---

clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis supplied).

[20] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency.  Two propositions are incompatible with one another if both cannot be true or correct.  Thus, a state court decision is contrary to federal law if that decision and the

court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405) (alteration supplied).

> **b.**   *The meaning of § 2254(d)(1)'s "unreasonable application" clause*

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our

---

applicable federal law cannot both be true or correct.  Given this premise, there appears to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:

- the state court applies the correct federal standard and arrives at a correct outcome;

- the state court applies an incorrect federal standard and arrives at an incorrect outcome;

- the state court applies an incorrect federal standard and arrives at a correct outcome; and

- the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied).  *See also*, *e.g., Putman*, 268 F.3d at 1240-41 (same).

It is important to notice that "an *unreasonable* application of federal law is different from an *incorrect* application."  *Williams*, 529 U.S. at 410 (emphasis in original).  A federal *habeas* court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*.  Rather, that application must also be *unreasonable*."  *Id*. at 411 (emphasis supplied).

In other words, the question that should be asked is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "unreasonable."    *Id*. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.") (alteration supplied).  *See also*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established  federal  law  is  objectively  unreasonable,"  and  stating  that  "an

38

unreasonable application is different from an incorrect one"); *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 785-87 (2011) (same).[21]

In order to demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the *habeas* petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Id.* at 786-87 (emphasis supplied). Stated another way, if the state-court's resolution of a claim is *debatable among fairminded jurists*, it is *not* "objectively unreasonable."

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted) (alteration supplied). Mixed

---

[21] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis in original).

questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

> **c.** *The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"*

"28 U.S.C. § 2254(d)(2) imposes a 'daunting standard — one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, — U.S. —, 132 S. Ct. 611, 612 (2012) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010) (internal quotation marks omitted in original)).

> As we have observed in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)) (alteration in original). Conversely,

> when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal

40

conclusions that flow from them.

*Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 -1250 (11th

Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en

banc*) (alteration in original) (quotation marks and citations omitted in original)).

      **d.**    *Evaluating state court factual determinations under 28 U.S.C. §§
2254(d)(2) and (e)(1)*

As set out in the previous parts of this opinion, 28 U.S.C. § 2254(d)(2)

regulates federal court review of state court findings of fact.  That provision limits the

availability of federal *habeas* relief on any claims by a state prisoner that are

grounded in a state court's factual findings, unless the state court's findings were

"based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Moreover, it must be remembered that 28 U.S.C. § 2254(e)(1) provides that

factual determinations made by a state court are "presumed to be correct," and that

the *habeas* petitioner bears "the burden of rebutting the presumption of correctness

by *clear and convincing evidence*." *See* 28 U.S.C. § 2254(e)(1) (emphasis supplied);

*Ward*, 592 F.3d at 1155 (holding that the presumption of correctness attending a state

court's findings of fact can be overcome only by clear and convincing evidence).

Nevertheless, there is Eleventh Circuit case authority observing that the manner

41

in which subsections 2254(d)(2) and (e)(1) relate to one another remains an open question. *See Cave v. Secretary for Department of Corrections*, 638 F.3d 739, 744-45 (11th Cir. 2011) ("'[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard.") (quoting *Gore v. Secretary for Department of Corrections*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)).

Even so, the Eleventh Circuit's earlier opinion in *Ward v. Hall*, 592 F.3d 1144 (2010), clearly held that federal *habeas* courts "must presume the state court's factual findings to be correct *unless the petitioner rebuts that presumption by clear and convincing evidence*." *Id.* at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)) (emphasis supplied). That same opinion also observed that "28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in original).

## D.    The Burden of Proof and Heightened Pleading Requirements for *Habeas* Petitions

*Habeas* review "exists only to review errors of constitutional dimension."

*McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a).[22]

Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estill*, 463 U.S. 880, 887 (1983) (alteration and redactions supplied).  Two consequences flow from those fundamental propositions.

*First*, the *habeas* petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal post-conviction relief should be granted.  *See, e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[23] *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always

---

[22] The statute cited in text provides that:  "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*."  28 U.S.C. § 2254(a) (emphasis supplied).  It follows that claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.

[23] As discussed in Part IV.C *supra*, Section 2254(d) provides that the state courts' adjudication of a *habeas* petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination *either* (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *or* (2) that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Further, § 2254(e)(1) provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

*Second*, the *habeas* petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (Section 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without concomitant allegation of sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and to then "*state the facts supporting each ground*." 28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (emphasis supplied).[24]  *See also* 28 U.S.C. § 2242 (stating that an application for writ of *habeas corpus* "shall allege *the facts* concerning the applicant's commitment or detention") (emphasis supplied).

In short, a *habeas* petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977)

---

[24] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

(observing that a *habeas* petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*).  *Cf. Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a case premised upon 28 U.S.C. § 2255 that, despite the liberal construction due a *pro se* petitioner's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief").[25]

In addition, "[c]itation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated."  1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005) (alteration supplied).  As another district judge has stated:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners.  Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

## E.   An Introduction to Ineffective Assistance of Counsel Claims

---

[25] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial.  *He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty*.") (emphasis supplied).

An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims — which are governed by a highly deferential standard of constitutional law — and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of *habeas* review. A general discussion also provides a central reference point, because Ferguson has divided his allegations that trial counsel provided ineffective assistance into three separate *habeas* claims.

Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial, or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

The Supreme Court's "benchmark" standard for judging any claim that a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions is the question of "whether counsel's conduct so undermined the proper functioning

46

of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that question is "yes," then counsel was constitutionally ineffective. Even so, *Strickland* requires that the issue be approached in two steps: *i.e.,*

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis supplied); *see also*, *e.g.*, *Williams*, 529 U.S. at 390 (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

Both parts of the *Strickland* standard must be satisfied: that is, a *habeas* petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was *deficient*; *and*, that such deficient performance *prejudiced his defense*. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a federal court is not required to address both parts of the *Strickland* standard when the *habeas* petitioner makes an

47

insufficient showing on one of the prongs.  *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

### 1.    *The performance prong*

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable."  *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313).   To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.  The standard for gauging attorney performance is "reasonableness under prevailing professional norms."  *Id*. at 688; *see also*, *e.g.*, *Williams*, 529 U.S. at 390-91 (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same); *Chandler*, 218 F.3d at 1313 (same).  "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial."  *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313).  Furthermore, courts must "recognize that 'omissions

48

are inevitable, but, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error, and in light of all the circumstances. *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude

49

> counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d
> 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration supplied,

second alteration in original).  Judicial scrutiny of counsel's performance must be

"highly deferential," because representation is an art, and an act or omission that is

unprofessional in one case may be sound or even brilliant in another.  *See Strickland*,

466 U.S. at 697.  Indeed, reviewing courts are instructed that they "must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance."  *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's
> assistance after conviction or adverse sentence, and it is all too easy for
> a court, examining counsel's defense after it has proved unsuccessful,
> to conclude that a particular act or omission of counsel was
> unreasonable.  A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to
> evaluate the conduct from counsel's perspective at the time.  Because of
> the difficulties inherent in making the evaluation, a court must indulge
> a strong presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance; *that is*, *the defendant must
> overcome the presumption that, under the circumstances, the challenged
> action might be considered sound trial strategy*.  There are countless
> ways to provide effective assistance in any given case.  Even the best
> criminal defense attorneys would not defend a particular client in the
> same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation

marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)

50

("When reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate.") (internal quotation marks omitted).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take*.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis supplied). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer*, *in the circumstances*, *would have done so*." *Rogers*, 13 F.3d at 386 (emphasis supplied).

## 2.   *The prejudice prong*

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a *habeas* petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'") (quoting *Strickland*, 466 U.S. at 693)) (alteration in original). "It is not enough for the [*habeas*

51

petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693 (alteration supplied); *see also Harrington*, 131 S. Ct. at 791-92 (citing *Strickland*, 466 at 693) ("The likelihood of a different result must be *substantial*, not just conceivable.")) (emphasis supplied).

Instead, to prove prejudice, the *habeas* petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same).   When that standard is applied in the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer [*i.e.*, in Alabama, the trial court judge] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"   *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695) (alteration supplied).

That is a high standard, and in order to satisfy it a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'"   *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).   In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair

52

and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted) (alteration supplied).

**3**.     *Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims*

State court findings of historical fact made in the course of evaluating a claim of ineffective assistance of counsel are subject to a presumption of correctness under 28 U.S.C. §§ 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state-court finding of fact, the petitioner bears a burden of proving contrary facts by "clear and convincing evidence."

Additionally, under the AEDPA, a federal *habeas* court may grant relief  a claim of ineffective assistance of counsel *only if* the state-court determination involved an "unreasonable application" of the *Strickland* standards to the facts of the case. *Strickland* itself, of course, also requires an assessment of whether counsel's conduct was professionally unreasonable. Those two assessments cannot be conflated into one. *See Harrington,* 131 S. Ct. at 786. Thus, *habea*s relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts *only if* the *habeas* court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not

53

"professionally unreasonable."  The *Harrington* Court explained:

> "Surmounting *Strickland's* high bar is never an easy task."
> *Padilla v. Kentucky*, 559 U.S. [356], [371-372], 130 S. Ct. 1473, 1485,
> 176 L. Ed. 2d 284 (2010).  An ineffective-assistance claim can function
> as a way to escape rules of waiver and forfeiture and raise issues not
> presented at trial, and so the *Strickland* standard must be applied with
> scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity
> of the very adversary process the right to counsel is meant to serve.
> *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even under *de novo*
> review, the standard for judging counsel's representation is a most
> deferential one.  Unlike a later reviewing court, the attorney observed
> the relevant proceedings, knew of materials outside the record, and
> interacted with the client, with opposing counsel, and with the judge.  It
> is "all too tempting" to "second-guess counsel's assistance after
> conviction or adverse sentence."  *Id.*, at 689, 104 S. Ct. 2052; see also
> *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914
> (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L.
> Ed. 2d 180 (1993).  The question is whether an attorney's representation
> amounted to incompetence under "prevailing professional norms," not
> whether it deviated from best practices or most common custom.
> *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult.  The standards
> created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at
> 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.
> Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem,
> review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at [125], 129
> S. Ct. at 1420 [(2009)].  The *Strickland* standard is a general one, so the
> range of reasonable applications is substantial.  556 U.S., at [123], 129
> S. Ct. at 1420.  Federal habeas courts must guard against the danger of
> equating unreasonableness under *Strickland* with unreasonableness
> under § 2254(d).  When § 2254(d) applies, the question is not whether

54

> counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 787-88 (alterations supplied); *see also Premo v. Moore*, — U.S. —, 131 S. Ct. 733, 739-40 (2011).

## V.  FERGUSON'S CLAIMS

**A**.   **The Trial Judge Violated Ferguson's Constitutional Rights to Due Process and Equal Protection When He Disregarded the Jury's Nearly Unanimous 11-1 Verdict Recommending a Sentence of Life Without Parole**.[26]

When examining this claim, this court identified matters appearing to be remnants of previous state court claims that focused on the constitutionality of Alabama's sentencing statute (*i.e.*, *per se,* standing alone), and *not* the statute's particular application to Ferguson's case.[27]   However, a constitutional attack on Alabama's statutory sentencing scheme is not, and cannot be, the decisive issue in Ferguson's *habeas* claim.  Indeed, Ferguson concedes that the Supreme Court's opinion in *Harris v. Alabama,* 513 U.S. 504 (1995), already had decided that Alabama's sentencing scheme "'adequately channels the sentencer's discretion so as to prevent arbitrary results.'"[28]  *Id.* at 511.  The *Harris* Court also decided that "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence.  It is

---

[26] *See* doc. no. 9, ¶¶ 17-33, at 6-13 (petition); doc. no. 15, ¶¶ 1-7, at 3-6 (reply brief).

[27] *See* doc. no. 9, at 10-11.

[28] *Id.* at 10.

55

thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it proper weight." *Id*. at 515 (alteration supplied).

Therefore, to the extent that Ferguson's pleadings complain about the type of standards that should be part of, or the purported lack of standards associated with, Alabama's statutory sentencing scheme, which permits a trial court judge in capital cases to override a jury's sentencing recommendation, such contentions are due to be dismissed for not stating a claim upon which relief can be granted.

Placing that issue to the side, the aspect of the present *habeas* claim that must be addressed is the contention that the trial judge *applied* Alabama's sentencing statute to Ferguson's case in an arbitrary manner, thereby violating his rights to due process and equal protection.[29]  Specifically, Ferguson alleges that, "[w]*ithin the context of his case*, the trial court's judicial override of an impartial jury's sentencing recommendation was not 'adequately channeled' and therefore resulted in an arbitrary decision which is contrary to clearly established Federal law."[30]

**1**.    *Brief summary of the twofold claim*

The allegations underlying this claim are twofold.  First, Ferguson contends

---

[29] *Id.* at 6-13; doc. no. 15, at 3-6.

[30] Doc. no. 15, at 4 (emphasis and alteration supplied).

that the trial court's characterization of his wife's penalty phase testimony as an "emotional appeal" is factually flawed, and that her testimony was unreasonably discounted by the trial judge, in view of the fact that similar testimony by the State's witnesses was neither denigrated nor discounted as an "emotional appeal."[31]  From that platform, Ferguson then argues that the trial judge's decision to override the jury's nearly-unanimous, 11-1 recommendation for a sentence of life without parole was arbitrary, and "contrary to clearly established Federal law."[32]

The first aspect of Ferguson's claim appeared in the most rudimentary of forms on *direct* appeal.[33]  Ferguson received an automatic, independent appellate review of the propriety of his death sentence from the Alabama Court of Criminal Appeals on the first round of appeals following conviction and sentencing in the trial court.  *See Ferguson v. State*, 814 So. 2d 925, 968-70 (Ala. Crim. App. 2000).  The intermediate appellate court found "no evidence" that Ferguson's death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and held "that the findings and conclusions of the trial court are amply supported by the evidence." *Id.* at 970.  The intermediate appellate court also agreed with the trial judge's imposition of a death sentence, despite the jury's nearly unanimous recommendation

---

[31] Doc. no. 9, at 7-10.

[32] *Id.* at 9.

[33] *See* C.R. Vol. 9, Tab. 29, at 45 (direct appeal brief).

to the contrary, but only after engaging in an independent reweighing of the aggravating and mitigating circumstances of the case.  *Id.*

The second aspect of Ferguson's present claim is his contention that the trial judge violated his "right to equal protection" by failing to accord the jury's 11-1 recommendation *the weight* it was due as a mitigating circumstance under Alabama law:  an error that also resulted in an arbitrary and discriminatory imposition of the death penalty.[34]  This aspect of the claim arose for the first time during Rule 32, *post-conviction* proceedings, in response to what was then a recent clarification of Alabama's jury override standard by the Alabama Supreme Court in two cases: *i.e., Ex parte Tomlin*, 909 So. 2d 283, 286-87 (Ala. 2003), and *Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002).[35]  Although the Rule 32 court found this claim to be procedurally defaulted,[36] Ferguson raised the issue again on collateral appeal,[37] and received a second merits review of his sentence from the Alabama Court of Criminal Appeals.  *See Ferguson v. State*, 13 So. 3d 418, 431-32 (Ala. Crim. App. 2008).  The intermediate appellate court found that the trial judge's sentencing order — even though written before either *Carroll* and *Tomlin* were decided — nevertheless

---

[34] Doc. no. 9, at 12-13.

[35] *See* Rule 32 C.R. Vol. 13 at 274-91; 331-36 (motion to modify sentence in conformance with the *Tomlin* and *Carroll* decisions).

[36] *Id.*, Vol. 16, Tab. 51, at 62-64.

[37] *Id.*, Vol. 15, Tab. 42, at 11-15.

58

complied with the clarified override standard enunciated in those cases. *Id.* at 432.

2.   *The proper constitutional standard and* habeas *standard of review*

The combination of Ferguson's "as applied" constitutional claim, and two state

court adjudications affirming the propriety of his death sentence, means that the

> "federal constitutional question [presented to this court] is only whether the [Alabama] state courts' application of [the State's sentencing scheme] was arbitrary or discriminatory or, stated another way, whether it produced an arbitrary or discriminatory result." *Harris*, 513 U.S. at 511, 115 S. Ct. at 1035; *Spaziano* [*v. Florida*, 468 U.S. 447, 465, (1984)]. Moreover, AEDPA adds an additional layer of deference to [this court's] review because [that statute requires this court to] examine only whether the [Alabama Court of Criminal Appeals'] decision[s] — that the state trial judge did not arbitrarily apply [Alabama's sentencing scheme] — was contrary to, or an unreasonable application of, clearly established federal law evidenced in a holding of the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *see also* [*Berghuis v. Smith*, 559 U.S. 314, 326 (2010); *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)].

*Marshall v. Secretary, Florida Department of Corrections*, 610 F.3d 576, 588 (11th

Cir. 2010) (alterations supplied).

3.   *Analysis of Ferguson's twofold* habeas *claim*

   a.   *The trial judge unreasonably discounted Mrs. Ferguson's penalty phase testimony as an "emotional appeal," and overrode the jury's life recommendation on the basis of that finding, resulting in an arbitrary and discriminatory death sentence.*

At the time of Ferguson's trial, Alabama's sentencing statute instructed trial

59

court judges that they *must* (*i.e.*, "shall"[38])

> determine whether the aggravating circumstances it finds to exist
> outweigh the mitigating circumstances it finds to exist, and in doing so
> the trial court shall consider the recommendation of the jury contained
> in its advisory verdict. . . . *While the jury's recommendation concerning
> sentence shall be given consideration*, *it is not binding upon the court*.

Ala. Code § 13A-5-47(e) (1975) (emphasis supplied).

Ferguson alleges that his trial judge, when applying the foregoing statute, made

unreasonable factual determinations with regard to one part of his sentencing order,

which resulted in an arbitrary and discriminatory imposition of the death penalty.[39]

That part of Ferguson's sentencing order at issue reads as follows: "'The Court does

find that the Jury's recommendation of life imprisonment without parole is a

mitigating factor and the Court has considered said mitigating factor at the sentence

hearing.   However, the Jury was allowed to hear an emotional appeal from the

defendant's wife.'"[40]   Ferguson insists that the trial court's characterization of his

wife's testimony as "an emotional appeal" was unreasonable as a matter of fact

because "the court reporter did not note a single sob or cry from Mr. Ferguson's wife

---

[38] In law, the word "shall" means "must."  *Hicks v. Miranda*, 422 U.S. 332, 352 (1975) (Burger, C.J., concurring) ("It is well settled that 'shall' means 'must.'").  *See also*, *e.g.*, *United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) (Carnes, J.) ("The word 'shall' does not convey discretion.  It is not a leeway word.").

[39] Doc. no. 9, at 7-11; Doc. no. 15, at 3-4.

[40] Doc. no. 9, at 7 (quoting C.R. Vol. 16, Tab. 47, at 140).

in the fifteen lines of transcript reflecting her testimony."[41]   The relevant portion of

the trial transcript reads as follows:

> Yes.  I would like to ask the jury please don't kill my husband.
> I don't know how this happened or why this happened, but Dale is a
> good man and Dale does have a lot of goodness in him.  He really does.
> He has always been a good husband to me and he has always been really
> good to me, took care of me.  Dale has expressed to me on several
> occasions that he is really sorry this whole situation ever happened.  I
> will never get to be with my husband again as a husband and wife
> should be, but please don't take him away from me by killing him.  I
> love Dale very much.  Please don't — He does not deserve to die.
> Thank you.[42]

Ferguson presents two other reasons for his contention that the trial judge

unreasonably exaggerated the effect of Mrs. Ferguson's testimony on the jurors in

order to justify his decision to override the jury's 11-1 recommendation.  First, he

argues that there was "much lengthier victim impact testimony" from a close friend

of Mr. Pugh, and an elementary school teacher of Joey Pugh, that "focused on

personal remembrances of the Pughs."[43]  Ferguson describes the State's victim-impact

testimony as ranging "from a Sunday school class taught by Mr. Pugh, to his efforts

to mentor children he coached on a baseball team, to Joseph's favorite pencil and his

girlfriend,"[44] and asserts that those portions of such testimony that were

---

[41] *Id.*

[42] *Id.* at 7 (quoting R. Vol. 5, Tab. 19, at 821-22).

[43] *Id.* at 8-9.

[44] *Id*. at 8.

61

most similar to Mrs. Ferguson's statement requesting a sentence of life [came from] Mr. Pugh's lifelong friend[, who] spoke about "loss," (R. 776-87), and Joseph Pugh's teacher[, who] spoke of the event's "impact," (R. 784-85), combined for more than three times as many lines as Mrs. Ferguson spent requesting a life sentence for her husband.[45]

Second, Ferguson points out that, even though his trial counsel challenged the State's "planned aggravating testimony" at sentencing, "[n]either the State nor the trial court complained about Mrs. Ferguson's testimony during the penalty phase hearing . . . ."[46]

In essence, therefore, Ferguson argues that the State also presented an "emotional appeal" to the jury in the form of victim impact testimony; and that, despite defense counsel's objection, that testimony was not rejected by the trial court; whereas, Mrs. Ferguson's testimony was unfairly denigrated as "an emotional appeal," even though it was not objected to by the State or interfered with by the trial court during  the penalty phase hearing.[47]

_____

[45] *Id.* (alterations supplied).

[46] Doc. no. 9, at 8-9 (alteration supplied).

[47] Ferguson comments that the victim impact testimony was unrelated to the single statutory aggravating circumstance presented at the penalty phase:  *i.e.*, that the capital offense was committed while Ferguson was engaged in a robbery.  *Id.* at 8.  Then, in a footnote attached to this comment he writes:   "Although the sentencing order often refers to 'aggravating circumstances' when determining Ferguson's fate, the State only argued the existence of one aggravating circumstance, and the trial court only found one aggravating circumstance to exist."  *Id.* at 8 n.3 (record citations omitted); *see also* C.R. Vol. 16, Tab. 47, at 136-37, 140-41.  The foregoing sentences are cryptic assertions that do not forthrightly state a *habeas* claim.  This court finds that, if the two-sentence embedded comment is intended to state a *habeas* claim, it fails to satisfy the heightened pleading requirements for federal *habeas* pleadings, and it is due to be dismissed with prejudice.

Alternatively, the historic record shows that the two-sentence combination never was raised

####### i. *The decision of the Alabama Court of Criminal Appeals on direct appeal*

As briefly addressed in Part V.A.1, *supra*, the Alabama Court of Criminal Appeals conducted an independent review of the propriety of Ferguson's death sentence on direct appeal, as required by Alabama Code §§ 13A-5-51 and 13A-5-53(b) (1975). *See Ferguson v. State*, 814 So. 2d 925, 968-70 (Ala. Crim. App. 2000).

---

as a claim in state court. As such, it is obvious that, even if Ferguson's comment satisfied the heightened pleading requirements for federal *habeas* claims, it is precluded (procedurally defaulted) from federal review because Ferguson failed to first present it fairly to the state court, and it now would be defaulted pursuant to state procedural rules.

As a second alternative, the claim is due to be denied because it is without merit. Victim impact testimony is constitutionally permissible at capital sentencing proceedings, and there is no requirement that such testimony be "related" to a proffered aggravating factor. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (holding that there is no *per se* bar to the introduction of victim impact evidence and argument). Additionally, even though the trial judge did state the substance of the victim-impact testimony in his sentencing order, he did so only as part of an effort to summarize all of the testimony and evidence at each stage of the trial. *See* C.R. Vol. 16, Tab. 47, at 134. Importantly, there is no evidence that the trial judge gave significant consideration to the victim-impact testimony in that portion of the sentencing order in which he made specific findings regarding the existence or non-existence of any statutory aggravating circumstances. *Id.* at 136-37. The trial judge ultimately found one statutory aggravating circumstance, which was the only one argued by the State: *i.e.*, the capital offense was committed during the course of a robbery. *Id.* There also is no evidence that the trial judge considered the victim-impact testimony as some form of non-statutory aggravating circumstance, because — after addressing each of the statutory aggravating circumstances, and finding the existence of only one — he wrote in a separate paragraph: "The Court finds no other aggravating circumstances to exist." *Id.* at 137. In fact, the victim impact testimony is not mentioned at all in that portion of the trial judge's order where he determined the existence and weight of any aggravating or mitigating circumstances and thereafter decided to sentence Ferguson to death. Finally, while it is true that the trial judge often employed the plural phrase "aggravating *circumstances*" in his sentencing order, the order clearly reflects that he *found* only *one aggravating circumstance* as having been established by the evidence. The Alabama appellate courts reviewed the sentencing order on both direct appeal and again on collateral review, and found that only one aggravating circumstance had been proven. Thus, this court finds that the trial judge's use of the plural "*circumstances*" reflects only either careless writing or consideration of aggravating circumstances as a genre, and not the existence of more than one aggravating circumstance in Ferguson's case.

Such an independent appellate review is designed to minimize "any risk" of an "arbitrary or capricious" imposition of the death penalty, to "the extent that any risk . . . exists" under a sentencing scheme already found to adequately channel a sentencer's discretion. *Proffitt v. Florida*, 428 U.S. 242, 252-53 (1976). *See also Harris v. Alabama,* 513 U.S. 504, 509 (1995); *Gregg v. Georgia*, 428 U.S.153, 204-206 (1976). The Alabama Court of Criminal Appeals found that:

> The trial court's sentencing order reflects that[,] after considering all the evidence presented, the presentence report, and the advisory verdict of the jury[,] and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Ferguson to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.

> Ferguson was convicted of the offenses of murder committed during a robbery, murder of two or more persons by one act or pursuant to one scheme or course of conduct, and the murder of a child less than 14 years of age. These offenses are defined by statute as capital offenses. See § 13A–5–40(2), (10), and (15), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a robbery: *Sneed v. State*, 783 So. 2d 841 (Ala. Crim. App. 1999); *Hardy v. State*, 804 So. 2d 247 (Ala. Crim. App. 1999); [seven additional citations omitted]; see also, e.g., cases dealing with the murder of two or more persons pursuant to one course of conduct: *Wilson v. State*, 777 So. 2d 856 (Ala. Crim. App. 1999); *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999) [six additional citations omitted]; cases dealing with the murder of a child under 14 years of age: *Ward v. State,* 814 So. 2d 899 (Ala. Crim. App. 2000); *Dunaway v.*

64

*State*, 746 So. 2d 1021 (Ala. Crim. App. 1998).

After carefully reviewing the record of the guilt phase and the sentencing phase of Ferguson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.  We conclude that the findings and the conclusions of the trial court are amply supported by the evidence.  We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case.  Considering Ferguson and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

*Ferguson v. State*, 814 So. 2d at 969-70 (alterations supplied).

### *ii*.  *Analysis*

*Habeas* review begins with Ferguson's initial argument:  his contention that the historic record does not support the trial judge's characterization of his wife's testimony as an "emotional appeal."  The only evidence presented in support of that contention is the absence of any notation in the official court reporter's transcript that Mrs. Ferguson was sobbing during her testimony.  Nevertheless, even a cold reading of that portion of the transcript record of Mrs. Ferguson's statement provides support for the trial judge's determination that she made an emotional appeal for her husband's life.

Moreover, the trial judge was in a position to observe Mrs. Ferguson's

demeanor as she testified, and the *ore tenus* rule requires that deference be accorded to his opinion.  Indeed, live witnesses, testifying orally, may make a very different impression from that generated by a reading of their words on the cold pages of a transcript record.  Accordingly, the trial judge's finding is not an unreasonable determination of the facts in light of the evidence before the trial court.

Additionally, the reasonableness of the trial judge's assessment of the tenor of Mrs. Ferguson's testimony is not shaken, as Ferguson argues, by comparing her statements, delivered without objection by the State, to that of the "lengthier" victim impact testimony objected to by defense counsel.  The trial transcript shows that Mrs. Ferguson's testimony on her husband's behalf was more than the appeal quoted earlier, and *at least* as lengthy as the testimony of the two prosecution witnesses *combined*.[48]  Those witnesses — Dana Hester, a family friend, and Linda Freeman, a teacher — gave testimony that humanized the victims.  Unlike Mrs. Ferguson, however, neither Hester nor Freeman made any appeal on behalf of the victims or the community regarding the sentence to be imposed.  Instead, the nature and content of their constitutionally permissible testimony[49] was *in response* to the prosecutor's

---

[48] Mrs. Ferguson's testimony spreads across 22 pages opf the transcript.  *See* R. Vol. 5, Tab. 19, at 810-32.  In contrast, Dana Hester's testimony was about 13 pages in length, and Linda Freeman's testimony about 7 pages.  *Id.*, Tab. 18, pp. 765-85.

[49] *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (holding that there is no *per se* bar to the introduction of victim impact evidence and argument).

questions about the effect on, and loss to, the community as a result of the victims'

deaths,[50] and it contains none of the emotionally intense pleas of Mrs. Ferguson's

testimony.

Further, the trial judge did not arbitrarily denigrate Mrs. Ferguson's testimony

as an "emotional appeal," while crediting allegedly lengthier victim impact testimony

of the same type.[51]  In fact, the trial judge's statement of his reasons for overriding the

jury's sentencing recommendation did not mention the victim impact testimony at all.

> The Court does find that there is a reasonable basis for enhancing the
> jury's recommendation of life imprisonment without parole for the
> reasons stated herein, and this was a murder of [an] adult man and his
> young son during a robbery, and the defendant had the opportunity to
> reflect and withdraw from his actions and chose not [to] do so; that the
> defendant's capacity to appreciate the criminality of his conduct or to
> conform his conduct to the requirements of the law was not substantially
> impaired.[52]

The affirmation of the trial judge's sentencing decision by the Alabama Court

---

[50] *See* R. Vol. 5, Tab. 18, at 776, 784.

[51] The trial judge's sentencing order did contain a synopsis of all evidence presented at each
phase of the trial.  His summary of the State's evidence at the penalty phase is cursory:  *i.e.*,

> The State and the Defendant both made opening statements.  The State called
> two witnesses, Dana Hester, who testified that he was a close friend of Harold Pugh
> and had known him since the eighth grade.  He further stated Harold Pugh was active
> in the church and active in little league baseball with his son, Joey.
>
> Glenda Freeman testified that she was Joey Pugh's fifth grade teacher and
> knew he and Harold Pugh.

C.R. Vol. 16, Tab 47, at 134.

[52] *Id.* at 140 (alteration supplied).

of Criminal Appeals did not result in a death sentence that was arbitrary or capricious. As a result, Ferguson cannot show that his sentence was imposed in a manner that is either contrary to, or based upon an unreasonable application of, clearly established federal law. He also cannot demonstrate that it was based upon an unreasonable determination of the facts in light of the evidence before the trial court judge.

> **b**. *The sentencing judge did not afford the jury's recommendation the weight it was due under* Ex parte Carroll *and* Ex parte Tomlin; *and, as a result, Ferguson's death sentence was arbitrary and capricious*

As previously noted, while Ferguson's case was on direct appeal, the language of Alabama's sentencing statute instructed the trial judge to *consider* the jury's sentencing recommendation, but explicitly stated that the recommendation was "not binding upon the court." Ala. Code § 13A-5-47(e) (1975). After Ferguson's case became final on direct review, however, the Alabama Supreme Court added a gloss to the statutory language, addressing the weight to be accorded a jury's recommendation of life imprisonment without the possibility of parole.

> Such a recommendation is to be treated as a mitigating circumstance. *The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such recommendation in the form of information known to the jury*, such as conflicting evidence concerning the identity of the 'triggerman' or a recommendation of leniency by the victim's family; *the jury's recommendation may be overridden based upon information known only*

68

> *to the trial court and not to the jury*, when such information can properly be used to undermine a mitigating circumstance."

*Ex parte Tomlin*, 909 So. 2d 283, 285 (Ala. 2003) (quoting *Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002)) (emphasis supplied, footnote omitted).

Ferguson argues that the foregoing judicial gloss means "that a sentencing judge may justify overriding the jury's sentencing recommendation of life without parole only if the judge [and not the jury] had knowledge of circumstances (such as a bad criminal record) that would undermine the factual basis for the jury's recommendation."[53]  He asserts that, in his case,

> the court acted without any additional information that would undermine the factual basis for the jury's sentencing recommendation and failed to give adequate weight to the number of jurors voting in favor of life without parole (11 to 1).  In fact, the only information that was not provided to the jury was Mr. Ferguson's criminal record.[54]

Accordingly, Ferguson argues that the trial judge's determination that he did not have a significant history of prior criminal activity actually bolstered the jury's recommendation of a sentence of life without parole,[55] and demonstrated that the trial judge's override was not "based on reason," but upon "emotion or caprice."[56]  In sum, Ferguson contends that the trial judge's failure to follow the standards established by

---

[53] Doc. no. 15, at 5 (citations omitted) (alteration supplied).

[54] *Id.*

[55] *Id.* at 5-6.

[56] *Id.* at 6.

69

the Alabama Supreme Court's opinions in *Tomlin* and *Carroll*, violated his constitutional right to equal protection.[57]

Ferguson's interpretation of *Tomlin* and *Carroll* is incomplete.  While those cases do state that a jury's sentencing recommendation "may be" overridden by a trial judge based upon information known only to him, and not to the jury, the *Tomlin* court also held that the weight of the jury's recommendation could be affected by "information known to the jury, such as . . . ," and then proceeded to offer two examples.  It is that latter type of information — the type Ferguson ignores — that is applicable to his case.

> ***i.*** *The decision of the Alabama Court of Criminal Appeals on collateral review*

Ferguson received an appellate review of the propriety of the trial judge's death sentence under the *Tomlin* and *Carroll* override standards from the Alabama Court of Criminal Appeals during the collateral review process.  That court held that, even though the trial judge's sentencing decision was handed down prior to the Supreme Court's decisions in *Tomlin* and *Carroll*, the trial judge, nevertheless, had complied with the rationale of those cases.  That portion of the appellate court's opinion reads as follows:

---

[57] See doc. no. 9, at 12.

[T]he circuit court complied with [*Tomlin* and *Carroll*] when it chose to override the jury's recommendation and sentence Ferguson to death. When sentencing Ferguson to death, the circuit court [judge] stated:

"The Court does find that the jury's recommendation of life imprisonment without parole is a mitigating factor and the Court has considered said mitigating factor at the sentence hearing. However, the jury was allowed to hear an emotional appeal from the defendant's wife. The Court further finds that the defendant's problems during his childhood are not a mitigating factor.

"There was also evidence presented to the jury that Mark Moore was the instigator of the killings of Harold and Joey Pugh, but that fact alone does not make the defendant any less culpable and is not a mitigating factor. The defendant was able and capable to make choices.

"The Court has also considered the Pre-Sentence Investigation Report as set out in Section 13A-5-47, Code of Alabama, as amended, in determining a sentence in this case.

"The Court having considered the aggravating circumstances and the mitigating circumstances, finds that the aggravating circumstances due to the nature of the crime and the defendant's involvement in it outweighs the mitigating circumstances presented, and the mitigating factor that the jury recommended a sentence of life imprisonment without parole and the vote was 11 for life and 1 for death.

"The Court does find that there is a reasonable basis for enhancing the jury's recommendation of life imprisonment without parole for the reasons stated herein, and this was a murder of [an] adult man and his young son during a robbery, and the defendant had the opportunity to

reflect and withdraw from his actions and chose not [to] do
so; that the defendant's capacity to appreciate the
criminality of his conduct or to conform his conduct to the
requirements of the law was not substantially impaired."

The circuit court's sentencing order, although issued before the
decisions in *Carroll* and *Tomlin*, fully complies with those decisions by
stating the specific reasons the circuit court gave the jury's
recommendation[,] the weight it gave it[,] and by treating the jury's
recommendation as a mitigating circumstance. *Carroll* and *Tomlin* do
not state that a court must give "considerable" or "great" weight to the
jury's recommendation of life imprisonment without parole whenever
the vote in favor of life without parole is 10 or greater. Nor do we agree
with Ferguson that we should expand the Supreme Court's holdings in
*Carroll* and *Tomlin*. The holdings in those cases were fact specific and
should not be applied broadly in this case to "tip [ ] the scales in favor
of following the jury's recommendation." *Carroll*, 852 So. 2d at 837.

As we stated in *Sneed v. State*, 1 So. 3d 104, 116 (Ala. Crim. App.
2007):

> "In *Ex parte Carroll*, the Supreme Court held that a
> jury's recommendation of imprisonment for life without
> the possibility of parole must be considered as a mitigating
> circumstance. *Although the Supreme Court also stated that*
> *a jury recommendation could be overridden based on*
> *information that was not known to the jury, it did not state*
> *that that was the only circumstance in which a jury*
> *recommendation could be overridden.*

> "In this case, the trial court considered the jury's
> recommendation as a nonstatutory mitigating circumstance
> and gave it moderate weight. It then stated specific reasons
> for giving the jury's recommendation the consideration it
> gave it, including the appellant's participation in the
> robbery-murder and the jury's vote. Therefore, we
> conclude that the circuit court complied with both *Ex parte*

> *Taylor*[58] and *Ex parte Carroll* in overriding the jury's
> recommendation."

> *See also McGowan v. State,* 990 So. 2d 931, 1006 (Ala. Crim. App.
> 2003) (opinion on return to remand) ("Here, there was no conflicting
> evidence about who committed the murders, nor did the victims' family
> ask that McGowan be sentenced to life imprisonment without parole.
> The circuit court's findings as set out above are sufficient to comply
> with the dictates of *Taylor* and *Carroll*. *See Hodges v. State*, 856 So. 2d
> 875 (Ala. Crim. App. 2001).").

> Under the particular circumstances presented in this case, the
> circuit court complied with *Taylor*, *Carroll*, and *Tomlin* in overriding
> the jury's recommendation and sentencing Ferguson to death, and
> Ferguson's claim in his Rule 32 petition that application of those cases
> to his case requires that he be resentenced to life imprisonment without
> parole is without merit.

*Ferguson v. State*, 13 So. 3d 418, 431-32 (Ala. Crim. App. 2008) (first four

alterations and footnote supplied).[59]

---

[58] The Alabama Supreme Court held in *Ex parte Taylor,* 852 So. 2d 1215, 1219 (Ala. 2001),
that Alabama's sentencing statute required the trial judge to "state specific reasons for giving the
jury's recommendation the consideration he gave it."

[59] Judge Baschab, one of the five judges deciding Ferguson's collateral appeal, filed a dissent
from this portion of the intermediate appellate court's opinion. She wrote:

> The trial judge entered his sentencing order before the Alabama Supreme
> Court released its decisions in *Ex parte Taylor*, *Ex parte Carroll*, and *Ex parte
> Tomlin*. Nevertheless, he did state specific reasons for giving the jury's
> recommendation the consideration he gave it, as required by *Ex parte Taylor*, and did
> treat the jury's recommendation as a mitigating circumstance, as required by *Ex parte
> Carroll*. The trial judge did not specifically state what weight he gave the jury's
> recommendation. However, it does not appear to have been considerable, as was
> required with regard to a 10-2 recommendation in *Ex parte Carroll*, or great, as was
> required with regard to a 12-0 recommendation in *Ex parte Tomlin*. Because the jury
> recommended a sentence of imprisonment for life without the possibility of parole
> by a margin of 11-1, it is reasonable to conclude that it was entitled, at a minimum,
> to considerable weight. Moreover, as the trial judge recognized in his sentencing

*ii*.    *Analysis*

Ferguson insists that the trial judge violated his "equal protection rights by not giving proper weight to the jury's vote" in accordance with *Ex parte Tomlin* and *Ex parte Carroll*.[60]   He ignores, however, and does not challenge the intermediate appellate court's *interpretation* of the gloss layered on the State's statutory sentencing scheme by the Alabama Supreme Court's opinions in *Tomlin* and *Carroll*.[61]   The Alabama Court of Criminal Appeals held that, even though the Alabama Supreme Court stated that a jury's sentencing recommendation "'could be overridden based on information that was *not known* to the jury, *it did not state that that was the only circumstance in which a jury recommendation could be overridden*.'"   *Ferguson*, 13

---

order, there was information before the jury that established that the jury's recommendation rested upon an adequate factual basis.  Specifically, the trial judge made reference to an emotional appeal by the appellant's wife and to evidence regarding problems during the appellant's childhood.  Finally, the trial judge did not cite to any information that was not known to the jury when it overrode the jury's recommendation.

Under these specific circumstances, giving considerable weight to the jury's sentence recommendation when weighing the above-referenced mitigating circumstances against the one aggravating circumstance, I would conclude that the trial court erred in overriding the jury's recommended sentence of imprisonment for life without the possibility of parole.  Therefore, this court should remand this case to the circuit court for that court to resentence the appellant, following the jury's recommendation, to imprisonment for life without the possibility of parole.

*Ferguson v. State*, 13 So. 3d 418, 453 (Ala. Crim. App. 2008) (Baschab, J., dissenting in part).

[60] Doc. no. 9, at 12.

[61] *Id.* at 12-13.

So. 3d at 432 (quoting *Sneed v. State*, 1 So. 3d 104, 116 (Ala. Crim. App. 2007))
(emphasis supplied).

Moreover, Ferguson does not contest the intermediate state appellate court's
conclusion that the defendants in *Tomlin* and *Carroll* were granted relief on the basis
of facts specific to those cases — facts that do not exist in his case.  Indeed, a review
of both cases definitively shows that the circumstances underlying Ferguson's case
are not comparable to those of the defendants in either *Tomlin* or *Carroll*.

The pertinent facts underlying the capital offense in the *Carroll* case may be
found in *Carroll v. State*, 852 So. 2d 801, 806 (Ala. Crim. App. 1999).  Briefly,
however, Carroll, who was then seventeen years of age, along with another defendant,
participated in the robbery of a dry-cleaning business.  Although Carroll pointed a
gun at one victim and demanded that she give him her necklace, Carroll did not say
much else during the course of the robbery, and appeared nervous throughout.
Carroll later informed law enforcement that he did not intend to kill anyone, but that
his gun went off and accidentally killed a victim, whereupon he and his co-defendant
ran away.  *Id.* at 807.  The trial court overrode the jury's 10-2 recommendation for a
sentence of life without parole and sentenced Carroll to death.  *Id.* at 804-05.

After lengthy appellate litigation, the Alabama Supreme Court reversed the
death sentence on the basis of sentencing errors.  *See Ex parte Carroll*, 852 So. 2d

75

833, 835 (Ala. 2002).  As one of two reasons stated for reversal of the death sentence, the Alabama Supreme Court found that the trial court had impermissibly utilized a youthful offender conviction and incarceration to *negate* the statutory mitigating factors of Carroll's age and lack of significant criminal history.  *Id.* at 836 (holding that such a conviction can be used to *diminish* the mitigating factors under Alabama law, but not to negate them).  The Court also found that the trial court had referred to the pain the victim's family expressed at the sentencing hearing as a reason for the override, but failed to reference the fact that members of the family had stated that they did *not* desire Carroll to be sentenced to death.  *Id.* at 835-36.

In summary, the Alabama Supreme Court overturned the death sentence in *Carroll* because it found that the trial court had improperly used the defendant's "juvenile record as the basis for giving little or no weight" to the mitigating circumstances of his age at the time of the offense, and his lack of a significant criminal record.  The Court also could not "reconcile" the override based on the family's pain, when the family did not ask for imposition of the death penalty.  The Court held that, because of Carroll's

> age at the time of the offense, his lack of a significant criminal history, and the recommendation of the victim's family that he be sentenced to life imprisonment without parole, the jury's 10-2 recommendation that he not be sentenced to death tips the scales in favor of following the jury's recommendation."

*Ex parte Carroll*, 852 So. 2d at 837. No similar facts are present in Ferguson's case.

The Alabama Supreme Court's opinion in *Ex parte Tomlin*, 909 So. 2d 283 (Ala. 2003), addressed a case that had been tried and reversed three times. Tomlin and his co-defendant (a purported "hitman") were accused of capital murder for the 1997 double murder of Ricky Brune and Cheryl Moore, who had been killed with a shotgun and a .38 calibur pistol. *See Tomlin v. State*, 909 So. 2d 213, 224 (Ala. Crim. App. 2002). There were no eyewitnesses to the murders. The victims were found dead in an automobile on the side of Interstate 65 near Mobile. *Id.* at 224-25. The evidence showed that Tomlin had subsequently stated to witnesses, one of whom was an undercover narcotics officer in Houston, Texas, that he intended to kill Ricky Brune, because Brune had murdered his (Tomlin's) brother during an altercation. Moreoever, Tomlin and his co-defendant had shown a pistol and sawed-off shotgun to witnesses. Tomlin also had been seen by some witnesses in the Mobile area around the time of the murders, although Tomlin testified that he had been in Houston, Texas (his home-town), and that the witnesses who said he was in Mobile were lying because they did not like him. *Id.*

Tomlin was convicted of the capital offense, and the offense itself was the only aggravating factor. The State and defense counsel agreed to stipulate to the third trial jury's unanimous (12-0) recommendation of life without parole. *Id.* at 223.

77

Moreover, the trial court expressly found that Tomlin had been a model prisoner and spiritual role model during his incarceration (approximately twenty years at that time), that he had no significant history of (or reputation for) violence, and that he had "been a source of parental support for his children." *Ex parte Tomlin*, 909 So. 2d at 285-86. In spite of those mitigating factors, the trial court judge overrode the jury's unanimous recommendation of a life sentence solely because he did not believe it was "fair" to sentence Tomlin to life without parole when Tomlin's co-defendant had been sentenced to death for the same offense. *Id.* at 286. The Alabama Supreme Court held that a co-defendant's sentence "cannot properly be used to undermine a mitigating circumstance," and directed that Tomlin be re-sentenced to life without parole. *Id.* at 287.

Unlike either *Carroll* or *Tomlin*, Ferguson's sentencing judge did not rely on impermissible factors (or factors unknown to the jury) to negate the jury's recommendation, or factors constitutionally irrelevant to legitimate, individualized sentencing concerns, or factors that were in direct contradiction to witness testimony. The trial judge's sentencing order in this case was not a summary disposition, but 47 pages in length.[62] Before making his findings concerning the existence and weight of aggravating and mitigating factors, the trial judge set out the evidence presented

---

[62] C.R. Vol. 16, Tab. 47, at 1-47.

at each stage of the trial and incorporated the transcript of Ferguson's statement into it.[63]

Thus, Ferguson's complaints that the trial judge did not "**actually consider**" the jury's recommendation, and that he summarily dismissed it are without merit.[64] The sentencing order, as independently examined and affirmed by the Alabama Court of Criminal Appeals on two occasions — first on direct appeal, and again on collateral review — reflects that neither allegation is true.  The state courts' decisions not only reflect serious consideration of the jury's 11-1 life recommendation, but express acceptance of it as a mitigating circumstance.

Moreover, it was not unreasonable for the Alabama Court of Criminal Appeals to acknowledge, by virtue of its incorporation of a portion of the trial court's sentencing opinion, that the weight given to the jury's recommendation as a mitigating factor was affected by the trial court's belief that the recommendation was based on Mrs. Ferguson's "emotional" testimony and, perhaps, Ferguson's childhood — factors that the trial court could (and did) independently determine had little or no mitigating effect.  That portion of the trial judge's opinion incorporated by the appellate court also included the trial judge's finding that the override was justified

---

[63] *Id.*

[64] Doc. no. 9, at 13 (emphasis by Ferguson).

79

by the nature of the offense, and Ferguson's willing, *continued* participation in the complex criminal scheme that began in Alabama and ended in Mississippi.

Since the trial judge expressly believed that the jury's recommendation depended on Mrs. Ferguson's emotional appeal and, perhaps, on evidence about Ferguson's childhood, his independent determinations regarding the lack of mitigating weight or effect as to both matters obviously affected his assessment of the strength of the facts underlying the jury's 11-1 determination that the aggravating circumstances were outweighed by mitigating factors. After reviewing the entire record, the trial judge's sentencing order, and Alabama case law, it was not unreasonable for the Alabama Court of Criminal Appeals to conclude that the weight the trial judge gave to the jury's 11-1 recommendation was diminished for permissible reasons.

Equally important to the override is the strength the trial judge afforded to the aggravating factors in the case: *i.e.*, the complex nature of the criminal scheme that began in Alabama and extended into Mississippi, and Ferguson's knowing and continued participation in it.

The strength of the aggravating circumstances of the case must be weighed against the weight of the other mitigating factors found by the court. The sentencing order shows that the trial judge found the penalty case against Ferguson to be strong,

in that Ferguson participated in lengthy plans to (and did personally) rob and kill an adult and small child — all of which were precursors to yet another crime in another state: the Mississippi bank robbery. After weighing these matters, including the jury's sentencing recommendation and other mitigating circumstances, the trial judge determined that the balance tipped in favor of the death penalty.

Ultimately, it is not the duty of this court to weigh and reweigh the mitigating and aggravating circumstances, or to question Alabama's interpretation of its own sentencing scheme. This court's only concern is that the state courts' assessments did not produce an arbitrary or discriminatory result. The Alabama Court of Criminal Appeals' determination that Ferguson's death sentence was not the result of any arbitrary or discriminatory decisions by the sentencing judge is due to be upheld. The distinctions between Ferguson's case and that of the defendants in *Tomlin* and *Carroll* affirm that the state court's decision did not produce such a result.

For all of the foregoing reasons, this court finds that the Alabama Court of Criminal Appeals' adjudications of this twofold claim did not produce an arbitrary or discriminatory result. Thus, Ferguson has not shown that his sentence is contrary to, or an unreasonable application of, clearly established federal law, or the product of decisions based on unreasonable determinations of the facts in light of the evidence before the state court. This claim is due to be denied.

81

B.    **Ferguson's Constitutional Rights Were Violated When He Was Involuntarily Medicated by the State and, Thereby, Rendered Incompetent to Stand Trial.**[65]

Ferguson claims that "Haldol"® — *i.e.*, an antipsychotic medication used in the treatment of such mental disorders as schizophrenia, acute psychosis, mania, Tourette syndrome, and severe anxiety[66] — was administered without his consent, and that the drug rendered him incompetent during trial.[67]

The manner in which Ferguson frames this claim implicates the "substantive" dimension of the Fourteenth Amendment's Due Process Clause in two ways.[68]   On

---

[65] *See* doc. no. 9, ¶¶ 34-40, at 13-18 (petition); doc. no. 15, ¶¶ 8-11, at 6-8 (reply brief).

[66] *See* PHYSICIANS' DESK REFERENCE 2334, 2593, 2757 (64th ed. 2010).

[67] *See*, *e.g.*, doc. no. 9, at 13-15.

[68] *Cf.*, *e.g.*, Erwin Chemerinsky, *Constitutional Law Principles and Policies* § 7.1 (2006) (discussing the distinction between the "procedural due process" and "substantive due process" doctrines under the Fourteenth Amendment's Due Process Clause).

> *Procedural due process* . . . refers to the procedures that the government must follow before it deprives a person of life, liberty, or property.  Classic procedural due process issues concern what kind of notice and what form of hearing the government must provide when it takes a particular action.
>
> *Substantive due process* . . . asks whether the government has an adequate reason for taking away a person's life, liberty, or property.  In other words, substantive due process looks to whether there is a sufficient justification for the government's action. . . .
>
> . . . .
>
> The concept of procedural due process never has been controversial, although there certainly have been major disputes over what constitutes liberty and property interests and what procedures should be required.  In contrast, the very idea of substantive due process has been contested.  The argument is that due process connotes procedures and that it is incorrect to use the due process clause as the place

82

one hand, a criminal defendant possesses a right under the so-called "substantive due process" doctrine to *not* be prosecuted, tried, and convicted while incompetent. *See*, *e.g.*, *Watts v. Singletary*, 87 F.3d 1282, 1286 (11th Cir. 1996) (majority opinion) (citing *Pate v. Robinson*, 383 U.S. 375, 377 (1966)). A defendant is not competent if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and he also does not possess "a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*) (internal quotation marks omitted).

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right of effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring)).

On the other hand, the Supreme Court also has recognized that a convict "possesses a significant liberty interest [under the substantive dimension of the Due

---

*Id*. at 545-46, 547 (italics in original, footnote omitted). Despite the fact that the phrase "substantive due process" appears to be an oxymoron (*i.e.*, a figure of speech combining antithetical, incongruous terms), both the Supreme Court and Eleventh Circuit have applied that doctrine to facts similar to those addressed in the present claim, as demonstrated by the textual discussion following this footnote.

Process Clause] in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221 (1990) (alteration supplied) (citing, *e.g.*, *Vitek v. Jones*, 445 U.S. 480, 491-94 (1980) (holding that the involuntary transfer of a state prisoner to a mental hospital implicates a liberty interest protected by the substantive dimension of the Fourteenth Amendment's Due Process Clause)).

Respondent does not draw any distinction between Ferguson's claim of involuntary medication and his attached claim of drug-induced incompetency at trial. Instead, Respondent simply asserts that the claim as a whole is procedurally defaulted, because Ferguson failed to raise it either at trial or on direct appeal.[69] Alternatively, Respondent argues that Ferguson is not entitled to a hearing in this court, because he failed to present a factual basis for the claim in the state court.[70] Finally, Respondent denies the claim.

Ferguson's claim that an anti-psychotic medication was administered against his will is, in large part, subsumed within his contention that the drug rendered him incompetent during trial. Accordingly, discussion will begin with the procedural posture of the latter contention.

**1**.     *The procedural posture of Ferguson's contention that he was incompetent at trial due to the involuntary administration of Haldol.*

_____

[69] Doc. no. 12, at 17-18.

[70] *Id.*

84

Ferguson does not deny that he failed to allege, either in the trial court or on direct appeal, that he was incompetent during trial.  Even so, he correctly observes that claims of incompetency to stand trial cannot be procedurally defaulted in this Circuit.[71]   Indeed, the Eleventh Circuit addressed the procedural default rule applicable to a trial competency claim under the substantive dimension of the Due Process Clause, *and* the proper constitutional standard applicable to such a claim, in *Wright v. Secretary, Department of Corrections*, 278 F.3d 1245 (11th Cir. 2002), where the Court said:

> The district court's ruling that Wright had procedurally defaulted his substantive due process mental competency claim is contrary to the law of this circuit that such claims generally cannot be defaulted.  *See Johnston v. Singletary*, 162 F.3d 630, 637 (11th Cir. 1998); *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995); *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir. 1985).  Bound as we are to follow prior panel precedent, we conclude that Wright's substantive due process claim relating to mental competency is not procedurally barred, and we will address its merits.  We review it without any § 2254(d)(1) deference, because there is no state court decision on the merits of this claim.

*Wright*, 278 F.3d at 1259.

Other than simply stating that substantive due process trial competency claims can never be procedurally defaulted, Ferguson makes no effort to explain the

---

[71] Doc. no. 15, at 6-7 ("The *Sykes* procedural default rule does not, however, preclude review on the merits of a postconviction incompetency claim, even if that claim was not raised on direct appeal.") (quoting *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)) (other citation omitted).

distinction between the drug-induced incompetency aspect of his claim, and the forcible medication aspect of the claim. Regardless, this court will assume, without deciding, that there is no distinction when the substantive due process trial competency claim also forms the hinge upon which a petitioner relies to establish that he was denied a full and fair trial in the context of a substantive forcible medication claim. As such, the claim as a whole is not procedurally defaulted, and is subject to *de novo* review.

> **2.** *The law applicable to the claim of drug-induced incompetency to stand trial*

Ferguson relies solely upon *Washington v. Harper*, 494 U.S. 210 (1990), for the proposition that "[t]he forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty." *Id*. at 229 (alteration supplied). The *Harper* holding was not rendered in a *habeas* proceeding, however, but in the context of a civil rights action that had been commenced by a mentally-ill state prisoner who challenged a prison policy that authorized his involuntary treatment with antipsychotic drugs in the absence of a judicial hearing. Even so, as the following extract from the Supreme Court's subsequent opinion in *Riggins v. Nevada*, 504 U.S. 127 (1992), demonstrates, the Court extended *Harper's* rationale to the *habeas* appeal of a Nevada prisoner

convicted of capital murder, and who had argued that the involuntary administration

of an antipsychotic drug had denied him "a full and fair trial":

> Taking account of the unique circumstances of penal confinement, . . . we determined [in *Washington v. Harper*, 494 U.S. 210 (1990),] that due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id*. at 227, 110 S.Ct., at 1040.

> Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial. See *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877, 60 L. Ed. 2d 447 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 2404, 96 L. Ed. 2d 282 (1987) ("[P]rison regulations . . . are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"). Thus, once (Riggins) moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.

> Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. See *Harper*, *supra*, 494 U.S., at 225–226, 110 S. Ct., at 1039; *cf. Addington v. Texas*, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to

be mentally ill and dangerous).  Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.  See *Illinois v. Allen*, 397 U.S. 337, 347, 90 S. Ct. 1057, 1063, 25 L. Ed. 2d 353 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace").  We note that during the July 14 hearing Riggins did not contend that he had the right to be tried without Mellaril if its discontinuation rendered him incompetent.  See Record 424–425, 496, 500.  The question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial is not before us.

*Riggins*, 504 U.S. at 134-36 (first alteration supplied, remainder in original).

The Eleventh Circuit explicated the relevant legal principles in *Medina v. Singletary*, 59 F.3d 1095 (11th Cir. 1995), saying that:

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *James v. Singletary*, 957 F.2d 1562, 1569-70 (11th Cir. 1992) (citing *Pate v. Robinson*, 383 U.S. 375, 384-86, 86 S.Ct. 836, 841-42, 15 L. Ed. 2d 815 (1966); *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)).  The test for determining competence to stand trial is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky*, 362 U.S. at 402, 80 S. Ct. at 789.

. . . .

A petitioner may make *a substantive competency claim* by alleging that he was, in fact, tried and convicted while mentally incompetent. [*James v. Singletary*, 957 F.2d] at 1571.  *In contrast to a procedural competency claim, however, "a petitioner raising a*

88

*substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.*" *Id.* *A petitioner who presents* "clear and convincing evidence" *creating a* "real, substantial and legitimate doubt" *as to his competence to stand trial is entitled to a hearing on his substantive incompetency claim. Id.* at 1573 (quoting *Felidae* [*v. Dugger*], 819 F.2d [1564], 1568 n.1 (11th Cir. 1987)[)]. *To show entitlement to a postconviction evidentiary hearing on a substantive competency claim*, "*the standard of proof is high* [and] *the facts must positively, unequivocally, and clearly generate the legitimate doubt.*" *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (quotations omitted), cert. denied, 510 U.S. 839, 114 S. Ct. 121, 126 L. Ed. 2d 86 (1993). A presumption of correctness attaches to a state court's finding of competence and a federal habeas court must determine that the finding is not "fairly supported by the record" before it may overturn the state court's decision. *Maggie v. Mulford*, 462 U.S. 111, 117, 103 S. Ct. 2261, 2264, 76 L. Ed. 2d 794 (1983); *Card*, 981 F.2d at 484 n. 5 (citing *Demosthenes v. Baal*, 495 U.S. 731, 110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990)). A district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a petitioner's competence to stand trial is reviewed for clear error. *Card*, 981 F.2d at 483–84.

"[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Id.* at 487–88 (quoting *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir.), *cert. denied*, 469 U.S. 1193, 105 S. Ct. 972, 83 L. Ed. 2d 975 (1985)). Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976). The fact that a defendant has been treated with anti-psychotic drugs does not *per se* render him incompetent to stand trial. *Felidae*, 819 F.2d at 1569.

*Medina*, 59 F.3d at 1106-07 (emphasis supplied, final alteration in original, all others

supplied).

The principles outlined in *Medina* were applied to the facts of *Wright v. Secretary, Department of Corrections*, 278 F.3d 1245 (11th Cir. 2002), in which the Court held that the petitioner had not carried his burden of proof.

> The fact that [the petitioner] suffers from chronic schizophrenia[,] the effects of which have come and gone over the years[,] is not enough to create a real, substantial, and legitimate doubt as to whether he was competent to stand trial in January of 1987.  His incompetency to stand trial seven and eight months later, like his incompetency to stand trial seventeen years earlier, is relevant, but it is not enough to counter the best evidence of what his mental condition was at the only time that counts, which is the time of the trial.  *The best evidence of Wright's mental state at the time of trial is the evidence of his behavior around that time, especially the evidence of how he related to and communicated with others then.*  The unrebutted evidence at trial is that in the days and weeks leading up to the trial Wright behaved in a perfectly normal fashion, related well to others, and had no problem at all communicating with them.  There is no evidence that he behaved abnormally at trial, nor is there any evidence that he had any problem understanding the charges against him or communicating with his counsel.  This claim fails on the merits.

*Id.* at 1259 (alterations and emphasis supplied).

> **3.**  *Analysis of Ferguson's behavior and mental state at the time of trial as it bears upon his claim under the substantive component of the Due Process Clause that the administration of antipsychotic medications by state officials prior to trial rendered him incompetent at trial.*

Ferguson begins his argument with the statement that he "was . . . medicated with Haldol prior to and during his trial," and the allegation (attributed to Dr. James

90

F. Chudy) that the drug was prescribed by "'a resident from the University of South Alabama.'"[72]  Ferguson explained the effects of Haldol as follows:

> Haldol is an anti-psychotic (Butyrophene) tranquilizer available by prescription only.  (R. 797).  Haldol is used to treat people with thought disorders, who may experience delusional thoughts, hallucinations, confusion, or erratic thinking.  *Id.*  Haldol produces calmness and sedation without sleep and does away with hallucinations and delusions.  Generally, patients who are properly prescribed the drug become more responsive.   On the other hand, the side effects of Haldol can be severe and include symptoms such as "confusion, drowsiness and lethargy."  *Cabanilla v. Bates*, No. 99-16074, 2000 WL 1693675, at *2 (9th Cir. Nov. 13, 2000).  Other side effects include
>
> > Parkinsonian effects (*e.g.*, rigidity, tremors, muscle stiffness, shuffling gate, stooped posture), akathisia (described . . . as a kind of restlessness), dystonic reactions (slow, sustained, muscular contraction or spasm that can result in an involuntary movement involving the neck, jaw, tongue, or entire body), tardive dyskinesia (repetitive tics, or movements that typically involve the face, mouth or upper extremities) and in some cases neuroleptic malignant syndrome, a relatively rare condition that can lead to death from cardiac dysfunction.

*United States. v. McCray,* 474 F. Supp. 2d 671, 675-76 (D. N.J. 2007).[73]

Ferguson alleges that unnamed "family members" remarked that he was "unusually quiet, withdrawn and non-responsive" during the trial.[74]   Other unidentified "witnesses" allegedly could testify, if this court were to conduct an

---

[72] Doc. no. 9, at 15-16 (quoting testimony of Dr. James F. Chudy, found at R. 796).

[73] *Id*.

[74] *Id.* (alteration supplied).

evidentiary hearing, that Ferguson "stared vacantly throughout the trial[,] and had no visible responses to most of the proceedings."[75]   One unidentified juror, a nurse, allegedly said that "Ferguson seemed to be medicated throughout his trial, as he seemed to be removed from everything."[76]   "Another [unidentified] juror recognized that Mr. Ferguson looked pasty-faced and ill."[77]

It is important to note that Ferguson's original statement of this claim did not allege that Haldol impaired his ability to rationally understand trial proceedings, or the factual underpinnings of the charges against him, or deprive him of the ability to consult with his lawyer during the course of trial with a reasonable degree of rational understanding.

Nevertheless, Ferguson's reply brief "proposes to offer" evidence that "he was unable to consult with his lawyer and to have a rational understanding of the proceedings against him."[78]   Even so, Ferguson's proposed evidence does not include testimony from his trial attorneys, or any other person who engaged in direct communication with him during the course of trial.   In other words, the evidence he proposes to elicit would not demonstrate that he was unable to understand the nature

---

[75] *Id.*

[76] *Id.* at 16.

[77] *Id.* at 16-17 (alterations supplied).

[78] Doc. no. 15, at 7.

of the trial proceedings, or unable to communicate with and assist his attorneys during the course of trial due to the ingestion of Haldol. In fact, his proposed evidence depends solely upon the visual observations of his alleged demeanor by *unidentified* family members, witnesses, and jurors.[79]   The observations of unidentified family members, witnesses, or others would not clearly and convincingly give rise to doubt that Ferguson was competent during trial.

Moreover, there is no indication in the record presented to this court that any mental health expert, courtroom deputy, court reporter, probation officer, or the trial judge expressed any concern about Ferguson's competency, based upon his behavior, communication ability, or apparent comprehension skills.

It also is important to note that Ferguson alleged in state post-conviction proceedings that *he ceased taking Haldol one to two weeks prior to the beginning of trial*.[80]

    **a.**    *The report of the court-appointed psychologist, Dr. C. Van Rosen*

Admittedly, Ferguson's trial attorney filed a motion for a psychiatric evaluation on October 8, 1997, requesting a determination of whether Ferguson was competent, both at the time of the offense, as well as for trial.[81]   The trial judge granted the

---

[79] *Id.*

[80] Rule 32 C.R. Vol. 12, Tab. 40, at 24.

[81] C.R. Vol. 1, Tab. 1, at 21-22 (alteration supplied).

motion on November 10, 1997, and ordered an outpatient evaluation of Ferguson by

Dr. C. Van Rosen, a forensic psychologist.  The mental health examination occurred

on December 18, 1997.[82]  Dr. Rosen spent six hours with Ferguson, three of which

were dedicated to the administration of psychological tests:  *e.g.*, a mental status

examination; a competency to stand trial assessment instrument; a wide range

achievement reading subtest; and a Weschler Adult Intelligence Scale – Revised

("WAIS-R").[83]  Ferguson received a full scale IQ score of 69, but Dr. Rosen declared

that it was "quite apparent" that Ferguson was not attempting to make a good effort.[84]

Ferguson reported that he began taking Haldol in November of 1997.[85]

Therefore, Dr. Rosen spoke with members of the

> Metro Jail nursing staff, who reported that Mr. Ferguson was being seen
> by the jail psychiatric consultant.  He was receiving antidepressant
> medication as well as *a low dose of an antipsychotic medication*,
> although [Ferguson was] not seen as psychotic and in fact [received] a
> diagnosis of Post-Traumatic Stress Disorder.[86]

Dr. Rosen reported that the information concerning Ferguson's mental status

was "uncorroborated  and  therefore  unsubstantiated,"  and  that  "much  of  this

---

[82] *Id.*, at 23-25.

[83] R. Vol. 7, at 115 ("State's Ex. 94").

[84] *Id.* at 121.

[85] *Id.* at 115-124.

[86] *Id.* at 117 (emphasis and alterations supplied).

94

information may be self-serving and partially inaccurate."[87]  He noted that Ferguson

had "some vaguely articulated thoughts of suicide but appeared to be trying to gain

attention for his mental disturbance and consequently exaggerating this

considerably."[88]

Dr. Rosen declared that there was no evidence that Ferguson was then, or had

ever been, psychotic, or that he suffered from Post-Traumatic Stress Disorder.[89]

Instead, he diagnosed Ferguson as suffering from cannabis and alcohol abuse, a

personality disorder with antisocial and borderline traits, and borderline intellectual

functioning.[90]

Dr. Rosen's based his diagnoses on the following information obtained from

Ferguson during his interview.  Ferguson reported that he began "'sniffing gas' and

'spray paint'" at age nine or ten, and that he did so until he was fifteen, when he

switched to marijuana, which he continued to use until the date of his arrest for

capital murder.[91]  He also began drinking alcohol at age fifteen, and his consumption

intensified until he reached the point of passing out most days of the week —

---

[87] *Id.*  (alteration and redaction supplied).

[88] R. Vol. 7, at 123 ("State's Ex. 94").

[89] *Id.*

[90] *Id.*

[91] *Id.* at 118.  Dr. Rosen also believed that Ferguson possibly had engaged in long-term abuse of other drugs, such as cocaine.  *Id.* at 123.

although Ferguson added that he had stopped drinking to that extent within the year preceding the crime for which he was to stand trial, except for the occasional ingestion of a six-pack of beer.[92]

Ferguson reported that he "consistently" heard "unusual sounds" — sounds heard by no one else, and sounds that he described as "voices." He said that "the voices" were sometimes associated with "little green men" who could be seen only out of the corners of his eyes, and that the "little green men" would tell him to steal things or hurt people. He added that he sometimes saw walls moving.[93] Dr. Rosen opined that Ferguson's hallucinatory descriptions were not "reflective of [a] psychotic process," but were, instead, embellished stories that became increasingly bizarre during the course of his interview.[94] In Dr. Rosen's opinion, Ferguson was neither "out of touch with reality" nor "psychotic," but was, instead, attempting to portray himself as "emotionally disturbed."[95]

Dr. Rosen pronounced Ferguson as competent to stand trial, saying that he: understood the nature of the charges against him, and the potential range of penalties that could be imposed upon a conviction; possessed "a relatively good understanding

---

[92] R. Vol. 7, at 118 ("State's Ex. 94").

[93] *Id.* at 120.

[94] *Id* (alteration supplied).

[95] *Id.*

96

of the roles of various participants in the courtroom setting"; and, enjoyed a good

relationship with his attorney.[96]  Dr. Rosen's report of his evaluation included the

following observations:

> The defendant was dressed in a standard metro jail jumpsuit and
> showed acceptable personal hygiene and adequate grooming. He did not
> appear to have any visual, auditory or speech difficulties.  He moved
> with normal gross and fine coordination.  His physical health appeared
> to be without significant difficulties and he made no complaints of any
> physical ailments during the examination.
>
> The defendant was aware of the ebb and flow of court procedures.
> He was able to understand and articulate, after some explanation, his
> understanding as to why his attorney was the only one who could call on
> him to testify.  He was aware that he needed to cooperate with his
> attorney and to behave with propriety in the courtroom.  The defendant
> additionally voiced an understanding of the process of plea-bargaining.
> As noted elsewhere, he was able also to provide an extremely detailed
> account of the overall story as to the sequence of events before his
> alleged criminal actions, a version of what had happened[,] and also a
> detailed account as to what transpired afterwards.
>
> Based on this interview, it appears that Mr. Ferguson is quite
> capable of assisting his attorney in the preparation for his defense and
> behaving in an essentially normal manner during the trial.   The
> defendant's memory regarding the situation is relatively good, his trust
> in his attorney[97] appears to be well above average and he is motivated
> to defend himself to the best of his ability.[98]

Dr. Rosen's written report was admitted into evidence during the penalty phase

---

[96] R. Vol. 7, at 123-24 ("State's Ex. 94").

[97] Attorneys Kenneth Millican and Tony Glenn were representing Ferguson at this time.

[98] R. Vol. 7, at 121-22 ("State's Ex. 94") (alteration and footnote supplied).

of trial before the jury.[99]  His testimony during that phase echoed those portions of the report quoted above.[100]  While Dr. Rosen perceived Ferguson as "depressed" during his interview, he did not believe that Ferguson's demeanor was consistent with a full blown depression.[101]  He expressed his belief that Ferguson's personality disorder had borderline traits, because of mood swings, and added that "there is some unusual thinking . . . and occasionally he can do some things that are perhaps somewhat out of touch with reality at least in a transient or temporary state."[102]

> **b**.    *The report of Ferguson's retained psychologist, Dr. James F. Chudy*

Ferguson's defense attorneys retained a clinical psychologist, Dr. James F. Chudy, who conducted psychological evaluations on June 9 and 13, 1998.[103] Ferguson's trial began nine days after the last evaluation.[104]  Ferguson was found guilty of capital murder three days later, on June 25, 2008, and the penalty phase of his trial began immediately thereafter.[105]  Dr. Chudy's report of his evaluation was

---

[99] *Id.* at 115-24.

[100] R. Vol. 5, Tab. 20, at 833-46; *id.*, Vol. 6, at 847-61.

[101] R. Vol. 5 at 847.

[102] *Id.*

[103] R. Vol. 8, at 327-34 ("Defendant's Ex. 1").  Dr. Chudy testified that psychological testing was conducted on the first day of evaluation, and his interview of Ferguson was conducted the second day of evaluation. R. Vol. 5, Tab. 19, at 801.  He interviewed Ferguson for four hours.  *Id.*

[104] *Id.,* Vol. 1, Tab. 1, at 4.

[105] *Id.*

98

admitted into evidence during the penalty phase. He wrote that Ferguson had

provided "coherent" responses to questions, and that he had provided

> answers that were logical and goal directed. It was apparent from the questioning that he was coherent when it came to understanding the legal proceedings and the charges against him. He understood the judicial process and he understood what would happen if found guilty.

> Mr. Ferguson's overall functioning showed that he was a somewhat dull, listless person who lacked spontaneity during the interview process. His affect was flat and unchanging and his mood was sad. There were no signs of disturbance in his thinking, although he noted that he had been hearing voices for some time, most intensely right after he was placed in jail. He claims that in the past these voices have directed him to do things against other people. Since being in Metro jail he has been placed on medication including Haldol, Artane and Anafranil. He claims that he is calmer and hearing voices less regularly.

> Mr. Ferguson also related his long history of emotional instability which included periods of depression with suicidal acts. He claimed that after finding out about his biological father he seriously contemplated suicide.[106] Also, when his wife was threatening to leave him, he put a gun to his head which his wife took away from him. This was confirmed by his wife. Mr. Ferguson claims additionally that he has a lot of problems in social relationships. He often feels suspicious and threatened around others. He claims that at times he has even confronted people when he thought they were making reference to him.

> . . .

> During administration of the tests, Mr Ferguson seemed to put forth his best effort. His concentration was somewhat variable but generally he was able to focus well enough to complete the tasks

---

[106] Karen Ferguson testified at the penalty phase before the jury that her husband was not told until he was seventeen years of age that his stepfather was not his biological father.

presented. At times he would stare off as he contemplated an answer but on most of the questions and tasks, he seemed to respond in a fairly efficient manner.

. . . .

Emotional Functioning

The testing showed fairly high levels of anxiety and depression. Mr. Ferguson feels anxious and worried about his present circumstances, however, he seems to show more chronic signs of anxiety as well. He feels vulnerable and easily threatened by others, often over-evaluating situations for potential rejection or humiliation. Being so defensive he is capable of reacting with anger when threatened or feeling unfairly treated. However, he is not likely to be impulsive or volatile with his anger. Mr. Ferguson also reports a rather significant level of depression. Currently he is taking medicine that is managing both his anxiety and depression but he admits to a history of suicidal thoughts and acts which preceded his current situation. In both cases he refrained from acting out the suicidal intentions. His testing showed a pattern typical of someone with unstable moods that would include some rather severe depressive swings related to situational factors. These swings might also be due in part to drug abuse.

A pattern similar to individuals with psychotic symptoms was present on the testing. Likewise, Mr. Ferguson shared experiences where he heard voices directing him to do things and had visual hallucinations of seeing people and objects move. The accuracy and extent of these reported experiences remains in question. However, in discussions with his wife she claimed that he told her on various occasions of hearing voices which worsened with the stress of his present situation. He reports that these symptoms had improved with medication provided through a prison psychiatrist. Mr. Ferguson does not display florid psychotic thoughts but his thinking shows evidence of being illogical. His thinking also shows elements of indecisiveness and ambivalence where problem solving and judgement may be adversely

100

affected.[107]

Dr. Chudy's pre-trial diagnosis was "Major depression moderate."[108]  Chudy

stated that, "[a]t one point [Ferguson's depression] was severe[,] because he was more

suicidal and [was] being treated with medication in jail[,] which seems to be helping

him."[109]  In forming his opinion, Chudy had looked at the "evaluation [made by the

medical] resident who was treating [Ferguson] at the jail facility."[110]  When asked

what medication was being administered to Ferguson, Chudy testified: "They are

giving him two — . . . one what they call neuroleptic or antipsychotic medication

named Haldol, then they gave Anafranil which is for anxiety."[111]  He stated that

> Haldol is considered a major tranquilizer.  It is used typically for people
> who are having thought disorders where they might be experiencing
> delusional thoughts or hallucinations, they are really confused and
> erratic thinking, so it is intended mostly for maintaining control and
> thought disorder.[112]

Chudy observed that Ferguson was a "polysubstance drug abuser which

included marijuana, cocaine and inhalents."[113]  As part of his Axis I diagnosis, Chudy

---

[107] R. Vol. 8, at 330, 332 ("Defendant's Exhibit 1") (footnote supplied).

[108] R. Vol. 5, Tab. 19, at 796 (alteration supplied).

[109] *Id.* (alterations supplied).

[110] *Id.* at 806 (alterations supplied).

[111] *Id.* at 796.

[112] *Id.* at 797.

[113] Dr. Chudy's written report recorded that Ferguson admitted that he had

a long history of substance abuse.  He started sniffing gas and paint when he was

determined that Ferguson had "major depression moderate," and "generalized anxiety disorder."[114]   His Axis II diagnosis was "personality disorder that borderlines schizotypal features and secondly borderline[] intellectual functioning."[115]

Ferguson's anxiety disorder was "long-term," and involved "a lot of tension and uneasiness."[116] Ferguson's personality disorder with borderline and schizotypal features indicated "problems of instability in moods with irritability, ups and downs in mood leading to possible problems in relationships.  And then some odd behavior, maybe some transient or brief periods where he might be out of touch with reality."[117]

Chudy testified that Ferguson's claims of "hallucinations or hearing voices" did not affect his evaluation, because Ferguson reported that he "was doing generally a

---

approximately 10 years old and continued the abuse until his imprisonment.  He would sniff whenever he did not have access to other drugs.  Other drugs he abused included marijuana, LSD, crack cocaine and powder cocaine.  He denies any history of IV use.  He also drank alcohol heavily and regularly for a while until he accumulated three DUI's.  When his wife threatened to leave him because of his drinking he quit, which was approximately two years ago.  However, his drug use has continued unabated.  He admits that his drug use has caused financial problems which has led him to pawn things and to ask for loans from other people.  He also sold marijuana as a means of generating income.  However, he denies any other illegal activities such as burglarizing homes.  He does admit that he forged checks belonging to his grandmother to secure drugs.  He was criminally charged with the offense and was put on probation which he served successfully.

R. Vol. 8, at 330.

[114] R. Vol. 5, Tab. 19, at 795.

[115] *Id.* (alteration supplied).

[116] *Id.* at 797.

[117] *Id.* at 798.

lot better" as a result of the medications that had been prescribed for him.[118]

      **c.**    *Analysis of evidence bearing upon Ferguson's behavior and mental state at the time of trial.*

The penalty phase of Ferguson's trial ended on June 25, 1998. Ferguson did not testify at any stage of the trial, and there is no record that he spoke with court officials at any time. Ferguson was still taking Haldol in August of 1998, when the probation officer examined him for the purpose of preparing a presentence investigation report.[119] There are no notations in the eight-page report indicating that Ferguson had any difficulty understanding the officer's questions, or communicating with her.[120] The trial judge's sentencing order acknowledged the presentence report,[121] and there is no indication in the transcript of the September 1998 sentencing hearing that Ferguson had any trouble understanding the proceedings, or communicating with the trial judge.[122]

Ferguson does not specifically allege, and the trial record does not contain any evidence indicating, that the administration of Haldol prior to trial rendered him incompetent. There is no record that any of those persons having direct

---

[118] *Id.* at 805 (alterations supplied).

[119] C.R. Vol. 1, Tab. 2, at 94.

[120] *Id*. at 87-94.

[121] *See* C.R. Vol. 16, Tab. 47, at 136.

[122] *See* R. Vol. 6, Tab. 26, at 16.

communication and interaction with Ferguson immediately before, during, or after the trial — namely, mental health experts, defense counsel, court officers, or the trial judge — expressed any concern that that Ferguson was not competent at any point leading up to and through the trial process.

Moreover, as previously noted, the Rule 32 petition filed in state court alleged that the administration of Haldol ceased "*one to two weeks before the trial*" began.[123]

Ferguson's unnamed family members and witnesses may well have observed a quiet, withdrawn defendant.  However, such behavior is commensurate with one mental health expert's report stating that Ferguson understood he was to behave with propriety at trial.[124]  It also is commensurate with another expert's observation that Ferguson was a depressed, dull, listless person whose affect was flat and unchanging, and whose mood was sad.[125]

Ferguson's behavior as allegedly described by unidentified family members and witnesses may even be commensurate with lethargy and drowsiness.  But neither those witnesses, nor the testimony of the experts, or the observations by other witnesses having close communication with Ferguson during the trial, show that Haldol caused him any confusion or dulled sensibilities — much less produced a

---

[123] Rule 32 C.R. Vol. 12, Tab. 40, at 24 (emphasis supplied).

[124] R. Vol. 7, at 122 ("State's Ex. 94").

[125] R. Vol. 8, at 330 ("Defendant's Ex. 1").

mental state that rose to the level of incompetency.  In fact, both experts who examined Ferguson clearly found him to be competent while he was actively taking the medication, and Ferguson himself reported that he actually felt better when he was taking Haldol.[126]

In summary, this claim is without factual support and merit.  There is no credible evidence, must less "clear and convincing evidence" giving rise to "a real, substantial, and legitimate doubt" as to Ferguson's competence during the period leading up to and through trial.  *Medina v. Singletary*, 59 F.3d 1095, 1106-07 (11th Cir. 1995) (quoting *Felidae v. Dugger*, 819 F.2d 1564, 1568 n.1 (11th Cir. 1987)). Accordingly, Ferguson is not entitled to a hearing in this court on his claim under the substantive dimension of the Due Process Clause that the ingestion or administration of Haldol and other medications rendered him incompetent to stand trial.

> **4**.     *Analysis of Ferguson's claim that the administration of medications by state officials without his consent violated his "substantive due process" rights*.

When considering a substantive due process claim that medications were administered by state officials without the petitioner's consent, the threshold question is:  "'What factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will.'" *United States v. Loughner*, 672

---

[126] R. Vol. 8, at 330, 333 ("Defendant's Ex. 1"); R. Vol. 5, Tab. 19 at 805 (Dr. Chudy); R. Vol. 7, at 121-22 ("State's Ex. 94") (Dr. Rosen).

F.3d 731, 744 (9th Cir. 2012) (citing *Washington v. Harper*, 494 U.S. 210, 220 (1990)).  The answer provided by *Harper* is:  "[T]he Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  *Harper*, 494 U.S. at 227 (alteration supplied); *see also Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (applying the *Harper* standard in the context of a *habeas* proceeding).

Ferguson describes the administration of Haldol during the period leading up to his trial as either "involuntary," or "State-induced."[127]  That is the extent of his factual allegations in support of this aspect of his claim.  He offers no specific factual allegations to support those conclusory assertions, and he makes no effort to satisfy any other element of the *Harper/Riggins* standard.  On the other hand, the record shows that the administration of Haldol actually made Ferguson feel better.[128]

Due to the conclusory and factually unsupported allegations regarding every element of this claim, it is not sufficiently specific for federal pleading purposes, and

---

[127] Doc. no. 9, at 17-18.

[128] As previously noted, both experts who examined Ferguson clearly found him to be competent while he was actively ingesting medications, and Ferguson himself reported that he actually felt better when taking Haldol.  *See* R. Vol. 8, at 330, 333 ("Defendant's Ex. 1"); R. Vol. 5, Tab. 19 at 805 (Dr. Chudy); R. Vol. 7, at 121-22 ("State's Ex. 94") (Dr. Rosen).

it is due to be dismissed on the merits.[129]

## C.    Ferguson's Trial Counsel Denied Him Effective Assistance During the Sentencing Phase of Trial, Before the Trial Judge[130]

Ferguson alleges that his defense attorneys provided ineffective assistance during the sentencing phase of trial, because counsel "failed to investigate and proffer evidence of either the sexual abuse Mr. Ferguson suffered as a child[,] or the physical abuse both [he] and his mother endured at the hands of [his] stepfather."[131]   He contends that, if that evidence had been presented to the trial judge, a "reasonable sentencer" would have been persuaded to follow the jury's 11-1 recommendation and sentence him to life without parole.[132]   Ferguson asserts that the state court's rejection of this claim is an unreasonable application of clearly established Federal law.[133]   He

---

[129]   Although not a part of the court's decision to dismiss this claim for lack of specificity, the trial record shows that Ferguson reported when he first entered the jail that he was having hallucinations and was suicidal.  *Harper* allows prisons officials to involuntarily medicate an inmate if he is a danger to himself or others, and the medication is in his interest.  Haldol is a tranquilizer that controls hallucinations and erratic thinking. Therefore, the medication was appropriate.

Additionally, Ferguson does not dispute that he was given a low dose of the medication, and does not deny that he felt better while he was on the medication.  Ferguson's behavior and abilities while on this prescription were documented by Dr. Rosen and Dr. Chudy.  Both reports show Ferguson was capable of understanding and communicating with his lawyers, and assisting in his defense, even while ingesting medications.  Finally, Ferguson has previously alleged that the administration of Haldol ceased before trial began.

[130]   *See* doc. no. 9, ¶¶ 41-60, at 18-29 (petition); doc. no. 15, ¶¶ 12-16, at 8-10 (reply brief).

[131]   Doc. no. 9, at 20 (alterations supplied).

[132]   *Id.*

[133]   *Id.* at 19, 25, 29 (citing *Strickland*, 466 U.S. at 686, 694; and *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

requests a hearing to present evidence in support of his claim.

**1.**   *The trial evidence of physical abuse by Ferguson's stepfather*

Ferguson's attorneys presented the psychological evaluation of Dr. James Chudy as evidence that Ferguson had been physically abused as a child by his stepfather.  Dr. Chudy documented Ferguson's report that "the stepfather . . . has a history of drinking and has been moody and volatile at times.   Mr. Dale Ferguson recalls at least one episode where he was physically abused by his stepfather."[134] Defense counsel corroborated that Ferguson's stepfather had been a violent, abusive person through the testimony of Ferguson's wife, Karen, who testified that Ferguson did not get along with his stepfather.[135]  She also testified that, when Ferguson was about 18 years of age, she and Ferguson had to rescue Ferguson's mother from his stepfather.[136]  Ferguson's mother had called them, said that the stepfather had beaten her, and she was hiding in the bushes.[137]  When they retrieved Ferguson's mother from her hiding place, the stepfather chased the automobile in which they made their escape for forty-five minutes, and attempted to run them off the road.[138]

**2.**   *Additional allegations of physical abuse by Ferguson's stepfather*

---

[134] R. Vol. 8, at 327-28.

[135] R. Vol. 5, Tab. 19, at 818.

[136] *Id.* at 819.

[137] *Id.*

[138] *Id.*

*included in the Rule 32 petition*

Ferguson alleged in the Rule 32 petition filed in state court that the stepfather physically abused all three step-children, but especially him.[139]  His mother would whisk the children away for several days at a time, to stay with her mother, but she always returned to the home.[140]  He added that, during the incident in which he and his wife had rescued his mother, the stepfather not only chased their automobile for a considerable distance, but also threatened Ferguson with a gun.[141]  Moreover, due to the stepfather's mistreatment, Ferguson's mother "ultimately attempted suicide, which resulted in her hospitalization in a mental institution."[142]

Ferguson also asserted that his childhood friend, Ricky Vinzant, could testify that the stepfather punched Ferguson with closed fists.[143]  Ferguson added that "[t]hese beatings were a routine aspect of [his] childhood and teenage years.  The only time he had any respite was when [his stepfather], a trucker, was on the road."[144]  The stepfather's "unpredictable temper" caused Ferguson to have few friends, because he was afraid to ask anyone to his home.[145]  He claimed that unidentified

---

[139] Rule 32 C.R., Vol. 12, Tab. 40, at 67.

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.* at 68.

[144] *Id.* (alterations supplied).

[145] Rule 32 C.R., Vol. 12, Tab 40, at 70.

109

"family members" could have testified to this treatment.[146]

**3.**  *The adjudication of Ferguson's physical abuse allegations by the Alabama Court of Criminal Appeals on collateral review*

The relevant findings of fact and conclusions of law of the Alabama Court of

Criminal Appeals on collateral review were as follows:[147]

> Ferguson argues that the court hearing his Rule 32 petition erred in not granting him relief on his claims that his counsel was ineffective at the penalty phase for failing to present additional mitigation witnesses.

> The circuit court made the following findings on this claim:

> "The instant case is similarly distinguishable from *Wiggins* [*v. Smith*, 539 U.S. 510, 534 (2003)], because trial counsel presented the vast majority of mitigation evidence that Ferguson alleges should have been presented. *For instance, Ferguson alleges that trial counsel should have presented evidence of physical abuse* and other difficulties *during his childhood.* (Pet. at 62-68.) *Specifically, Ferguson alleges that numerous witnesses could have testified that his stepfather was physically and verbally abusive towards him as a child.* (Pet. at 64.) *A review of the record, however, reveals that trial counsel did present evidence during the penalty phase that Ferguson was*

---

[146] *Id.* at 68.

[147] The Alabama Court of Criminal Appeals' rejection of the post-conviction version of this claim on collateral review covers a broader expanse of ineffective assistance of counsel allegations than the physical abuse discussed by Ferguson in his *habeas* petition. Even so, the opinion is quoted *in toto* so that the appellate court's entire analysis on collateral review, especially its reweighing of aggravating and mitigating circumstances, can be examined in order to determine whether Ferguson is entitled to *habeas* relief from the state court's determination that he did not suffer constitutional prejudice. Those portions of the following opinion by the intermediate state appellate court that address the physical abuse allegedly suffered by Ferguson are highlighted by *italics*.

*physically and verbally abused by his stepfather. During Dr. Chudy's testimony, the defense offered into evidence his psychological evaluation of Ferguson. (R. 790.) The psychological evaluation contained a detailed history of Ferguson's childhood. (C.R. 327-330.) That history included Ferguson's recollection that his stepfather physically abused him and would ridicule his physical appearance. (C.R. 328.) Ferguson's wife, Karen, also testified that Ferguson's struggles with his stepfather made Ferguson cry. (R. 818.)*

"Other alleged instances of failures by trial counsel to present mitigating evidence are equally refuted by the record. *In his petition, Ferguson recounts how at one point he had to pick up his mother from her home after she was beaten by his stepfather. Ferguson said that after he picked her up, his stepfather attempted to run him off the road. (Pet. at 64.) This incident was brought out by trial counsel during the testimony of Ferguson's wife, Karen.* (R. 819.)

"Ferguson also recounts how he did not learn that his stepfather was not his biological father until he was seventeen years old. Ferguson claims that he tried to establish a relationship with his biological father but abandoned his efforts under pressure from his stepfather. (Pet. at 65-66.) Ferguson contends that had trial counsel adequately investigated, they would have uncovered this information and could have presented it to the jury. The record, however, demonstrates that this information was, in fact, presented. Karen Ferguson testified at the penalty phase before the jury, that her husband was not told until he was seventeen years old that his stepfather was not his biological father. (R. 820.) Ms. Ferguson also stated that Ferguson stopped talking to his biological father because his mother and stepfather disapproved. (R. 820.)

111

"Ferguson also faults counsel for failing to explain that, as a result of his own childhood, he viewed his wife's stepfather as a surrogate father.  Ferguson contends that counsel should have presented evidence that he respected and admired his stepfather-in-law.  (Pet. at 67.)  Once again, the record demonstrates that counsel did present evidence of Ferguson's close relationship with his stepfather-in-law.  Karen Ferguson testified extensively about her husband's father-son type relationship with her stepfather.  (R. 815-816.)

"Ferguson also faults trial counsel for failing to uncover his history of alleged mental health problems. (Pet. at 68.)   Incredibly, Ferguson contends that 'trial counsel made absolutely no effort to investigate such issues for the penalty phase.'  (Pet. at 70.)  Ferguson's claim, however, is refuted by the trial record.

"Trial counsel for Ferguson presented the testimony of clinical psychologist, Dr. James F. Chudy.  Dr. Chudy testified that he was contacted by Ferguson's counsel and asked to conduct a complete psychological evaluation of Ferguson.  (R. 788.)  Dr. Chudy stated that he interviewed Ferguson's family, reviewed school records, administered numerous psychological tests, and conducted a clinical interview of Ferguson.  (R. 788-91.)  Dr. Chudy also administered tests to determine whether Ferguson suffered from any organic brain damage.  (R. 791.)  Dr. Chudy testified extensively about Ferguson's slow development as a child, his borderline intelligence, and his drug and alcohol abuse.  (R. 792-95.)  Dr. Chudy testified that Ferguson also suffered from depression, anxiety, and a personality disorder with borderline and psycho type features.  (R. 795-798.)  As such, any claim by Ferguson that trial counsel failed to investigate and present evidence of his mental health records is directly refuted by the record.  See *Gibby v. State*, 753 So. 2d 1206, 1207-08 (Ala.

Crim. App. 1999) (holding that a postconviction claim that is refuted by the record on direct appeal is without merit).

"Ferguson also alleges that counsel was ineffective for failing to investigate and present evidence of his non-violent nature, love of children, and history of depression. (Pet. at 73.) Karen Ferguson, however, testified at trial that her husband was never violent and always treated her well. (R. 811, 821.) *Karen also testified that Ferguson would often cry because of his difficulties with his family. (R. 819.)* Dr. Chudy testified regarding Ferguson's history of depression and his attempted suicide. (R. 795, 808.)

"Ferguson is correct that counsel did not present any evidence regarding his love of children. However, such evidence would have been of no value in this case. Ferguson was convicted of murdering an eleven-year-old boy and his father after they spent the day fishing. Ferguson's own action in murdering an eleven-year-old boy to steal a truck destroys any contention that he loves children. The facts and circumstances of this case serve to diminish any mitigating value that evidence of a love of children may have carried. Even assuming that such evidence had minimal value, it would not have affected the outcome of the trial.

"Ferguson also contends that trial counsel failed to introduce evidence of his good character. (Pet. at 75.) Specifically, Ferguson argues that trial counsel should have presented evidence of his work history and of his dedication to his family. (Pet. at 76.) This claim is directly refuted by the record. Dr. Chudy's report, which was introduced into evidence, detailed Ferguson's extensive work history. (CR. 329.) Karen Ferguson also testified that her husband always provided for her and supported her while she attended nursing school. (R. 811-12.) Karen

Ferguson pleaded for her husband's life and explained that he was a good man and a good husband.  (R. 821-22.)

    *"The record in this case demonstrates that both the trial court and the jury were presented with evidence that Ferguson suffered physical* and psychological *abuse as a child*.  Trial counsel also presented evidence of Ferguson's limited intellect and his other mental health problems.  Counsel also presented evidence concerning Ferguson's history of non-violence and his good character.  *Even if the Court assumed that the allegations in the petition are true and that counsel could have presented additional witnesses to testify regarding Ferguson's abuse as a child,* his mental health problems, his drug abuse, and his good character, *the evidence would be nothing more than cumulative to that already presented.*  Cumulative witnesses and evidence, even if true, would not have altered the trial court's opinion that death was the appropriate sentence in this case.  As the Court stated in *Atkins v. Singletary*, 965 F.2d 952, 958-60 (11th Cir. 1992), '[t]rial counsel did enough.  A lawyer can almost always do something more in every case.  But the Constitution requires a good deal less than maximum performance.'

    *"*Although Ferguson now asserts that more should have been done, he cannot show that what was done was unreasonable.  Perhaps the best reason for summarily denying the sort of claim presented in Ferguson's petition, is found in *Chandler v. United States*, 218 F.3d 1305, 1316-1317 n.20 (11th Cir. 2000).

        "'For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating [ ] evidence, had they been called or . . . had they been asked the right

questions." *Waters* [*v. Thomas*], 46 F.3d
[1506] at 1514 [(11th Cir. 1995) ] (*en banc*).
But "[t]he mere fact that other witnesses
might have been available or that other
testimony might have been elicited from those
who testified is not a sufficient ground to
prove ineffectiveness of counsel." *Id.* (noting
that such witnesses show nothing more than
that, "with the luxury of time and the
opportunity to focus resources on specific
parts of a made record, post-conviction
counsel will inevitably identify
shortcomings"). And, basing the inquiry on
whether an investigation (if one had been
undertaken) would have uncovered mitigating
evidence (or witnesses) is an example of
judging counsel's acts from the benefit of
hindsight. The proper inquiry was articulated
in *Rogers v. Zant*[, 13 F.3d 384 (11th Cir.
1994)]: "Once we conclude that declining to
investigate further was a reasonable act, we
do not look to see what a further investigation
would have produced." (Citation omitted.)'

"The record in this case supports a finding that trial
counsel did enough. Counsel presented the vast majority
of mitigating evidence that Ferguson alleges he did not
present. Trial counsel cannot be deemed ineffective for
simply failing to present cumulative mitigation testimony.
See *Pierce v. State*, 851 So. 2d 558, 582 (Ala. Crim. App.
1999), *rev'd on other grounds*, 851 So. 2d 618 (Ala. 2002)
('"Trial counsel's performance was not 'outside the wide
range of professionally competent assistance' simply
because they failed to present evidence that would have
been cumulative of other evidence presented at trial."').
Moreover, 'counsel does not necessarily render ineffective
assistance simply because he does not present all possible

115

mitigating evidence.' *Williams v. State*, 783 So. 2d 108, 117 (Ala. Crim. App. 2000). '"There ha[s] never been a case where additional witnesses could not have been called."' *Fortenberry v. State*, 659 So. 2d 194, 199 (Ala. Crim. App. 1994), *quoting State v. Tarver*, 629 So. 2d 14, 21 (Ala. Crim. App. 1993). 'The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.' *Chandler*, 218 F.3d at 1317 (11th Cir. 2000) (quoting *Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)).

"Finally, in light of the nature and circumstances of this crime — the robbery and murder of a father and his young son — and the specific findings made by the sentencing authority, there is no reasonable probability that the mitigating circumstances alleged in the petition, even if true, would have altered the balance of aggravating and mitigating factors in this case. See *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001). The sentencing authority was well aware of the mitigation evidence presented at trial.

"The sentencing authority determined that Ferguson's difficult childhood was not a mitigating factor. (C.R. 140.) This Court agrees. Ferguson was 24 years old at the time of the crime. He had been married for five years and was able to support himself and his wife while she attended nursing school. Under the circumstances of this case, the petition's (sic) allegations of childhood abuse and borderline intellect, even if true, would not mitigate his actions as an adult.

"Additionally, Ferguson's mental health problems were thoroughly investigated and presented by trial counsel. The sentencing authority determined that Ferguson's mental health problems did not diminish his

116

ability to distinguish right from wrong or to control his actions. (CR. 138.) This Court agrees. Ferguson's mental health problems were not of such a severe degree that Ferguson was less culpable for his actions.

"Additionally, evidence of Ferguson's non-violent nature and his good character were introduced through his wife, Karen Ferguson. This mitigating evidence, along with the other mitigating evidence presented at trial and that alleged in the petition is outweighed by the aggravating circumstance in this case.

"Finally, the jury recommended by an 11 to 1 vote that Ferguson be sentenced to life without the possibility of parole. Clearly, trial counsel was effective in convincing the jury to reject the death penalty. See, e.g., *White v. State*, 587 So. 2d 1218, 1235 (Ala. Crim. App. 1990) ('A strong indication of trial counsel's proficiency is the fact that the jury, despite the defendant's two damning and incontrovertible confessions, recommended a sentence of life without parole. We find no merit to the defendant's contention that he was denied the effective assistance of counsel.'). As such, Ferguson has failed to state a claim that would entitle him to relief. This claim is therefore summarily dismissed. Ala. R. Crim. P. 32.7(d)."

(C.R. 487-93) (footnotes omitted). The circuit court's findings are supported by the record, and we adopt them as part of this opinion.

*Ferguson v. State*, 13 So. 3d 418, 439-43 (Ala. Crim. App. 2008) (alterations in original) (emphasis supplied).

**4.**    *Analysis of the claim that counsel was ineffective during the sentencing phase of trial, for failing to investigate and present additional evidence of physical abuse of Ferguson by his stepfather*

117

In order to obtain *habeas* relief on this claim, Ferguson "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* — U. S. —, 131 S. Ct.770, 786-87 (2011).

Ferguson does not dispute the accuracy of the preceding factual findings made by the trial court and adopted by the Alabama Court of Criminal Appeals.  Instead, he argues, contrary to the opinions of those courts, that reasonable defense attorneys would have investigated the issue of physical abuse more thoroughly after being placed on notice of the issue by Dr. Chudy's report, and that a more thorough investigation would have revealed witnesses who were both able and willing to testify about the severity of the abuse during the sentencing phase of trial.  Specifically, Ferguson contends that

> Frances Hill Cummings (Mr. Ferguson's maternal grandmother),[148] Ricky Vinzant (a childhood friend), and Billy Joe Haithcock (Mr. Ferguson's biological father — in addition to possibly James Ray and

---

[148] In his procedurally defaulted claim of ineffective assistance of counsel at the guilt phase of trial, based upon the contention that defense counsel failed to investigate Ferguson's intoxication and intellectual problems, Ferguson alleged that counsel failed to interview "family and friends adequately (spending only 0.7 hours with Mr. Ferguson's mother and brother)."  Doc. no. 9, at 35. In a footnote attached to that statement, Ferguson declared that "[t]here is no evidence in counsel's own time log that they ever communicated with any other member of the family.  Frances Cummings, Mr. Ferguson's grandmother, made repeated attempts to contact her grandson's lawyers through both phone calls and letters, and was consistently rebuffed."  *Id.* at n.6 (citing Rule 32 C.R. Vol. 12, Tab. 40, at 35).

Chris Ferguson (Mr. Ferguson's two half-brothers) — were willing to testify to the abuse [that] both Mr. Ferguson and his mother experienced from Mr. Ferguson's stepfather.[149]

Ferguson asserts that a reasonable attorney would have gathered additional information from his family and friends "'to verify, corroborate, explain and expand upon [the] information obtained'" by the clinical psychologist retained by his defense counsel, Dr. James F. Chudy.[150]  Ferguson contends that the state court unreasonably "'assumed, based on the fact that [Ferguson's] sentencing phase presentation included *some* evidence of abuse, that counsel's investigation was sufficient to permit a reasonable decision as to what evidence should be offered.'"[151]

In the opinion of this court, the state courts' determination that declining to investigate further was a reasonable and constitutionally sufficient act by trial counsel is an unreasonable application of the *Strickland* standard's performance prong, which then was "clearly established federal law, as determined by the Supreme Court of the United States."[152]

At the time of Ferguson's trial, no reasonable defense attorney would have

---

[149] Doc. no. 9, at 24 (footnote and alteration supplied).

[150] *Id.* at 22 (quoting *Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008) (in turn quoting ABA Guidelines, 11.4.1(D) (1989))) (alteration in petition).

[151] *Id.* at 25 (quoting *Williams v. Allen*, 542 F.3d at 1339) (alteration and emphasis in petition).

[152] 28 U.S.C. § 2254(d)(1).

limited an investigation into the extent and severity of the physical abuse of Ferguson by his stepfather after being placed on notice of that mitigation issue by the information contained in Dr. Chudy's report. That is particularly true in this case, because Ferguson's piteous childhood was a significant aspect of the defense's mitigation case. In the opinion of this court, fairminded jurists *would agree* that the state courts' rejection of this claim was not a reasonable application of *Strickland's* performance prong.

Ferguson also asserts that it was unreasonable for the state courts to determine that he was not prejudiced by his counsel's deficient performance. He contends that there was a reasonable probability that the trial judge's decision regarding Ferguson's childhood abuse as a mitigating factor, and the weight he afforded the jury's sentencing recommendation, would have changed the balance of aggravating and mitigating circumstances, and resulted in a sentence of life without parole.[153]

---

[153] This claim is dedicated to counsel's ineffectiveness in investigating and presenting sexual and physical abuse allegations at the *sentencing* phase of trial, before the trial judge. Even if Ferguson had attempted to expand the claim to also encompass the penalty phase of trial, "[a] petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death." *Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009) (alteration supplied) (citing *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir. 1994)).

Moreover, when arguing the *prejudice prong* of this ineffective assistance of counsel claim, Ferguson adds two additional and separate issues of *trial error* that should not be a part of the mix. Those "errors" are either a refusal of the trial judge to find, or a dispute as to the weight the trial judge afforded, two items of mitigating evidence. Ferguson desires to include those alleged trial errors in an effort to convince the court that the state appellate court's reweighing of the aggravating and mitigating factors pertinent to the prejudice portion of the ineffective assistance of counsel claim offend 2254(d).

120

When conducting its prejudice inquiry on collateral appeal, the Alabama Court of Criminal Appeals held that, even assuming that Ferguson's additional, cumulative evidence was true, the evidence would not have resulted in a determination that his childhood abuse was a mitigating circumstance, because Ferguson was 24 years of age on the date of the crimes, and had developed a life and family separate from his stepfather.  Consequently, the balance of the totality of aggravating and mitigating circumstances would not have been altered.

The initial question before this court is whether the state court unreasonably applied *Strickland's* prejudice prong when it found that the post-conviction allegations of physical abuse were cumulative to the abuse evidence presented at trial. *See Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1259 (11th Cir.

The first issue is Ferguson's assertion that the state courts refused to consider his borderline intellectual functioning as a mitigating circumstance, and that this factor should have been part of the reweigh process to determine the reasonable probability of prejudice with regard to the ineffective assistant of counsel claim.  Doc. no. 9, at 26-27.  Next, Ferguson complains that the trial judge unreasonably overrode (*i.e.* did not give proper weight to) the jury's sentencing recommendation, and again asks that this be included in determining whether he is entitled to *habeas* relief from the state court's reweigh in the context of the state court's prejudice analysis of his ineffective assistance of counsel claim.  *Id.* at 27-28.  However, the constitutionality of the state courts' refusal to find Ferguson's borderline intelligence to be a mitigating factor under the circumstances of his case,  and its determination as to the amount of weight to be afforded the jury's recommendation, are separately addressed in this Memorandum Opinion.  In both instances, this court finds that Ferguson is not entitled to *habeas* relief from the state court's refusal to find borderline intelligence to be a mitigating circumstance, nor is he entitled to relief from the amount of weight afforded the jury's sentencing recommendation.   Since those determinations are constitutionally sound, it follows that the information the Alabama Court of Criminal Appeals considered in the reweigh of aggravating and mitigating circumstances (at trial and on collateral review) during its ineffective assistance of counsel prejudice analysis was proper as to the question of borderline intelligence and weight afforded the jury's recommendation.

121

2012) (holding that a "'largely cumulative'" finding by the state court was a legal finding to be examined under 28 U.S.C. 2254(d)(1)).  In doing so, this court must consider whether Ferguson's post-conviction allegations merely amplified the evidence of abuse presented at trial and, therefore, were reasonably deemed cumulative on collateral review, *or* whether the post-conviction allegations constituted "new" evidence, because the nature and scope of the allegations was so dissimilar to the story told at trial that the state court's determination that the evidence was cumulative amounted to an unreasonable application of clearly established federal law.  *See Holsey v. Warden*, 694 F.3d at 1267 (comparing the evidence presented during the sentencing phase to post-conviction allegations in order to determine whether the latter "largely told the same story as [Holsey's] sentencing phase evidence, although it did add details and bolster that evidence," or whether it told "a different story") (alteration supplied).

This court finds that it was not reasonable for the Alabama Court of Criminal Appeals to conclude that Ferguson's post-conviction evidence of physical abuse was cumulative to that presented during the sentencing phase of trial.  In other words, the post-conviction evidence did more than amplify the abuse evidence presented at trial. Indeed, the post-conviction evidence of physical abuse painted a different picture of the physical abuse than that presented at trial, which was limited to a mental health

expert's notation that Ferguson reported that his stepfather physically abused him at least once.

Regardless, it was not unreasonable for the Alabama Court of Criminal Appeals to determine that the post-conviction evidence would not change the balance of aggravating and mitigating circumstances, because the state court expressly found that Ferguson was 24 on the date of the murders, and was living an adult life independent of his stepfather.  In other words, any mitigating effect of Ferguson's childhood abuse was removed by his chronological distance from those experiences. Additionally, it is obvious that the trial court judge found that Ferguson's involvement in the murders (particularly the murder of a child), the reasons for his involvement, Ferguson's ability to extricate himself from the long-planned crimes, and his continual support for the criminal activity that occurred thereafter by participating in the bank robbery, were heavily aggravating when those circumstances were considered in combination.  Even with the additional evidence of physical abuse, fairminded jurists *could* disagree with the conclusion of the Alabama court of Criminal Appeals that there was no reasonable probability that the balance of aggravating and mitigating factors would have shifted sufficiently for the trial court judge to be persuaded to follow the jury's sentencing recommendation.

**5**.    *The claim that counsel was ineffective during the sentencing phase of*

> *trial for failing to investigate and present additional evidence of childhood sexual abuse of Ferguson*

Ferguson did not allege during Rule 32 proceedings in the trial court or on collateral appeal that his attorneys were ineffective for failing to investigate and present evidence that he had been sexually abused as a child. Ferguson's failure to present the underlying sexual abuse allegation as part of his ineffective assistance of counsel claim during state court collateral proceedings renders it procedurally defaulted in this court.

Alternatively, even if the sexual abuse allegation falls within the *Martinez* procedural default exception — that is, Ferguson's *post-conviction* counsel was ineffective for failing to allege in his Rule 32 petition that *trial counsel* did not investigate and present either his wife's, or Dr. Chudy's, testimony as part of the mitigating sexual abuse background evidence — the argument would not be successful, *unless* Ferguson can establish that his underlying ineffective assistance of *trial counsel* claim has "some merit." *Martinez v. Ryan*, — U.S. —,132 S. Ct. 1309, 1319 (2012).

    **a**.   *The trial evidence*

The trial record shows that Ferguson's trial attorneys investigated and presented to the jury and trial judge evidence of the sexual abuse of Ferguson during

childhood in the form of Ferguson's statements to Dr. Rosen and Dr. Chudy, both of whom recorded the subject matter in professional reports that were admitted into evidence as exhibits during the penalty phase of trial.[154]   Dr. Rosen wrote that Ferguson

> discussed being allegedly molested as a child, with several years of being "sexually abused" by an older sister. The defendant also reports as to having been the victim of a homosexual "rape" by an older cousin, these items also generally being included in his letter noted above to his defense attorney.[155]

Dr. Chudy recorded that "[t]here is no evidence of sexual maladjustment[,] but Mr. Ferguson reports an early history [age 6 to 10] of rather extended sexual abuse by an older male and female relative."[156]   Ferguson also reported to Chudy that, "[o]ut of fear[,] he did not tell anyone about the abuse."[157]

Accordingly, there is no merit to Ferguson's contention that trial counsel *failed* to investigate and present evidence of his sexual abuse.   Ferguson's current *habeas* allegation — that he "told his wife about being sexually abused, but such testimony never surfaced at the sentencing hearing,"[158] and that "Dr. Chudy's psychological

---

[154] C.R. Vol. 7, at 120 ("State's Ex. 94"); *id.,* Vol. 8, at 327-34 ("Defendant's Ex. 1.").

[155] *Id.,* Vol. 7, at 120.

[156] *Id.,* Vol. 8, at 333-34 (alterations supplied).

[157] *Id.* at 333 (alterations supplied).

[158] *Id*. at 22.

evaluation . . . twice mentioned abuse"[159] — boils down to an argument that counsel should have emphasized and elaborated on the sexual abuse evidence through the testimony of Mrs. Ferguson and Dr. Chudy at the sentencing hearing before the trial judge. Moreover, while Ferguson faults trial counsel for not interviewing Ferguson's cousins, parents, or "perhaps brothers" to corroborate the sexual abuse claim, he does not allege that any of those individuals were aware of the abuse, nor does he reveal what those individuals would have stated if called to testify. In short, evidence of sexual abuse is in the trial record, and the proposed testimony by Mrs. Ferguson and Dr. Chudy would have been cumulative to that which was presented and considered by the trial judge.

Moreover, the sentencing court's order makes clear that the trial judge read the psychological reports of Drs. Rosen and Chudy, even if the specific sexual abuse allegations were not mentioned in the order.[160] The court found "that the defendant's problems during his childhood [are] not a mitigating factor."[161]

> **b.**    *Analysis*

Counsel cannot be deemed to have been ineffective for failing to investigate

---

[159] *Id.* at 21.

[160] *See* C.R. Vol. 16, Tab. 47, at 40-41 (citing Dr. Chudy's report as Defense Exhibit 1, and Dr. Rosen's report as State's Exhibit 94).

[161] *Id.* at 46 (alteration supplied).

126

and present evidence that counsel, in fact, investigated and presented. Moreover, the trial court found that Ferguson was long removed from his childhood abuse. Fairminded jurists could disagree as to whether trial counsel was objectively deficient, and whether Ferguson suffered *Strickland* prejudice from that deficiency.

Because Ferguson cannot establish that his underlying ineffective assistance of counsel claim has some merit, he has failed to show that post-conviction counsel was ineffective in failing to raise the claim on post-conviction review. Therefore, this claim is procedurally defaulted.

**D.   Ferguson's Trial Counsel Denied Him Effective Assistance During the Guilt Phase.**[162]

Respondent asserts that this entire claim is procedurally defaulted because the Alabama Court of Criminal Appeals expressly found that Ferguson had abandoned the claim in his brief on collateral appeal.[163]   The pertinent portion of the intermediate appellate court's opinion reads as follows:

> Ferguson also contends that "[t]rial counsel's performance was also objectively deficient, for many reasons and including the unavailability of sufficient funds for a thorough defense." (Ferguson's brief at p. 23.) In a footnote, he then purports not to waive any claim presented in his petition or apparent from the record. However, he does not set forth any facts or argument in support of his bare contention. Rather, he simply moves to his next ineffective-assistance allegation.

---

[162] *See* doc. no. 9, ¶¶ 61-82, at 30-41 (petition); doc. no. 15, ¶¶ 17-20, at 10-12 (reply brief).

[163] Doc. no. 12, at 27 n.1.

> Therefore, he has not complied with the requirements set forth in Rule 28(a)(10), Ala. R. App. P., as to this allegation.

*Ferguson v. State*, 13 So. 3d 418, 439 (Ala. Crim. App. 2008) (alteration in original).

Ferguson does not deny that the Alabama Court of Criminal Appeals accurately described the footnote. He also does not deny that Alabama Rule of Appellate Procedure 28(a)(10) is an adequate and independent state procedural ground for federal procedural default purposes. That rule reads as follows:

> **(a)    Brief of the Appellant/Petitioner**. The brief of the appellant or the petitioner, if a petition for a writ of certiorari is granted and the writ issues, shall comply with the form requirements of Rule 32. In addition, the brief of the appellant or the petitioner shall contain under appropriate headings and in the order here indicated:

> . . . .

> **(10) Argument**. An argument containing the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to cases, statutes, other authorities, and parts of the record relied on. Citations of authority shall comply with the rules of citation in the latest edition of either *The Bluebook: A Uniform System of Citation or ALWD* [*Association of Legal Writing Directors*] *Citation Manual: A Professional System of Citation* or shall otherwise comply with the style and form used in the opinions of the Supreme Court of Alabama. Citations shall reference the specific page number(s) that relate to the proposition for which the case is cited[.]

Rule 28(a)(10), Ala. R. App. P. (alterations supplied).

Nevertheless, he argues that the allegations in his brief provided notice

128

sufficient to comply with Rule 28(a)(10), and he points to the State Supreme Court's opinion in *Ex parte Borden*, 60 So. 3d 940 (Ala. 2007), to support of that contention.[164]  For the reasons that follow, however, this court concludes that neither the rule nor the case supports Ferguson's argument.

Analysis must begin with the brief Ferguson presented to the Alabama Court of Criminal Appeals.  The relevant part reads as follows:

> Trial counsel's performance was also objectively deficient, for many reasons[10] and including the unavailability of sufficient funds for a thorough defense.

> _____

> [10]   Mr. Ferguson does not waive any claim presented in his Rule 32 petition or apparent from the record.  The selection of certain primary or "illustrative" examples of valid Rule 32 claims meriting an evidentiary hearing is not intended to diminish the validity of others.  Rather, the limitations of an appellate brief, the sheer number of allegations set forth in the 141-page petition and supporting investigative materials, and the need to address the controlling case law as well, have precluded extensive argument on every allegations and fact to be proven on remand.[165]

Although Ferguson asserts that page limitations on appellate briefing precluded his arguments, that contention does not bear close scrutiny.  His initial appellate brief was only 34 pages in length, and his reply brief was only 16 pages.  In contrast, Alabama Rule of Appellate Procedure 28(j)(2) allows a petitioner in capital cases to present an 80-page initial brief, and a 40-page reply brief.  In other words, Ferguson's

_____

[164] Doc. no. 15, at 10-11.
[165] Rule 32 C.R. Vol. 15, Tab. 42, at 23 & n.10.

initial and reply briefs could have been more than twice the length of those he presented (*i.e.*, 46 and 24 pages longer, respectively), and still have complied with the Rule.

Moreover, Alabama Rule of Appellate Procedure 28(j)(3) allows a party to request permission to exceed the page limitations for good cause shown. Ferguson did not do that. Indeed, Ferguson's initial brief gave no indication that he desired to pursue any identifiable aspect of his amorphorous "claim" that trial counsel denied him effective assistance during the guilt phase of trial. His reply brief denied the State's contention that his initial brief had failed to comply with Rule 28(a)(10), but stated only that: "because each of the claims denied by the Rule 32 court was summarily denied and the contentions, reasoning, and citations relied upon by Mr. Ferguson are in the initial brief or in the Rule 32 petition referenced as part of the record here."[166] When that portion of Ferguson's reply brief in the Alabama Court of Criminal Appeals is compared to the language of Rule 28(a)(10), it is obvious that neither Ferguson's initial nor his reply brief satisfied the requirements of that rule.

Rule 28(a)(10) was explicated by the Alabama Supreme Court in *Ex parte Borden*, 60 So. 3d 940 (Ala. 2007), where the Court said that:

> The purpose of Rule 28, Ala. R. App. P., outlining the

---

[166] *Id.*, Tab. 44, at 14-15.

130

requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make. *United States v. Levy*, 391 F.3d 1327 (11th Cir. 2004) (discussing the rule that issues not briefed are waived and Rule 28, Fed. R. App. P., which sets out the requirements for appellate briefs in the federal courts). Rule 28(a)(10), Ala. R. App. P., provides that the argument section of the appellant's brief shall set out "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Additionally, "'[i]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.'" *Butler v. Town of Argo*, 871 So. 2d 1, 20 (Ala. 2003) (quoting *Dykes v. Lane Trucking, Inc.*, 652 So. 2d 248, 251 (Ala. 1994)).

Borden argues that the Court of Criminal Appeals erred in holding that his brief failed to comply with Rule 28(a)(10), Ala. R. App. P. Borden's brief to the Court of Criminal Appeals regarding his ineffective-assistance-of-counsel claims included 22 pages of facts addressing why the trial court erred in summarily dismissing the ineffective-assistance-of-counsel claims in his Rule 32 petition. Borden's brief included 11 pages of argument regarding ineffective assistance of counsel, including some 25 citations to caselaw, along with explanations and quotations from the cited cases. Although another attorney may have treated the ineffective-assistance-of-counsel argument differently, Borden's brief is sufficient to apprise the Court of Criminal Appeals of Borden's contentions with regard to his ineffective-assistance-of-counsel claims. Accordingly, Borden did not fail to comply with the Rule 28(a)(10) [*sic*] and therefore did not waive his claims of ineffective assistance of counsel.

*Ex parte Borden*, 60 So. 3d at 943-44 (alterations in original). The briefs filed by Ferguson in the Alabama Court of Criminal Appeals bear no resemblance to the description of the brief addressed in *Ex parte Borden*. In fact, Ferguson's use of a

131

footnote to assert that he was not waiving any guilt-phase ineffective assistance of counsel claims presented in his Rule 32 petition constitutes a prototypical waiver under Rule 28(a)(10).

Thus, the Alabama Court of Criminal Appeals did not arbitrarily apply Rule 28(a)(10) to Ferguson's footnote reference to all 141 pages of his Rule 32 petition. Instead, Ferguson categorically failed to comply with the letter and spirit of that procedural rule, and the state court explicitly found that he had failed to do so. Therefore, the claim is procedurally defaulted and is due to be dismissed.

## E.    Ferguson's Pre-Trial Counsel Denied Him Effective Assistance.[167]

Ferguson claims that defense attorney Tony Glenn "failed to counsel adequately and represent vigorously his client's interests immediately prior to and during Mr. Ferguson's alleged 'confession' on August 27, 1997[,] at the Colbert County Jail."[168] He asserts that Glenn "effectively coaxed" his confession, along with the law enforcement officer who recorded his statements.[169] Ferguson also claims that "Glenn harbored a conflict of interest — created by the location and nature of his practice, combined with outrage in Colbert County sparked by the alleged crime — [which] arguably prompt[ed] Mr. Glenn to breach his duty of loyalty to Mr.

---

[167] *See* doc. no. 9, ¶¶ 83-92, at 41-47 (petition); doc. no. 15, ¶¶ 21-24, at 12-13 (reply brief).
[168] Doc. no. 9, at 41 (alteration supplied).
[169] *Id.*

Ferguson."[170]    Finally, Ferguson claims that he was prejudiced by Glenn's performance, because his confession was admitted into evidence.[171]

When these issues were raised on collateral review, the Alabama Court of Criminal Appeals entered the following findings of fact and conclusions of law:

> First, Ferguson contends that the attorney who represented him when he made his statement to police rendered ineffective assistance because, he says, counsel failed to advise him of his rights, encouraged him to make a statement, told him it would [be] better for him if he made a statement, and failed to consider Ferguson's drug use and mental facilities at the time he made the statement.

> In its order dismissing relief on this claim, the court hearing Ferguson's Rule 32 petition stated:

>> "On pages 1[6]-20 of his petition, Ferguson claims that during his interviews with police, his attorney . . . was ineffective.  Ferguson claims his attorney was ineffective for allowing him to make inculpatory statements before a plea deal had been reached. . . .  Ferguson contends that '[n]o reasonable defense attorney would have suggested such a course of action.' (Pet. at 20.)  This claim is denied without an evidentiary hearing as it can be resolved by the record without the need for additional evidence.

>> "Contrary to Ferguson's insinuation, it was not his attorney who suggested that he make an inculpatory statement to police.  Rather, it was Ferguson who initiated contact with the police and stated that he wanted to 'help himself' by making a statement.  It is clear from Ferguson's tape-recorded statement that Attorney Glenn advised

---

[170] *Id.* at 41-42 (alterations supplied).

[171] *Id.* at 45.

133

Ferguson of his right not to speak to the authorities and warned him of the possible consequences.   At the beginning of the statement, Glenn reminds Ferguson about his rights and the situation:

> " '[Ferguson's counsel]: Dale, you called me earlier today and you told me that you wanted to try to help yourself with the Colbert County Sheriff's Department and the FBI on these charges that are here pending today. You had information you thought that would help them.  You realize that I have gone over with you your rights and told you that you don't have to talk, but it is your —  but you have informed me that you choose to help at this point to try to help yourself; is that correct?

> " 'Ferguson:  Yes, sir.

> " '[Ferguson's counsel]:  Do you realize that there are no deals at this point?

> " 'Ferguson:  Yes, sir.

> " '[Ferguson's counsel]:  That what you are doing is voluntary and you are doing it to try to help yourself in furtherance —

> " 'Ferguson:  Yes, sir.

> " '[Ferguson's counsel]: — of this; is that correct?

> " 'Ferguson:  Yes, sir.

> " '[Ferguson's counsel]:  And this is what you

134

want to do?

" 'Ferguson:  Yes, sir.

" 'Ferguson:  Yes, sir.

" '[Ferguson's counsel]:  Okay. With that, do you want to go forward?

" 'Ferguson:  Yes, sir.'

"(CR. 98, 262-263)   The taped statement clearly reveals that it was Ferguson who wished to make the statement to police and not his attorney who suggested that he do so.  In *Gibby v. State*, 753 So. 2d 1206 (Ala. Crim. App. 1999), the Alabama Court of Criminal Appeals reviewed Gibby's post-conviction allegation that he was denied his right to testify at his trial.  The Alabama Court of Criminal Appeals held that Gibby's allegation was without merit because the record on direct appeal indicated that '[Gibby] knowingly and voluntarily waived his constitutional right to testify at his trial.'  *Id.* at 1208.   It is equally apparent that Glenn advised Ferguson about his rights and warned him that his statement would most likely be used against him in court. Despite these warnings, Ferguson, upon his own volition, chose to make a statement to police.   As the Court of Criminal Appeals found on direct appeal, Ferguson's statement to police was voluntary.  *Ferguson*, 814 So. 2d 925, at 942-943.

    "Moreover, '[u]nder the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.'  *Phillips v. State*, 527 So. 2d 154, 156 (Ala. 1988).   '"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or

135

was a natural consequence of his own actions.'" *Campbell v. State*, 570 So. 2d 1276, 1282 (Ala. Crim. App. 1990) (quoting *Leverett v. State*, 462 So. 2d 972, 976-77 (Ala. Crim. App. 1984)).  See also *Slaton v. State*, 680 So. 2d 879, 900 (Ala. Crim. App. 1995), aff'd, 680 So. 2d 909 (Ala. 1996).  'Invited error has been applied to death penalty cases.  "An invited error is waived, unless it rises to the level of plain error." *Ex parte Bankhead*, 585 So. 2d 112, 126 (Ala. 1991).' *Adams v. State*, [955 So. 2d 1037,] (Ala. Crim. App. Aug. 29, 2003).  Counsel cannot be held ineffective for the informed and voluntary choices of their client.  Moreover, a defendant cannot voluntarily choose a course of action and then blame trial counsel for that course of action.  Ferguson may not claim in his Rule 32 petition that his own choices violated his constitutional rights."

(C.R. 456-59.)  The record supports the circuit court's findings, and we adopt them as part of this opinion.  We further note that Ferguson has made several assertions about his attorney's performance.  However, he has not adequately supported those assertions, as required by Rules 32.3 and 32.6(b), Ala. R. Crim. P.  Therefore, summary dismissal was proper as to this claim.

*Ferguson v. State*, 13 So. 3d 418, 437-39 (Ala. Crim. App. 2008) (first two alterations

supplied, all other alterations and redactions in the original).

**1**.      *Was the opinion of the Alabama Court of Criminal Appeals an adjudication on the merits?*

Respondent contends that the summary dismissal of Ferguson's claim pursuant

to Alabama Rules of Criminal Procedure 32.3 and 32.6(b) constitutes a procedural

136

default.[172]  Ferguson argued in response that the Alabama Court of Criminal Appeals "did not expressly use the [Rule 32.6(b)] procedural bar to dismiss the claim because it adopted the Circuit Court's findings on the merits."[173]  Ferguson also contended that his claim was sufficiently specific.[174]  A lengthy dissection of the state appellate court's opinion is not necessary, because a recent Eleventh Circuit opinion resolves the issue in short form.  "A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits."  *Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011).

> **2**.  *Ferguson's claim that counsel provided ineffective representation during the time period surrounding Ferguson's statements to law enforcement.*

The Alabama Court of Criminal Appeals made detailed legal and factual findings in its discussion of this aspect of Ferguson's ineffective assistance of counsel claim.  Federal law requires that deference be accorded the state court's adjudication of the claim.  Thus, "if there is any reasonable argument that counsel satisfied *Strickland's* deferential standard," Ferguson is not entitled to *habeas* relief from the state court's rejection of his claim.  *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770,

---

[172] Doc. no. 12, at 30-31.

[173] Doc. no. 15, at 12 (alteration supplied) (citing *Peoples v. Campbell*, 377 F.3d 1208, 1235 (11th Cir. 2004), and stating that the *Peoples* Court had concluded that the district court had erred when "invoking [a] procedural default that state court of criminal appeals had declined to follow"), and *Davis v. Singletary*, 119 F.3d 1471, 1479 (11th Cir. 1997) ("It is settled that once the state courts have ignored any procedural bar and rejected a claim on the merits—not in the alternative way but as the only basis of decision—that claim is not barred from federal habeas review.")).

[174] *Id*. at 13.

787-88 (2011).  For the reasons that follow, Ferguson cannot establish that no reasonable jurist would have reached the same conclusion as the Alabama Court of Criminal Appeals.

Ferguson argues that *Strickland* requires courts evaluating *habeas* petitions to consider *all* of the underlying circumstances.[175]  In his reply brief, Ferguson argues that the Alabama Court of Criminal Appeals "unreasonably applied *Strickland* to the facts" of his case, because the court "failed to evaluate the reasonableness of counsel's decision to allow Mr. Ferguson to confess without even attempting to reach a plea agreement[,]" and failed to determine whether Ferguson was prejudiced thereby.[176]  Ferguson argues that

> Glenn should have discouraged Mr. Ferguson from speaking to authorities without any assurance that he would receive any benefit by volunteering information.  In fact, Mr. Glenn typically would not have encouraged a client to participate in an interview with authorities without first attempting to secure a plea bargain.  In this case, Mr. Glenn claims to have told Mr. Ferguson — just prior to Mr. Ferguson giving the alleged confession — that "most likely, this life is over for you." Mr. Glenn's statement to Mr. Ferguson that he could "cooperate and maybe get leniency" is not sound advice.[177]

The foregoing quotation from Ferguson's *habeas* brief does not say that, *before*

---

[175] Doc. no. 9, at 47 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.") (quoting *Strickland*, 466 U.S. at 688) (emphasis by petitioner).

[176] Doc. no. 15, at 12-13 (alterations supplied).

[177] Doc. no. 9, at 44-45.

138

he began making his statement to law enforcement, Tony Glenn failed to inform him that he did not have to speak with law enforcement, nor does Ferguson dispute that the advice he received from Glenn was the same advice that Glenn says he typically gave defendants (*e.g.*, he did not encourage Ferguson to make a statement in the absence of a plea agreement).[178]  Moreover, Ferguson fails to reveal the context in which Glenn stated that, "most likely, this life is over for you," or that Ferguson could "cooperate and maybe get leniency."

Ferguson's allegations must be considered in conjunction with the transcribed record of the exchange between Ferguson and his attorney, the accuracy of which Ferguson has never denied.  As such, Ferguson does not contest the appellate court's finding that it was he who initially contacted law enforcement for the express purpose of helping himself.   Nor does he deny that Tony Glenn informed him of his

---

[178] The court notes that the *allegations* of Ferguson's *habeas* brief differ from the allegations he made in the Rule 32 court.  His Rule 32 petition alleged that attorney Tony Glenn

> encouraged Mr. Ferguson to give a statement to the police without even reviewing what Mr. Ferguson would say in the statement.  Mr. Glenn never discussed the facts of the case with Mr. Ferguson before the statement was given, and had no idea what Mr. Ferguson was going to say.  Though he did inform Mr. Ferguson that no official deal had been made with the State at the time of the statement, he had privately told Mr. Ferguson that cooperation in the form of a statement would lead to a lesser sentence. . . .  Mr. Glenn had no basis for advising Mr. Ferguson that cooperation would lead to a lesser sentence.  Therefore, his advice was ill-advised, irresponsible, and prejudicial to Mr. Ferguson.

Rule 32 C.R. Vol. 16, Tab. 51, at 16-17.

constitutional rights, including his right not to speak to law enforcement.  Ferguson agreed that he was the one who informed Tony Glenn that he (Ferguson) desired to speak to law enforcement investigators.  Ferguson also agreed that he knew there was no plea agreement, and that anything he said could be used against him in court.  Nevertheless, Ferguson chose to speak to law enforcement in the hope of helping himself.

The Alabama Court of Criminal Appeals considered all of the circumstances surrounding counsel's representation in order to determine whether that representation was constitutionally reasonable.  Based on examination of the *habeas* claim and the state court's decision, this court finds that it was not unreasonable for the Alabama Court of Criminal Appeals to conclude that, under the circumstances presented to Tony Glenn, defense counsel provided reasonably competent professional assistance during the time period surrounding Ferguson's statement to law enforcement.  It also was not unreasonable for the court to refuse to place the blame for any prejudice resulting from *Ferguson's* choices at counsel's feet.

Ferguson would prefer that this court reach a different conclusion, even though his pre-trial defense attorney gave him accurate advice regarding his constitutional right to not make a statement to law enforcement officers, and notified him of the probable outcome of speaking with law enforcement before securing a plea

140

agreement.  In other words, he asks the court to decide that no reasonable attorney in Tony Glenn's same circumstances should stop at giving accurate legal advice, but that counsel should, instead, go farther, and *prevent* a client from making his own fully informed and fully understood decisions.[179]  Ferguson also asks that any prejudice resulting from a client's informed decisions be placed squarely on the shoulders of counsel.

As stated at the beginning of the discussion of this claim, however, the *habeas* standard of review demands that this court ask only whether there is any reasonable argument that Glenn satisfied *Strickland's* standard.  This court cannot find the state appellate court's determination regarding counsel's performance to be unreasonable, when counsel gave Ferguson accurate legal advice and a pragmatic assessment of the consequences of speaking to law enforcement without a plea agreement in place.  Further, Ferguson's argument that the state court's *Strickland* decision was unreasonable, because no reasonable counsel would fail to *prevent* a client from

---

[179] Although not material to the constitutional question at hand, on direct appeal Ferguson engaged in a meritless attack on the voluntariness of his confession based only on the length of time between what the Alabama Court of Criminal Appeals determined was an erroneous date on a police report and the 'true' date of his confession.  *See* Ferguson, 814 So. 2d at 942-43.  He also attempted to argue that the transcribed conversation between himself and his lawyer was inadmissible hearsay. *Id.* at 943-44.  Neither argument was successful, and Ferguson does not raise the claims again in the *habeas* petition.  *Ferguson never alleged on direct review nor does he make an independent claim in his* habeas *petition that he was not fully informed of and understood his rights, as explained by his own counsel and by law enforcement at the time of his confession, and thereafter made his own decision to speak.*

speaking under the circumstances revealed in this record, is an application of *Strickland* upon which fairminded jurists could disagree.

For all of the foregoing reasons, Ferguson has failed to show that he is entitled to *habeas* relief from the Alabama Court of Criminal Appeals' adjudication of this *Strickland* claim.   Accordingly, this claim is due to be denied.

> **3.** *Ferguson's claim that Tony Glenn breached a duty of loyalty to Ferguson, and "arguably" harbored an actual conflict of interest.*

Ferguson also asserts in this same claim that the state court's "failure to consider the breach of Mr. Glenn's duty of loyalty to [him], constitutes an unreasonable application of *Strickland*."[180]   He suggests that Glenn harbored an actual conflict of interest and, thus, breached that duty of loyalty.[181]   He supports these contentions with the following allegations:

> Mr. Glenn maintained a local law practice in a county nearby to where the alleged murders occurred.  Like any member of the bar, Mr. Glenn's monetary livelihood depended on maintaining a respectable reputation among potential clients.  From January 1, 1995 through 2008, Mr. Glenn's practice has focused on personal injury claims, worker's compensation claims, and other contract disputes, with 80% of all clients requiring plaintiff representation.  *See* Attorney Strategic Profile for Tony Glenn (1/1/1995 - 1/29/2009), *available at*: LexisNexis CourtLink (last visited Feb. 1, 2009).

---

[180] Doc. no. 9, at 47 (alteration supplied).

[181] *Id.* at 45 (citing *Cuyler v. Sullivan*,  446 U.S. 335, 344 (1980) (holding that an actual conflict of interest renders a lawyer's performance ineffective)).

Given the attention that the media devoted to the murders of Mr.
Pugh and his son, and the social opprobrium attached to defending one
of its alleged perpetrators, . . . Mr. Glenn could have harmed his law
practice by vigorously defending Mr. Ferguson.[182]

Ferguson neither claimed that Tony Glenn manifested an *actual* conflict of

interest while representing him, nor presented the preceding allegations in support of

such a claim in either his Rule 32 petition or the brief filed on collateral appeal.[183]  In

fact, Ferguson's collateral appeal brief said that he and the State "are agreed that the

[ineffective assistance of counsel] allegations in the Rule 32 petition are to be

subjected to the analysis detailed in *Strickland v. Washington*, 466 U.S. 668 (1984),

and *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000)."[184]  Ferguson

followed that statement with the allegations dedicated to pre-trial counsel's

representation during the events leading up to Ferguson's confession, which are

addressed in the previous section of this discussion.[185]

Ferguson's failure to assert during collateral review proceedings in the state

courts that pre-trial counsel harbored an actual conflict of interest, or to state until

now the factual allegations underlying such a claim, "means that [Ferguson] deprived

---

[182] *Id.* at 43-44.

[183] Rule 32 C.R. Vol. 12, Tab. 40, at 14-23 (Rule 32 petition); *id.*, Vol. 15, Tab. 42 and 44, at 21-23, and 11 respectively) (collateral appeal brief and reply brief).

[184] Rule 32 C.R. Vol. 15, Tab. 42 at 21 (alteration supplied).

[185] *Id.* at 21-23.

the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'" *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971)) (alteration supplied).

Furthermore, the claim is "procedurally defaulted, even absent a state court determination to that effect, [because] it is clear from state law that any future attempts at exhaustion would be futile." *Id.* (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998) (alteration supplied).  If Ferguson were to attempt to raise this portion of his claim in another Rule 32 petition, it would be denied as an impermissible, successive petition, filed outside the statute of limitations applicable to post-conviction petitions, and a claim that Ferguson was required to, but did not, raise during collateral review proceedings.  *See* Rules 32.2 (b), (c), and (d), Ala. R. Crim. P.  Accordingly, this aspect of Ferguson's pre-trial ineffective assistance of counsel claim is procedurally defaulted.  Moreover, Ferguson cannot establish a *Martinez* exception to the defaulted claim, because the claim was not sufficiently pled, and the bases for it (if any) are speculative.  Thus, the default cannot be overcome, because the actual conflict allegations do not satisfy the "some merit" requirement of *Martinez v. Ryan*, 132 S. Ct. at 1319.

Even if the *habeas* claim had not been procedurally defaulted, it still is due to be dismissed based on the following statements from the Eleventh Circuit's opinion

144

in *Reynolds v. Chapman,* 253 F.3d 1337 (11th Cir. 2001):

> Ineffective assistance of counsel claims in the conflict of interest context are governed by the standard articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). *Cuyler* establishes a two-part test that we use to evaluate whether an attorney is constitutionally ineffective due to a conflict of interest. To show ineffectiveness under *Cuyler*, a petitioner must demonstrate: (a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected the attorney's performance. See *Cuyler*, 446 U.S. at 348-49, 100 S. Ct. 1708.

> A series of opinions from this court have interpreted and refined the meaning of both prongs of the *Cuyler* test. *To satisfy the "actual conflict" prong, a defendant must show something more than* "a possible, speculative, or merely hypothetical conflict." *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987). In *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987), we developed a test that enables us to distinguish *actual* from *potential* conflicts of interest:

>> We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests . . . . Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative causes of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remain(s) hypothetical.

> *Smith*, 815 F.2d at 1404.

> Assuming a defendant can demonstrate that his attorney labored under an actual conflict of interest, the *Cuyler* test demands that he show that this conflict adversely affected the representation he received. To prove adverse effect, a defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b)

145

> that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties.  See *Freund* [*v. Butterworth*] 165 F.3d [839,] 860 [(11th Cir. 1999)]

*Reynolds*, 253 F.3d at 1342-1343(alterations and emphasis supplied).

Ferguson's allegations do not comply with *Reynolds'* specificity requirements. He does not allege facts demonstrating that his pre-trial attorney had an actual conflict of interest.  Instead, he only contends that it is "arguable" that a conflict existed.  Moreover, the factual basis for the "arguable" conflict is nonexistent. Therefore, Ferguson's allegations are not sufficient to satisfy the requirements specified in the Supreme Court's opinion in *Cuyler*, or the requirements outlined by the Eleventh Circuit in *Reynolds* and *Smith*.  The isolated fact that an attorney practices in a county of a notorious case does not show an actual conflict.  Ferguson also has not shown that Glenn could have pursued a reasonable alternative strategy, but did not do so because he practiced law in Colbert County, Alabama.  For all of the foregoing reasons, this aspect of Ferguson's ineffective assistance of pre-trial counsel is procedurally defaulted. In the alternative, it is due to be summarily dismissed.

**F**.   **Ferguson Was Improperly Denied A Hearing On His Mental Capacity Under** *Atkins v. Virginia*.[186]

Ferguson correctly observes that the Supreme Court has held that "states may

---

[186] *See* doc. no. 9, ¶¶ 93-118, at 47-63 (petition); doc. no. 15, ¶¶ 25-28, at 14-15 (reply brief).

not execute defendants handicapped by mental retardation."[187]  *See Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibition against "cruel and unusual" punishment prohibits the execution of mentally retarded offenders).  He then claims that he "is a person with a history of being disabled by mental retardation,"[188] and asserts that the state courts' rejection of his *Atkins* claim, without affording him an evidentiary hearing, is based upon an unreasonable application of clearly established federal law, and an unreasonable determination of the facts in light of the evidence before the state courts.[189]  According to Ferguson, "[g]iven the special risk of wrongfully executing persons suffering from mental retardation, *see Atkins*, 536 U.S. at 320-21," he is entitled to an "evidentiary hearing to evaluate his mental capacity" because there is evidence indicating that his mental capacity is diminished, *and*, because of the jury's 11-1 recommendation that he be sentenced to life without the possibility of parole.[190]

At the outset of discussion, this court holds that the jury's 11-1 recommendation is not relevant to the question of whether Ferguson is entitled to either *habeas* relief, or to an evidentiary hearing.  Only matters concerning

---

[187] Doc. no. 9, at 47-48.

[188] *Id*.

[189] *Id*. at 60-61; doc. no. 15, at 14-15 (citing 28 U.S.C. §§ 2254 (d)(1) & (2)).

[190] Doc. no. 9, at 49.

Ferguson's mental status and cognitive ability should be the subject of *habeas* review in connection with this Eighth Amendment claim.

Respondent observes that Ferguson does not explicitly allege in his *habeas* petition or reply brief that he is mentally retarded, in the sense that condition is discussed in *Atkins*.[191]  Instead, Ferguson contends:  that he has a *history* of mental retardation; that he stated a colorable claim of mental retardation in state court; and that the state court improperly denied him an evidentiary hearing.  This court finds that a 28 U.S.C. 2254(d) review of this claim is appropriate.

**1**.    *Historical development and presentation of this claim in state court*

      **a**.    *Direct review pre-Atkins*

Ferguson presented considerable evidence from lay and expert witnesses during the penalty phase of trial in an attempt to establish that his mental capacity was a mitigating factor.  As the following discussion will demonstrate, however, both the State's mental health expert and Ferguson's own expert witness testified that Ferguson's intellectual functioning ability fell in the "borderline" range.

        ***i***.    *Ferguson's mental health expert*

Dr. James F. Chudy, the clinical psychologist retained by Ferguson's defense attorneys, explained the manner in which he conducted assessments of a person's

―――――――――――――――――――――――――

[191] Doc. no. 12, at 37.

mental status as follows:

> [S]everal steps are involved, [I] usually do an interview with the client doing a lot of background and information gathering and then a clinical interview getting a lot of information about their personality, emotional functioning and that sort of thing. Then you try to get as many records or information from their past as you can. Then talk with family members and then give them a battery of tests that usually include intelligence, achievement, and personality and emotional function.[192]

In preparation for trial in this case, Dr. Chudy reviewed Ferguson's school records.[193] He also "talked with [Ferguson] about his background and then . . . called his grandmother, mother, his wife and biological father."[194] He conducted a clinical

---

[192] R. Vol. 5, Tab. 19, at 788 (alterations supplied).

[193] *Id.* at 789. (Defendant's Exhibits 2 and 3).

[194] Dr. Chudy recorded in his report that Ferguson's wife "claims that her husband has always been 'somewhat strange.' By that she explained that he did not think like other people and had trouble socializing in an appropriate way." R. Vol. 8, at 328. Elsewhere, Dr. Chudy observed that:

> Being intellectually slow with poor social skills[, Ferguson] seems peculiar among others. This sets him up to being taken advantage of. Over time he has learned to be hypervigilant to the point he often misinterprets others, feeling they are referring to him negatively. When he does develop friendships, his naive and limited thinking allows him to be easily influenced. Family members confirm that in relationships where he has come to trust the other person, he is easily led and become[s] a follower. He has such strong needs for acceptance [that] he will go over-board to please those [whom] he trusts.

*Id.* at 333 (alterations supplied). Karen Ferguson testified during the penalty phase of trial that she and her husband had known one another for five years, and had been married for four; that he was a kind person; that he had been a good, non-violent husband; and that he worked while she was attending nursing school. R. Vol. 5, Tab. 19, at 810-12. During their marriage, Ferguson had been employed at a trailer plant, and at Heilig Meyers as a "picker" and heavy machine operator. *Id.* at 812, 814-17. Mrs. Ferguson also testified that Ferguson had a drinking problem, which caused tension in their marriage, and he smoked marijuana. *Id.* at 813-14. She knew that Ferguson had been in special education classes; agreed that he appeared to be "mentally slow"; and confirmed that

interview which

> includ[ed] a lot of information gathering,[195] but also while you are
> doing that, you are getting a more or less complete picture of their
> mental functioning, emotional state at the time of the interview. And
> then you do a mental status trying to get a feeling for their overall
> cognitive skills, how much they are depressed, if they are; if there is
> anxiety present or psychotic features present, that sort of thing.[196]

Dr. Chudy administered only a brief intelligence test to Ferguson, because he

had "been tested so many times before,"[197] and the results obtained from the

administration of a full-scale assessment instrument would have been skewed by

Ferguson's prior practice experiences. Chudy also administered a memory scale and

an organic-visual orientation test, "which is for organic impairment because of his

history of drug abuse and also sniffing gas and paint, I wanted to rule out organic

---

she handled most matters, and generally told him what to do, because he did not understand things very well. *Id.* at 814. She also believed Ferguson's maternal grandmother to be "slow." *Id.* at 821. Karen's Ferguson testified that her stepfather, Mark Moore, a co-defendant in the case, cared for Ferguson like his own son; and, even though Moore was a controlling person, he did not mistreat Ferguson. *Id.* at 814-17, 825-26. She described her husband as being a "follower" when he was with Moore, as was her cousin's "significant other," Donnie Risley (another co-defendant). R. Vol. 5, Tab 19, at 814-17, 825-26. She was aware that Ferguson's mother was not affectionate, and that his stepfather was violently abusive throughout Ferguson's life — to the extent that it caused Ferguson emotional distress. *Id.* at 814, 817-19. Moreover, Ferguson did not learn that his stepfather was not his biological father until he was in his late teens, and that revelation caused him to suffer significant emotional turmoil. *Id.* at 820.

[195] Dr. Chudy recorded that his assessment was based upon information obtained from: "(1) interview[s] of family members, including mother, grandmother, and wife; (2) school records covering [Ferguson's] academic career; (3) clinical interview of client; and (4) intellectual, academic and personality assessment devices." R. Vol. 8, at 327 (alterations supplied).

[196] *Id.* at 790-91 (alteration and footnote supplied).

[197] *Id.* at 791.

150

problems."[198]  Dr. Chudy found some memory problems that were "fairly consistent

with low intelligence, but no significant organic problems."  *Id.*  He also administered

a battery of about four or five different personality tests.[199]  Based upon all of the

above, Dr. Chudy concluded that Ferguson's "intellectual functioning" was in the

"borderline" range.[200]

Dr. Chudy's report was entered into evidence as Defendant's Exhibit 1,[201] and

described Ferguson's academic history as

> difficult.  During [Ferguson's] early school years he was identified as
> having a speech problem for which he attended speech therapy for
> approximately two years.[202]  His speech was much improved from the
> therapy.  Mr. Ferguson ended up failing the first grade and when he
> went to repeat the grade he was evaluated and placed in educably
> mentally retarded classes (EMR).[203]  He stayed in EMR for several
> years[204] until late junior high school when he was re-evaluated and they

---

[198] *Id.*

[199] *Id.* at 792.  The personality assessment instruments administered included the Weschler Memory Scale – Third Edition ("WMS-III"), Hooper Visual Orientation Test ("VOT"), Wide Range Achievement Test – Revised 2 ("WRAT-2"), Incomplete Sentences Blank, Mooney Problem Checklist, Millon Clinical Multiaxial Inventory -III ("MCMI-III"), Substance Abuse Subtle Screening Inventory-2 ("SASSI-2"), Jessness Inventory, and the Shipley Institute of Living Scale. R. Vol. 8, at 331.

[200] *Id.*

[201] *Id.* at 790.

[202] *See* school records, Defendant's Exhibit 2, R. Vol. 7, at 128-36.

[203] In 1975, when Ferguson was six years of age, he was administered the Stanford-Binet intelligence test and received a full scale IQ score of 77.  *Id.* at 164.

[204] In 1985, when Ferguson was twelve years old, he was administered the Weschler Intelligence Test for Children – Revised ("WISC-R"), and received a full scale IQ score of 71.  The Woodcock Reading Mastery Test, the Keymath Diagnostic Arithmetic Test, and the Goldman-Fristoe Test of Articulation also were administered at that time.  *Id.* at 156-64.  The school found that

felt that he should be able to adapt to a learning disability regimen where he would not have to be in an enclosed environment with EMR.  Mr. Ferguson claims that his early elementary years in EMR were good.  He got along well with all the students and experienced no problems with people harassing him.  However, in the 7th grade he moved to Priceville Middle School where things changed dramatically for him.  At that time he started getting picked on and there was a lot of name calling.  He remembers being sad, hurt and angry much of the time.  He also remembers getting into several fights and defending himself against the ridicule.  In the 8th grade Mr. Ferguson was placed in the Hartselle City School System.[205]  His problems continued but not to the degree they

_____

the intelligence score of 71 was consistent with a prior Binet result, as well as another intelligence test (the Leiter) score of 83 that Ferguson had achieved in 1980.  *Id.* at 164.  The clinician who administered the WISC-R recorded that Ferguson was cooperative, but a bit apprehensive initially.  *Id.* at 149.  Even so, Ferguson "gave up easily on both verbal and non-verbal items.  He did not appear to be challenged by the more difficult items on the test."  *Id.*  An AAMD Adaptive Behavior Scale was completed by one of Ferguson's teachers, and Ferguson's parents were asked to complete a Behavior Rating Profile.  R. Vol. 7, Defendant's Ex. 2, at 145-55.  Thereafter, the school found that Ferguson continued to be eligible for "Educably Mentally Handicapped" (EMH) services.  *Id.* at 164. The report stated that

> Dale's achievement scores are considered to be consistent with overall EMH abilities.  Some strengths were noted in math (relative to his EA only).

> Dale's adaptive behavior based on the AAMD ABS results are considered to be consistent with EMH functioning.  A strength was noted in Community Self-Sufficiency underline relative to EMH norms.  A underline relative weakness was noted in Personal-Social Responsibility.

*Id.* (emphasis in original).

[205] Ferguson was reevaluated by the special education services division of the Hartselle City School system in the Spring of 1988, when he was fourteen years old.  *Id.* at 176.  He was administered the WISC-R (and achieved an IQ score of 87), the Kaufman Test of Educational Achievement, and a Stanford Achievement Test.  *Id.* at 178-81, 183-87.  Ferguson's teacher completed a Burk's Behavior Rating Scale, Ferguson was observed in science class, and a disadvantage checklist was completed.  *Id.* at 182, 184-89.  In the observation notes, the teacher wrote that Ferguson "can do his work well when he wants to.  Several times he has to be reminded to pay attention.  Dale is capable of doing more than he does."  Defendant's Exhibit 2, R. Vol. 7, at 184.  There were no problems noted on the behavioral scale and no items checked on the disadvantage checklist.  *Id.* at 189.  It was recommended that Ferguson be moved from classes for

were the year before.  However, he did continue to have some problems and in fact, at one point was found carrying a weapon at school which lead to a suspension.

Mr. Ferguson continued in school until he was nearly 17 years-old and was approaching the 10th grade.[206] At that time they had placed him in learning disabilities class and he was finding it increasingly difficult to do the work.  As his school work reveals he was failing most of his classes, particularly those in which he was placed in a regular classroom setting.[207]  In those classes where he got a lot of special education help he was earning average to above average scores.  In any case he found the work to be progressively more difficult, so he quit school.[208]

---

"educably mentally handicapped students," to classes for students suffering from "learning disabilities."  *Id.* at 191.

[206] In the Spring of 1989, a 15-year-old Ferguson attended school and received vocational training at the Tennessee Valley Rehabilitation Center.  *Id.* at 193-210.  At the time, he was designated as "Learning Disabled."  *Id.* at 219.  His major disability was identified as a "Specific Reading Disorder," and his secondary disability was characterized as a "Developmental Disorder – NOS [*i.e.,* "not otherwise specified" in] Spelling."  *Id.* at 193 (alteration supplied).  He was administered a Wide Range Achievement Test, and a Test of Basic Adult Education, with his reading, math, mechanics and expression, and spelling measuring mostly in the 5th grade range.  Defendant's Exhibit. 2, R. Vol. 7, at 194.  The Becker Reading Free Interest Inventory test showed Ferguson expressed high interest in automotive, horticultural and building trades, and low interest in laundry service, food service, and clerical aid work.  *Id.*

It was noted that Ferguson seldom initiated conversation during class, and usually would respond with a smile if someone spoke to him; that he had difficulty expressing himself verbally and in writing; and that he had difficulty working independently and would sit and watch others.  *Id.* at 200.  Ferguson could "anticipate situations," and "consider alternatives to problems," but he had difficulty organizing and would lose his train of thought.  *Id.* at 195.  It was noted that Ferguson needed improvement with "eye contact, posture, facial expression, gestures and appropriate laughing/smiling in daily situations."  *Id.* at 201.  Ferguson's grooming and hygiene were not good, but improved as the program progressed.  *Id.* at 202.

The recommendations for Ferguson were that he obtain high school level vocational training in the building trades or auto mechanics, or on-the-job training as a waiter, stable attendant, machine cleaner, service station attendant, or material handler.  Defendant's Exhibit 2, R. Vol. 7, at 202-03.

[207] *Id.* at 213.

[208] R. Vol. 8, at 328-29 (alterations and footnotes supplied).  It appears that Ferguson quit school during the 1990 school year.  Defendant's Exhibit 2, R. Vol. 7, at 220-30.

153

Dr. Chudy's opinion that Ferguson's intellectual functioning ability was best characterized as "borderline" was "backed up by information from his family," and was "consistent with the scores from IQ tests that had been administered from as far back as grade school."[209]   According to Chudy, an individual with "borderline" intellectual functioning abilities "would think in very concrete and naive ways.  His problem solving skills would be limited and his social skills would be — his reasoning in social situations would be impaired to more limited."[210]

Dr. Chudy characterized Ferguson as a "polysubstance drug abuser which included marijuana, cocaine and inhalents,"[211] and stated that alcohol or drug use "would compound further his limitations in his problem solving skills, cognitive

---

[209] R. Vol. 5, Tab. 19, at 793 and 807, respectively (alterations supplied).

[210] *Id.* at 793.

[211] Dr. Chudy's report noted that

Ferguson admits to a long history of substance abuse.  He started sniffing gas and paint when he was approximately 10 years old and continued the abuse until his imprisonment.  He would sniff whenever he did not have access to other drugs. Other drugs he abused included marijuana, LSD, crack cocaine and powder cocaine. He denies any history of IV use.  He also drank alcohol heavily and regularly for awhile until he accumulated three DUI's.  When his wife threatened to leave him because of his drinking he quit, which was approximately two years ago.  However, his drug use has continued unabated.  He admits that his drug use has caused financial problems which has led him to pawn things and to ask for loans from other people.  He also sold marijuana as a means of generating income.  However, he denies any other illegal activities such as burglarizing homes.  He does admit that he forged checks belonging to his grandmother to secure drugs.  He was criminally charged with the offense and was put on probation which he served successfully.

R. Vol. 8, at 329-30.

154

skills."[212]   Chudy's Axis I diagnosis was that Ferguson suffered from a "major depression moderate," and a "generalized anxiety disorder."[213]   His Axis II assessment was "personality disorder that borderlines schizotypal features and secondly borderline intellectual functioning."[214]

Chudy stated that some persons with Ferguson's borderline level of intellectual functioning would tend to "rely on other people to help them function in the world," while others would not.[215]   Even so, based upon Ferguson's "low IQ and other personality factors that [Dr. Chudy] found backed up by information from his family, it seem[ed to him] very clear that [Ferguson] was easily influenced."[216]

Dr. Chudy agreed that the results of the tests that he administered, Ferguson's schools records, and the results of the IQ test administered by Dr. C. Van Rosen, the

---

[212] R. Vol. 5, Tab. 19 at 794-795

[213] *Id.* at 795. Psychiatric diagnoses are generally categorized according to criteria established by the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION ("DSM-IV"), published by the American Psychiatric Association. The Manual covers all mental health disorders for both children and adults, and lists known causes of those disorders, statistics in terms of gender, age at onset, and prognoses (as well as some research concerning the optimal treatment approaches). The DSM-IV uses a multi-axial, or multidimensional, approach to diagnosing mental health disorders. "Axis I" addresses "clinical syndromes," and generally constitutes the person's diagnosis (e.g., depression, schizophrenia, social phobia). "Axis II" addresses "developmental and personality disorders." Developmental disorders include autism and mental retardation, disorders that are typically first evident in childhood. Personality disorders are clinical syndromes which have more long lasting symptoms, and encompass an individual's way of interacting with the world. They include Paranoid, Antisocial, and Borderline Personality Disorders.

[214] *Id.* (alteration supplied).

[215] *Id.* at 794.

[216] *Id.* at 793-94 (alterations supplied).

State's mental health expert witness, were all consistent with his conclusion that Ferguson's intellectual functioning was "borderline."[217]  He also testified that the same level of intellectual functioning was consistent with a person who was "able to gain employment with a furniture warehousing facility and being able to operate equipment."[218]  Chudy stated that such an individual could perform "real concrete and repetitive simple work that [he] is given time to simulate."[219]  That would also include being able to complete a "written test with regard to operating a piece of machinery that contained a simple computer device on it."[220]  He agreed that such persons could "function in society at a higher level" than their IQ score might otherwise indicate, although the level at which such persons could function would never be "much higher" than their IQ score.[221]

Most significantly, however, *Dr. Chudy testified that Ferguson was not*

---

[217] *Id.* at 807.

[218] *Id.* at 803 (alteration supplied).  Ed Kaplan, Ferguson's employer at Heilig Myers Distribution Center in Russellville, Alabama, testified that Ferguson worked as an "order picker operator," which is machine similar to a forklift.  R. Vol. 3, at 350.  Individuals were given hands-on training, video training, and a test.  *Id.* 350.  The order picker has a steering wheel, buttons that allow the lift to go up and down, a throttle to propel the vehicle, a computer consisting of a bar code scanner (which, if broken, requires the operator to type in the bar code number) and help buttons to determine, for instance, how many items are in a box, as well as safety and emergency buttons.  *Id.* at 357-61.  Ferguson began work at Heilig Myers "unloading trucks" and then was promoted to "order picker operator."  *Id.* at 355.

[219] R. Vol. 19 at 803(alteration supplied).

[220] *Id.*

[221] *Id.* at 806.

"mentally retarded."[222]

> ### ii.    The State's mental health expert

When the State's mental health expert, Dr. C. Van Rosen, examined Ferguson, he had in his possession "a number of records from the district attorney's office . . . and these included police reports and various descriptions . . . of witnesses."[223]  He also received background information from Ferguson's defense attorneys.[224]  In addition, he had some of Ferguson's school records, but he did not think the records were complete.[225]  He stated that a complete set of academic records might have been of marginal assistance, but he did not believe that the additional information would have been significant.[226]

Dr. Rosen was asked whether he still would find that Ferguson was malingering on his IQ test, if he had seen the results of IQ tests that had been administered to  Ferguson while he still was in school, and those test scores were consistent with the examination he gave Ferguson.[227]  Rosen answered: "They would

---

[222] R. Vol. 3, at 806  ("Q.  Now, you are certainly not saying that Mr. Ferguson is retarded, are you?;  A.  No, I am not.  *He is in between retarded and below average.*") (emphasis supplied).

[223] R. Vol. 5, Tab. 20, at 836-37.

[224] *Id.* at 837.

[225] *Id.,* Vol. 6, at 852.

[226] *Id.*

[227] *Id.*

have been somewhat helpful."[228]  He recalled "some of " the records, but could not remember whether his recollection was from materials initially furnished to him, or his examination of Dr. Chudy's report.[229]

Dr. Rosen did not believe that Dr. Chudy had a greater range of materials available to him,[230] but he admitted that Chudy had spoken with family members:  an avenue of investigation that Dr. Rosen "did not feel [was] necessary."[231] "[R]emember [that] my major job was *not* to do a complete psychological evaluation of him."[232]

Dr. Rosen conceded that, even though his evaluation was "pretty comprehensive, . . . [he] could have done more."[233]  He admitted that "some additional information" would have enabled him to conduct  "a more complete evaluation," but since he did not know what the "other information was," he could not say whether the additional information would have been of more than marginal assistance.[234]

Dr. Rosen admitted that the IQ score of 69 derived from his administration of

---

[228] *Id.*

[229] R. Vol. 6, at 852-53.

[230] It is not known whether Dr. Rosen was furnished the same school records as Dr. Chudy.

[231] R. Vol. 6, at 853 (alteration supplied).

[232] *Id.* (alterations and emphasis supplied).

[233] *Id.* (alteration supplied).

[234] *Id.* at 854.

158

a Weschler Intelligence test placed Ferguson in the mentally retarded range,[235] but

diminished the significance of that result, saying that

> it was considered quite apparent that [Ferguson] did not attempt to make
> a good effort in this test, giving up readily on many items and seemingly
> not trying as hard as possible. *The defendant's intellectual functioning
> is consequently considered to be within the higher portion of the
> borderline range of abilities.*[236]

He based his opinion on the fact that the intelligence sub-tests began with

exceedingly easy questions that became progressively harder, and that individuals

attempting to malinger would inconsistently answer the questions, not realizing that

their haphazard answers would reveal an "attempt[] not to do particularly well."[237]

According to Dr. Rosen, Ferguson's responses to questions manifested

> a somewhat inconsistent pattern . . . [and] he readily gave up and said,
> I did not know . . .  He was not particularly attentive in some of the
> tasks.  So all in all it was pretty obvious to me that he as not trying his
> best.  He was trying, but he could have done better.[238]

Dr. Rosen also testified that the results of a single IQ test were "not adequate

---

[235] *Id.*  In his report, Dr. Rosen wrote that he administered "the Reading sub-test for the Wide Range Achievement Test-III" and Ferguson scored a 64, which, although commensurate with an equivalent intelligence score, was "inconsistent with [Ferguson's] handwritten letter to his defense attorney and used as a part of this evaluation."  R. Vol. 17, at 120-21 (alteration supplied); *see also* R. Vol. 5, Tab. 20, at 841-42.  Dr. Rosen intended to administer a planned personality inventory as well, but did not because of Ferguson's problematic reading skills.  R. Vol. 17, at 120.

[236] R. Vol. 17, at 120-21 (alteration and emphasis supplied).

[237] R. Vol. 5, Tab. 20, at 843 (alteration supplied).

[238] *Id.* (alteration supplied).

for an evaluation or a diagnosis of mental retardation."[239]  While he was aware that

Ferguson had been found to be educably mentally retarded in school,[240] he did not

agree that his own IQ test findings were consistent with mental retardation, because

"[a] diagnosis of mental retardation hinges on three things.  Number one, it has to

have happened before [age] 18.  Number two, the reports of standardized test.  And,

number three, his functional capabilities.  All three of those go together to make a

diagnosis of mental retardation."[241]

> **b**.     *The Rule 32 proceedings conducted after* Atkins v. Virginia

On June 20, 2002 — after Ferguson's sentence had become final on direct

appeal — the United States Supreme Court handed down its opinion in *Atkins v.*

*Virginia*.  That decision announced a new rule of constitutional law made retroactive

to cases on collateral review.   *See In re Holladay*, 331 F.3d 1169, 1172 (11th Cir.

2003).  Ferguson timely raised his Eighth Amendment *Atkins* claim for the first time

in a *pro-se* Rule 32 petition filed on March 27, 2003.[242]

Ferguson's petition acknowledged that the *Atkins* opinion "did not set a

mandatory test for evaluating mental retardation," but cited with approval the

---

[239] R. Vol. 6, at 855.

[240] Dr. Rosen also admitted that "there is a range of approximately three to four IQ points by variation meaning if you give the test a hundred times, there is going to be variation."  *Id.* at 856.

[241] *Id.* at 855 (alterations supplied).

[242] Rule 32 C.R. Vol. 12, Tab. 40, at 9-13.

definition promulgated by American Association on Mental Retardation ("AAMR"):

> Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skills areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work.  Mental retardation manifests before age 18.[243]

---

[243] *Id.* at 9 (quoting American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)).  The Supreme Court's decision in *Atkins v. Virginia* did not dictate a national standard for determining whether a criminal defendant is mentally retarded and, for that reason, not subject to the ultimate sanction of the law. Instead, the Court left to the states "the task of developing appropriate ways to enforce the constitutional restriction" upon the execution of mentally retarded convicts.  *Atkins*, 536 U.S. at 317 (citation, internal quotation marks, and footnote omitted).

The Court's reticence to propound hard and fast rules undoubtedly was grounded in the fact that the statutory definitions of mental retardation adopted by Congress and those states that, on the date in 2002 that *Atkins* was decided, prohibited the execution of mentally retarded persons were not identical.  Even so, the Court observed that all of the existing statutes generally conformed to diagnostic criteria promulgated by the American Association on Mental Retardation and the American Psychiatric Association.

The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18." Mental Retardation:  Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and

Ferguson alleged that he met the "criteria set forth by the AAMR."[244]   He pointed out that the *Atkins* Court had observed "that an IQ score between 70 and 75 'is typically the cutoff IQ score for the intellectual function prong of the mental retardation definition.'"[245]   To support his assertion that he met the AAMR's criteria, Ferguson relied upon school records containing evidence that, at age 12, he was administered a Wechsler Intelligence Scale for Children-Revised ("WISC-R") and received a full scale score of 71.[246]   He also pointed to the full scale score of 69 on an IQ test administered when he was "awaiting trial at age twenty-five." [247]   He admitted that "a State expert claimed [at trial] that [he] was malingering on the [latter] test," but contended that the expert "failed to use [objective] scientific malingering scales" and, instead, "gave his own imprecise and biased [subjective] opinion as to how hard

---

Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id*., at 42-43.

*Atkins*, 536 U.S. at 309 n.3 (emphasis in original).  The *Atkins* opinion thus pointed the states in the direction of clinical definitions that have three constituent parts:  that is, in order to be diagnosed as "mentally retarded," the person under evaluation must exhibit (*i*) before the age of eighteen years (*ii*) significantly sub-average intellectual functioning, accompanied by (*iii*) significant limitations in adaptive functioning.

[244] Rule 32 C.R. Vol. 12, Tab. 40, at 9.

[245] *Id.* (citing *Atkins*, 536 U.S. at 309 n.5).

[246] *Id.* at 9-10.

[247] *Id.* at 10.  However, Ferguson failed to include in the Rule 32 petition two additional scores he readily admits he achieved on other IQ tests: "77 at age 6 . . . [and] 87 at age 15."  Doc. no. 9, at 50.

Mr Ferguson tried while taking the test."[248]

Ferguson also asserted that poor academic performance, educator notations, and other testing information contained in his school records showed that he suffered substantial intellectual and adaptive deficits before the age of 18.[249]  The records showed that he was placed in classes for "(educationally) mentally handicapped" persons in the sixth grade, and that he remained in that classification until the ninth grade, when he was placed in classes for "learning disabled" students until he withdrew from school in the tenth grade.[250]  In addition to information contained in his school records concerning his adaptive functioning abilities, Ferguson stated that "virtually everyone who had any extended contact with [him] can testify to his limitations."[251]  In the prayer for relief at the end of his 143-page petition, Ferguson requested "a full evidentiary hearing at which proof may be offered concerning the allegations in this petition[.]"[252]  Ferguson also filed a motion for appointment of counsel.[253]  On July 30, 2003, T. Thomas Cottingham filed a notice of appearance on

---

[248] Rule 32 C.R. Vol. 12, Tab. 40 at 10 (alterations supplied).

[249] *Id.* at 9-13.

[250] *Id.*

[251] *Id.* at 13 (alteration supplied).

[252] R. 32. C.R. Vol. 12, Tab. 40, at 143 (alteration supplied).

[253] Rule 32 C.R. Vol. 12, Tab. 40, at 146-47.

Ferguson's behalf.[254]  Vance Salter appeared as co-counsel.[255]

Nearly two years later, on May 19, 2005, the State filed an answer and argued that Ferguson's *Atkins* claim was due to be dismissed pursuant to Rule 32.7(d), because the claim was refuted by the trial record.[256]  Ferguson filed no response or any other pleading pertaining to his *Atkins* claim.  The following year, on October 18, 2006, the Rule 32 court summarily dismissed Ferguson's Rule 32 petition without a hearing pursuant to Rule 32.7(d), Ala. R. Crim. P.[257]

The Rule 32 court's order of dismissal analyzed *Atkins* and Alabama's then-current post-*Atkins* definition of mental retardation as explicated in *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002), and *Ex parte Smith*, No. 1010267, 2003 WL 1145475, *9 (Ala. Mar. 14, 2003).[258]  The court also engaged in a detailed review of evidence from the trial record in order to determine whether Ferguson met Alabama's mental retardation criteria.[259]  The court ultimately held that Ferguson's *Atkins* claim was without merit, finding that "Ferguson has not and cannot meet his burden of demonstrating that he is 'so impaired as to fall within the range of mentally retarded

---

[254] *Id.* at 165.

[255] *Id.* at 169-175.

[256] *Id.* at 186-87.

[257] Rule 32 C.R. Vol. 16, Tab. 51, at 1-65.

[258] *Id.* at 6-10.

[259] *Id.* at 10-14.

about whom there is a national consensus.'"[260]

    **c**.   *Collateral Appeal*

On collateral appeal, Ferguson again argued that *Atkins* applied, and that an evidentiary hearing was warranted.[261] Ferguson contended that he "should have been afforded an opportunity to present the full array of evidence relevant under *Atkins*, and the circuit court should not have summarily denied such a hearing by reviewing a limited record offered exclusively as mitigation evidence before *Atkins* became the law."[262]

Ferguson also asserted that the evidence underlying his *Atkins* claim, as alleged in his Rule 32 petition, went beyond intelligence test scores, thereby rendering the state court's findings regarding his adaptive functioning abilities inconsistent with criteria specified in *Atkins* and the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition* ("DSM-IV").[263] He argued that his level of adaptive functioning was consistent with a diagnosis of mental retardation,[264] and that the trial judge's determination to the contrary, based

---

[260] *Id*. at 14 (quoting *Atkins*, 536 U.S. at 317).

[261] Rule 32 C.R. Vol. 15, Tab. 42, at 16-21.

[262] *Id*. at 21.

[263] *See id* at 17-19.

[264] Rule 32 C.R. Vol. 15, Tab. 44, pp. 3-4 ("The fact that a person is employed, is promoted in a menial job, marries, or is offered other opportunities is not diagnostically controlling. The adaptive functioning element of mental retardation is much more detailed and only requires deficits

in part on Ferguson's ability to "operat[e] a forklift and marry[]," was "incorrect."[265]
Ferguson contended that he should have been afforded the opportunity to "present expert testimony, post-*Atkins*, in support of his allegations."[266]

Moreover, Ferguson alleged that his attorney had interviewed witnesses, retained experts, reviewed thousands of pages of records, and arranged for Ferguson to be examined by another clinical psychologist — all of which had been for naught because the Rule 32 court had denied him the opportunity for a hearing.[267]

Finally, Ferguson argued that the trial and appellate courts could not determine whether he was mentally retarded "as a matter of law from the existing record,"[268] "[b]ecause the criteria and the importance of such evidence has changed so completely, allegations and evidence regarding mental retardation are appropriate matters for trial [*i.e.*, an evidentiary hearing] in a Rule 32 case."[269]

The Alabama Court of Criminal Appeals rejected Ferguson's arguments and affirmed the Rule 32 court's determination that he was not mentally retarded.

> Ferguson argues that he is entitled to an evidentiary hearing on his claim that he is mentally retarded. He asserts that[,] according to the

---

or impairments in two of the 11 adaptive areas listed in the diagnostic criteria.")

[265] *Id.* at 20 (alterations supplied).

[266] *Id.*

[267] *Id.* at 4.

[268] *Id.*

[269] *Id.* at 10 (alterations supplied).

United States Supreme Court's decision in *Atkins v. Virginia*, supra, he may not be sentenced to death because he is mentally retarded.[FN4] Ferguson contends that there is more evidence of mental retardation than merely his IQ scores. Specifically, he asserts that his school records show that he is mentally retarded.

> FN4. The United States Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), held that executing a mentally retarded individual was not "categorically prohibited" by the Eighth Amendment. This decision was overruled by *Atkins v. Virginia*.

Ferguson is correct that this Court has held that the United States Supreme Court's decision in *Atkins v. Virginia* applies retroactively to cases on collateral review. See *Duncan v. State*, 925 So. 2d 245 (Ala. Crim. App. 2005). Thus, *Atkins* applies to this case.

The Alabama Supreme Court in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), adopted the most liberal definition of mental retardation used by those states that had laws prohibiting the execution of the mentally retarded. The following three factors must be considered: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems must have occurred during the developmental years, i.e., before the age of 18. See *Perkins*.

The circuit court, when addressing this claim, made the following findings:

> "Ferguson does not meet either the intelligence or adaptive functioning elements necessary to establish mental retardation. Ferguson has been administered intelligence testing on numerous occasions throughout his life, both prior to and after his conviction for capital murder. At the age of 6, Ferguson was administered the Stanford-Binet intelligence test and obtained a full scale score of 77. (C.R. 164.) At the age of 12, Ferguson was administered the Wechsler Intelligence Scale for Children-Revised (WISC-R) and obtained a verbal score of

167

74, a performance score of 71, and a full-scale score of 71. (C.R. 148-149.)  It was noted by the examiner of the WISC-R that Ferguson appeared to give up easily when taking the test, indicating he could have scored even higher.  (C.R. 149.)  Based on Ferguson's score, he was placed in classes for the educable mentally retarded.  (C.R. 164.)

"However, when Ferguson was retested three years later [*i.e.*, at the age of 15], he obtained a verbal score of 87, a performance score of 88, and a full-scale score of 87. (C.R. 178.)  These scores placed Ferguson within the low average range of intellectual functioning.  (C.R. 179.) Based in part on those test scores and others, Ferguson was moved out of classes for the educable mentally retarded and into classes for the learning disabled.  (C.R. 191.)  A school official noted at the time that there was a discrepancy between Ferguson's ability and achievement in school.  (C.R. 191.)  The clear import of the comment is that Ferguson was an underachiever in school.

"After being charged with capital murder, Ferguson was examined by court-appointed forensic psychologist C. Van Rosen.  (R. 836.)  Dr. Rosen administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R). (R. 844.)  Ferguson obtained a verbal score of 76, a performance score of 66, and a full-scale score of 69.  (R. 844.)  This score would place Ferguson within the upper bounds of mild retardation.  However, Dr. Rosen testified that Ferguson did not give a good effort on the test.  (R. 843.)  Dr. Rosen surmised that if Ferguson had tried on the test he would have actually scored in the mid to upper 70's. (R. 845.)  In Dr. Rosen's opinion, Ferguson was not mentally retarded.  (R. 844.)

"Dr. Rosen's opinion was supported by Ferguson's own expert psychologist, Dr. James F. Chudy.  While

testifying on behalf of Ferguson during the penalty phase of his trial, Dr. Chudy agreed that Ferguson was not mentally retarded. (R. 806.) Rather, based on his own testing, Dr. Chudy opined that Ferguson's intellectual functioning was somewhere in the borderline range. (R. 792, 806, C.R. 331.)

"As discussed earlier, the Alabama Supreme Court has stated that a full-scale IQ of 72 'seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions.' [*Ex parte*] *Smith*, [Ms. 1010267, March 14, 2003] — So. 3d —, — [(Ala. 2003)]. In another case, the Alabama Supreme Court likewise applied a cutoff of 70 or below in determining that an individual with a full-scale IQ of 76 is not mentally retarded. [*Ex parte*] *Perkins*, [851 So. 2d 453] at 456 [(Ala. 2002)]. The Court of Criminal Appeals, pursuant to *Perkins*, found that two full-scale IQ scores of 77 and 78 'revealed an IQ well above 70 — an IQ that is above the significant subaverage' range. *Stallworth* [*v. State*], 868 So. 2d [1128] at 1182 [(Ala. Crim. App. 2001)] (citation omitted).

"There is no doubt that Ferguson's IQ lies somewhere in the mid 70's to lower 80's and is best classified as borderline to low average intellectual functioning. Therefore, Ferguson's IQ is above the 'significant subaverage' range required for a finding of mental retardation.

"Moreover, the Court of Criminal Appeals noted in its decision on direct appeal the following regarding Ferguson's claim of mental retardation:

"'Moreover, contrary to Ferguson's contention, we find no evidence in the record

169

indicating that Ferguson was mentally retarded.  In fact, both Ferguson's expert, Dr. Chudy, and the [State's] expert, Dr. Rosen, stated unequivocally that Ferguson was not mentally retarded.   Although there was evidence that Ferguson had an IQ of 69 and was in the borderline range of intelligence, Dr. Rosen testified that the results of Ferguson's IQ test were deceptive because, Dr. Rosen said, Ferguson had purposefully not put an effort into the test in order to appear more troubled than he really was.  Dr. Rosen stated that it was his belief that[,] had Ferguson made an effort when taking the test, his IQ would have been in the middle to upper 70s.  Clearly, the trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was mentally retarded.'

"*Ferguson v. State*, 814 So. 2d at 965.  As such, the *Atkins* decision does not affect Ferguson's death sentence.

"Out of an abundance of caution, the Court will also briefly discuss evidence concerning whether Ferguson exhibits significant or substantial deficits in adaptive functioning.   As discussed earlier, to be diagnosed as mentally retarded, an offender must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, at p. 41.

"In assessing an offender's adaptive functioning, the state appellate courts have looked to a myriad of factors in

determining whether one is mentally retarded and therefore exempt from the death penalty. *Perkins*, 851 So. 2d at 456; [*Ex parte*] *Smith*, [Ms. 1010267, March 14, 2003] — So. 3d —, — (Ala. 2003)]; *Stallworth*, 868 So. 2d at 1182. Among these factors are: employment history, the ability to have interpersonal relationships, being extensively involved in criminal activity and post-crime craftiness or the part of the criminal.  The record demonstrates that all of these factors apply to Ferguson and establish that he is not mentally retarded.

"Prior to his arrest, Ferguson had held many jobs, including working at a chicken plant for one year and a sand processing plant.  (C.R. 92, 329.)  Ferguson also worked at Helig-Meyers.  While there, Ferguson even obtained a promotion from loading trucks to operating machinery.  (R. 823.)  Clearly, Ferguson was able to seek out and maintain employment.

"Ferguson also has the ability to develop and sustain interpersonal relationships with others.  During the penalty phase, Ferguson's wife testified that at the time of the murders, she and Ferguson had been married for almost five years.  (R. 811.)  Ms. Ferguson described him as a good husband who provided for her and supported her while she was in nursing school. (R. 811-812.)  Moreover, Ferguson's actions before, during, and after the crime support the conclusion that he is a street-wise criminal intent on minimizing his culpability and establishing a defense to his crime.  This conduct strongly indicates that Ferguson does not have substantial deficits in adaptive functioning.  Ferguson was an active member in a criminal gang that planned and carried out not only the murders of Harold and Joey Pugh but also a bank robbery. Ferguson had also been convicted of forging checks.  Additionally, during his psychological evaluation with Dr. Chudy, Ferguson admitted that he had sold drugs for money.  (C.R.

92, 117.)

"Finally, Ferguson's post-crime actions further demonstrate that he does not possess severe deficits in adaptive functioning. Ferguson gave a statement to investigators in which he repeatedly attempted to deceive and mislead authorities as to the extent of his involvement in the murders. Ferguson admitted that he removed the seat from the victim's boat and burned it, explaining that he was worried that he had left fingerprints on the seat. Ferguson's actions — his destroying evidence and misleading authorities — demonstrate a high level of adaptive functioning.[270]

"In sum, Ferguson has not and cannot meet his burden of demonstrating that he is 'so impaired as to fall within the range of mentally retarded about whom there is a national consensus.' *Atkins*, 536 U.S. at 317. It is clear from his school records and the testimony of both Drs. Rosen and Chudy that Ferguson is not mentally retarded. The Court concludes that Ferguson is not mentally retarded. Thus, his *Atkins* claim is without merit, and is summarily dismissed by the Court. Ala. R. Crim. P. 32.7(d)."

(C.R. 450-54.)

We have reviewed the record of Ferguson's direct appeal and the

---

[270] Although omitted by the Alabama Court of Criminal Appeals in its citation to the Rule 32 trial judge's order, the Rule 32 court placed a footnote at this point in its opinion stating that:

Ferguson's school records also indicate that as a child he did not exhibit severe deficits in adaptive functioning. Ferguson was administered a behavioral rating in 1988 that revealed no significant problems. (CR. 187). In 1989, an evaluation performed by Tennessee Valley Rehabilitation Center, Inc. found that Ferguson's functional skills were adequate. (CR. 193-94).

Rule 32 C.R. Vol. 16, Tab 50 at 13-14 n.5.

> record of the postconviction proceedings, and we conclude that the circuit court's findings are more than supported by the record. It is clear that Ferguson does not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in *Perkins*. The circuit court did not err in declining to hold a hearing on Ferguson's claim that he is mentally retarded.

*Ferguson v. State*, 13 So. 3d 418, 433-36 (Ala. Crim. App. 2008) (alterations to case citations and a footnote were supplied, all other alterations in original).

### 2. *The* habeas *claim*

Ferguson against states in the title of the *habeas* claim he filed in this court that he was "improperly" denied a hearing on his mental retardation claim in accordance with *Atkins v. Virginia*, 536 U.S. 304 (2002).[271] He argues that "[d]ue process demands that a state provide a person eligible for the death penalty particularly stringent safeguards."[272] Other than those two statements, however, Ferguson's allegations do not indicate that he is attempting to state a procedural due process claim arising from the state court's failure to afford him an evidentiary hearing during the collateral review process. Moreover, he admits that "*Atkins* did not dictate a particular procedure to assess mental retardation in a defendant."[273]

Even if Ferguson were attempting to assert a procedural due process claim,

---

[271] Doc. no. 9, at 47.

[272] *Id.* at 48 (alteration supplied).

[273] *Id*. at 49 (citing *Atkins*, 536 U.S. at 317).

with the basis for such a claim being that the state court improperly denied him an evidentiary hearing, the claim would fail. "Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but 'an alleged defect in a collateral proceeding does not state a basis for habeas relief.'" *Alston v. Department of Corrections*, 610 F.3d 1318, 1325-1326 (11th Cir. 2010) (quoting *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) (citations omitted)). Such a "challenge concerns a state matter because [Alabama] provides for post-conviction procedures through its state statutes. These collateral proceedings are a state created right. Thus, the state court finding[s] . . . concern[] the state's application of its own post-conviction procedures, not the legality of [Ferguson's] detention." *Id.* at 1326 (alterations supplied).

Thus, Ferguson's *habeas* claim is ultimately predicated on the argument that the state courts' rejection of his *Atkins* claim was an unreasonable application of clearly established Supreme Court precedent, and constituted an unreasonable determination of the facts in light of the evidence before those courts on collateral review.[274] Since Ferguson believes that the state courts' factual findings were "unreasonable in light of the evidence before them," Ferguson argues that the

---

[274] *Id.* at 60-61; doc. no. 15, at 14-15 (citing 28 U.S.C. 2254 (d)(1) & (2)).

174

findings are not entitled to a presumption of correctness.[275]  Ferguson contends that federal law entitles him to an evidentiary hearing here, in this court.[276]

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's dismissal of Ferguson's *Atkins* claim because it found that the lower court properly determined that "Ferguson does not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in *Perkins*."  *Ferguson v. State*, 13 So. 3d at 436. Ferguson agrees the *Atkins* Court guided, but did not specify, the mental retardation criteria to be applied by the states, nor did the *Atkins* Court establish a mandatory procedure for the states to follow when making mental retardation determinations.[277] He also agrees that *Ex parte Perkins* establishes the appropriate criteria for determining mental retardation in the State of Alabama.[278]

What Ferguson does not agree with are the state courts' determinations in light of the evidence before them.  He does not take issue with the historic factual findings (at least to the extent that the Rule 32 court described the *content* of his school records, psychological reports, and trial testimony when considering his *Atkins* claim). He also does not dispute that the Rule 32 court retrieved every single bit of

---

[275] Doc. no. 15, at 14-15 (citing 28 U.S.C. § 2254(d)(2)).

[276] *Id.*

[277] Doc. no. 9, at 49.

[278] *Id.*

175

that *content* from testimonial and record evidence that was admitted during his 1998 trial.  To the extent that Ferguson does argue that the state courts made unreasonable findings on collateral review, he divides his arguments among the three criteria for determining mental retardation: significantly subaverage intellectual functioning; significant or substantial deficits in adaptive behavior; and, the manifestation of those deficits before the age of 18.

**a**.    *Intellectual functioning*

Ferguson admits that he "has taken four IQ tests — scoring (1) 77 at age 6; (2) 71 at age 12; (3) 87 at age 15; and (4) 69 at age 25."[279]  Still, he contends that these test scores "fail to tell the whole story" because "IQ tests are susceptible to measurement error."[280]  He relies upon two forms of measurement error:  the standard error of measurement; and the "Flynn Effect."[281]  Ferguson contends that the state courts should have considered both forms of measurement errors, which he alleges would have altered (lowered) his full scale test scores.[282]  He states that the Alabama courts did not take either form of measurement error into account, and asserts "that

---

[279] *Id.* at 50 (citations to trial record omitted).

[280] *Id.*

[281] *Id.* at 50-53; doc. no. 15, at 15-16.  The Flynn Effect is "a method that recognizes the fact that IQ scores have been increasing over time" and "acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects."  *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010).

[282] Doc. no. 9, at 50-53; doc. no. 15, at 15-16.

176

omission alone justifies granting an evidentiary hearing."[283]

This court finds that Ferguson has failed to provide clear and convincing evidence to overcome the presumption of correctness that attaches to the state court's factual findings. Ferguson also has not demonstrated that the state courts unreasonably applied federal law in connection with their assessment of his intelligence tests. Furthermore, Ferguson did not raise either argument in the Rule 32 court, or on collateral appeal.[284] Moreover, Ferguson is not correct when he states that the state post-conviction court did not take the SOM into account. The Rule 32 court's opinion expressly recognized that "[a]ny IQ test score should be considered in light of the standard error of measurement which is generally +/- 5."[285]

### i. The Flynn Effect

Since Ferguson did not raise the Flynn Effect as an issue during collateral review, this court cannot now consider it. When a state court has adjudicated a claim on the merits, this court must judge the state court's decision on the record before that court. Even if Ferguson had raised the Flynn Effect as a concern on collateral review, neither *Atkins* nor Alabama law *requires* that a trial judge take the phenomenon into

---

[283] Doc. no. 9, at 50.

[284] Rule 32 C.R. Vol. 12, Tab. 40, at 9-14 (petition); *id.*, Vol. 15, Tab. 42, at 16-21, and Tab. 44, at 9-11 (collateral appeal briefs).

[285] Rule 32 C.R. Vol. 16, Tab. 51, at 7 (citing www.aamr.org/Policies) (alteration supplied).

account when evaluating a defendant's IQ test scores.  The cases cited by Ferguson

in support of the Flynn Effect[286] are not binding authorities of the Supreme Court,

Eleventh Circuit, or State of Alabama, and none of them have held that the Flynn

Effect must be taken into account when examining an IQ test score.  Moreover, this

court finds that, to the extent the appellate courts of the State of Alabama have

discussed the Flynn Effect, they have stated that consideration of the phenomenon

lies in the discretion of the trial judge.  For example, the Alabama Court of Criminal

Appeals observed in its 2009 opinion in the case of *Beckworth v. State*, No. CR-07-

0051, 2009 WL 1164994 (Ala. Crim. App. May 1, 2009), that it had not previously

> addressed the "Flynn effect," see *James R. Flynn, Tethering the
> Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psych., Pub.
> Pol'y, & L., 170-78 (2006), which posits that IQ scores increase over
> time in certain populations.  However, the Texas Court of Appeals
> recently stated:  "We have previously refrained from applying the Flynn
> effect . . . noting that it is an 'unexamined scientific concept' that does
> not provide a reliable basis for concluding that an appellant has
> significant sub-average general intellectual functioning." *Neal v. State*,
> 256 S.W.3d 264, 273 (Tex. Crim. App. 2008).

*Beckworth*, 2009 WL 1164994 at *38 n.5 (some citations omitted), *reversed on other*

*grounds*, *Ex parte Beckworth*, No. 1091780, 2013 WL 3336983 (Ala. July 3, 2013).

A more recent decision of the Alabama Court of Criminal Appeals, *Albarran*

*v. State*, 96 So. 3d 131 (Ala. Crim. App. 2011), makes it clear that consideration of

---

[286] Doc. no. 9, at 50-55.

the Flynn Effect is not a *requirement* of Alabama's criteria for determining whether

a criminal defendant suffers from mental retardation.  That opinion states:

> First, this Court cannot, based on the record, say that the circuit court
> abused its discretion in determining that Albarran failed to meet the
> definition of mental retardation adopted by the Alabama Supreme Court
> in *Perkins* based on Albarran's IQ score.   Although Dr. Weinstein also
> testified that, when adjusted for the "Flynn effect," Albarran's IQ was
> around 68, the circuit court could have reasonably rejected the "Flynn
> effect"  and determined that Albarran's IQ was 71.  *Gray v. Epps*, 616
> F.3d 436, 446 n.9 (5th Cir. 2010) (quoting *In re Mathis*, 483 F.3d 395,
> 398 n.1 (5th Cir. 2007) ("[T]he Flynn Effect 'has not been accepted in
> this Circuit as scientifically valid.'")); *Bowling v. Commonwealth*, 163
> S.W.3d 361, 375 (Ky. 2005) (holding that "*Atkins* did not discuss
> margins of error or the 'Flynn effect' and held that the definition [of
> mental retardation] in KRS 532.130(2) 'generally conform[ed]' to the
> approved clinical definitions" so the court could not consider the Flynn
> effect); *Thomas v. Allen*, 607 F.3d 749, 758 (11th Cir. 2010) [(observing
> that:] "[T]here is no uniform consensus regarding the application of the
> Flynn effect in determining a capital offender's intellectual functioning,
> and there is no Alabama precedent specifically discounting a court's
> application of the Flynn effect . . . .").  Because the circuit court could
> have reasonably determined that Albarran's IQ was 71, a score that
> places him outside the Alabama Supreme Court's definition of mental
> retardation, this Court cannot say that the circuit court abused its
> discretion in denying Albarran's *Atkins* motion.

*Albarran*, 96 So.3d at 199-200 (second alteration supplied, all others in original,

footnote omitted).

### *ii*.     *Standardized malingering test*

Finally, Ferguson criticizes the state courts' decision to credit Dr. C. Van

Rosen's opinion that Ferguson did not put forth his best effort on the 1997 WAIS-R

examination, because Dr. Rosen did not conduct a standardized test to determine whether Ferguson was "malingering" and, thereby, verify his opinion. However, Ferguson points to no federal or state law requiring the administration of such a procedure. He also failed to show that Dr. Rosen, an experienced clinical psychologist, was not qualified to state such an opinion based upon his personal observations of Ferguson, and the specific inconsistencies he observed in the testing processes. Ferguson's assertion that Dr. Rosen was "biased" is conclusory, and unsupported by any thing other than his (or his attorney's) subjective opinion.

Importantly for the resolution of the present issue, Ferguson's own expert, Dr. James F. Chudy, drew the same conclusion as Dr. Rosen. While Dr. Chudy did not administer a full-scale IQ test, because it would have been conducted too soon after the administration of Dr. Rosen's test to produce reliable results, he did conduct a short-form intelligence test and an additional battery of academic and personality assessment instruments. Morever, he was well-versed in the particulars of Ferguson's school records. Even with all of those cross-validity testing tools, Dr. Chudy still concluded that Ferguson's intellectual functioning ability was within the "borderline" range. It was well within the state courts' fact-finding discretion to determine the weight and credibility of the evidence before the courts, and that includes a decision to rely on an expert's testimony concerning malingering.

180

b.    *Adaptive Functioning*

Ferguson contends that his *Atkins* claim should proceed to an evidentiary hearing in this court, because the sentencing court "never properly examined the deficits in Mr. Ferguson's adaptive behavior."[287]   That contention is correct. Curiously, however, Ferguson attempts to convince this court to grant *habeas* relief on his *Atkins* claim by quoting from the opinions of the state intermediate and supreme courts *on direct appeal*.[288]  Of course, neither of those opinions addressed Ferguson's *Atkins* claim and, consequently, he cannot argue that the findings stated in either opinion was unreasonable from an evidentiary or legal standpoint.  As such, no further discussion is necessary in connection with the opinions of either state appeals court on direct appeal.[289]

Instead, the pertinent opinion for this court's review under 28 U.S.C. § 2254(d) is the opinion of the Alabama Court of Criminal Appeals on collateral appeal.  In order to obtain *habeas* relief, Ferguson must show that that court's affirmation of the

---

[287] Doc. no. 9, at 50.

[288] *Id.* at 59-60.  Ferguson's reliance upon the opinions of the Alabama Court of Criminal Appeals and the Alabama Supreme Court *on direct appeal* is characterized as "curious" because neither opinion, like the sentencing court, "properly examined the deficits in Mr. Ferguson's adaptive behavior."

[289] While consideration of a person's limitations in his adaptive functioning abilities became a component of the definition of mental retardation in 1959, the notion that you had to test for it did not become a diagnostic requirement until 2002, when the tenth edition of the American Association of Mental Retardation's manual was published.  Before then, psychologists relied primarily upon clinical judgment and the observations of third-party informants to assess a person's adaptive skills.

Rule 32 court's findings about his adaptive functioning abilities was an unreasonable application of *Atkins,* or an unreasonable determination of the facts in light of the evidence before those courts.

Ferguson suggests that the state courts' determinations about his adaptive functioning abilities are based upon incomplete school records or "other evidence," and that additional evidence would show substantial deficits.[290] From that platform, he again contends that he is entitled to an evidentiary hearing in this court.[291]   That argument is similar to a claim he made on collateral appeal: *i.e.*, that his school records were incomplete, and other evidence of his childhood adaptive functioning abilities was lacking.  A review of the trial record and the allegations in Ferguson's appellate brief, however, shows that his contentions about an incomplete or limited record were untrue then, and that they are equally untrue now.[292]  Almost every single

---

[290] *Id.* at 56-59.

[291] *Id.*

[292] Ferguson claimed that the record before the Rule 32 court was incomplete in that there existed additional evidence of his mental retardation in other information that was discovered after trial, but before his Rule 32 petition was filed.  A review of the trial record and the allegations in Ferguson's Rule 32 petition and appellate brief show that his contentions about an incomplete or limited record are untrue, with two insignificant and technical exceptions: an allegation (1) that anyone who ever had extended contact with him could testify to his limitations, and (2) that a sixth grade teacher had described him as "'incapable of premeditation on anything.'"  *See* Rule 32 C.R. Vol. 12, Tab. 40, at 13 (petition); *id.*, Vol. 15, Tab. 42, at 19 (appeal brief).  Other than these two items, all information in the Rule 32 petition and the briefs on collateral appeal were taken directly from Ferguson's extensive school records, which were admitted into evidence by defense counsel at the penalty phase of trial.  *See* R. Vol. 5, Tab. 19, at 780); C.R. Vol. 7, at 127-200; *id.*, Vol. 8, at 201-230 ("Defendant's 2"); *id.*, Vol. 8, at 231-60 ("Defendant's 3").  Importantly, Ferguson's "other" information is not in addition to nor would it have completed the record before the Rule 32

piece of information supporting the allegations in the Rule 32 petition, the briefs on collateral appeal, and in the present *habeas* petition *can be found* in school records offered and admitted into evidence by defense counsel during the penalty phase of trial.[293]  Thus, there are no incomplete school records.

As to Ferguson's "other evidence," he states: "Complementing Mr. Ferguson's school records, other evidence [adduced] at an evidentiary hearing would support additional adaptive deficiencies.  Mr. Ferguson's sixth grade teacher, for instance, described him as 'incapable of premeditation on anything.'"[294]  He contends that "[o]ther testimony also would establish the existence of inadequate *social* skills" during his childhood, because he was "unnerved" by "large groups of people," and exhibited a deficit in *communication* skills due to a speech impediment.[295]  He argues that such evidence also would establish that he  was socially inept as an adult, in that he was easily led, and only felt truly comfortable in the presence of children.[296]

---

court,  because the same subject matter already had been well developed through the trial testimony, psychological reports and school records submitted at his 1998 trial.  The "record" of Ferguson's state of functioning was therefore not limited or incomplete on collateral review and thus *ipso facto*, the state court did have before it a complete record of evidence from which it could determine whether Ferguson was mentally retarded.

[293] *See* R. Vol. 5, Tab. 19, at 780; C.R. Vol. 7, at 127-200; *id.*, Vol. 8, at 201-230 ("Defendant's 2"); *id.*, Vol. 8, at 231-60 ("Defendant's 3").

[294] Doc. no. 9, at 58 (quoting Rule 32 C.R. Vol. 12, Tab. 40, at 13) (alteration supplied).

[295] *Id.* at 58-59  (citing Rule 32 C.R. Vol. 12, Tab. 40, at 74, 76) ("Rule 32 Petition") (emphasis by petitioner) (alteration supplied).

[296] *Id.*

This allegedly "additional information" is cumulative to the testimony and documentary evidence already in the 1998 trial record, which was carefully examined by the state post-conviction court in the context of Ferguson's *Atkins* claim. Ferguson's school records are replete with references to his communication deficits and minimal social skills, as are the reports of the two psychologists who examined him before trial.   The deficits in Ferguson's adult social skills were also testified to by his wife, and are set out in the psychological reports as well.  Ferguson's assertion that he was only comfortable in the presence of children is the only additional allegation that is not present in the trial records.

In sum, Ferguson's school records were not incomplete, and the "other evidence" is, with the one exception noted in the previous paragraph, cumulative to the trial record.  Thus, the state courts' rejection of the adaptive functioning prong of his *Atkins* claim is not unreasonable, to the extent the courts relied upon the trial record.

Even so, one serious concern is the quality of the clinical assessment of Ferguson's adaptive functioning abilities in the trial record.  Dr. C. Van Rosen admitted he did not conduct a comprehensive evaluation of Ferguson's adaptive functioning abilities, and that he could have done more.  He did not consult with, or administer adaptive functioning tests to, family members, friends, co-employees, or

184

employers.  He did not closely examine Ferguson's school records.  In fact, he did not even deem it necessary to do so.  While Dr. Rosen testified that Ferguson's marriage and job abilities were consistent with borderline *intellectual* functioning, he was never asked whether those same skills were also consistent with the adaptive functioning abilities of individuals who suffered from mental retardation.  He was never asked to define the skill level demonstrated by Ferguson's criminal acts, social deficiencies, and purported reliance on his wife to handle most affairs of their marriage.  Moreover, there was no mention during his testimony of the eleven criteria of adaptive functioning listed in the American Association of Mental Retardation's manual and the DSM-IV.

Dr. James Chudy's assessment of Ferguson's adaptive functioning skills contains some of the same deficits.  Although he clearly saw the importance of interviewing family members, and of examining Ferguson's life history and job skills, he also failed to administer an adaptive functioning test to anyone.

Thus, unlike the examination of Ferguson's adaptive functioning skills as a child, which was clearly relied upon by school officials when making placement decisions during his years of formal public education, such concentration is clearly absent for the time period in which Ferguson was on trial.

Still, the state courts do not appear to have relied entirely upon the clinicians'

185

assessments of adaptive functioning.  Instead, those courts relied upon the adaptive functioning assessments performed when Ferguson was a child, demonstrating that he did *not* have significant deficits in functioning after the age of 12.  The state courts also did not rely solely on the testimony of the experts at trial to assess Ferguson's adult adaptive functioning, but instead utilized the DSM-IV criteria to determine the level of that functioning, and their decisions state the reasons for rejecting Ferguson's contention that he had significant deficits.

c.   *Onset before age eighteen*

Ferguson begins this part of his argument by correctly observing that the Alabama Supreme Court's opinion in "*Perkins* does not require all *evidence* [of mental retardation] to predate a defendant's 18th birthday."[297]  Even so, and taking all "evidence" into account, if it cannot be demonstrated that Ferguson's alleged mental retardation was manifest before he attained the age of 18 years, then he does not meet the diagnostic criteria for mental retardation.

School records clearly show that, after age 12, officials determined through extensive intelligence and adaptive functioning testing that Ferguson should be classified as " Learning Disabled," because he had a reading deficit and a secondary developmental spelling deficit.  Thus, school officials determined that Ferguson's

_____

[297] Doc. no. 9, at 61 (emphasis and alteration supplied).

intelligence scores and adaptive functioning skills were attributable to his learning disability, and not to mental retardation.

### 3. *Conclusion*

In summary, the only basis upon which this court could find that the state courts' rejection of Ferguson's mental retardation claim was an unreasonable determination of the facts before those courts, or an unreasonable application of the Supreme Court's *Atkins* opinion, is that the evidence was presented at trial in the context of a mitigating circumstance; and, consequently, cannot be relied upon in the context of a post-*Atkins* collateral appeal. In that regard, Ferguson argues that the state courts "made much of Mr. Ferguson's and the State's [pyschological] experts declaring — while not considering an *Atkins* claim, but a mere mitigating circumstance at sentencing — that Mr. Ferguson was not mentally retarded."[298] He complains that the state courts placed too much significance on the experts' opinions, and asserts that the experts "may have expended more care in their determination" if they had known of *Atkins* and its consequences.[299] Even so, Ferguson does not contend that the definition of mental retardation, as understood, testified to, and applied by mental health experts in 1998, differed in any degree from Alabama's legal

---

[298] *Id.* at 62 (alteration supplied).

[299] *Id.*

187

definition of mental retardation in 2003. It was not unreasonable for the state courts to determine that the testimony provided by the experts was sufficient to conclude that Ferguson's deficits in intelligence and adaptive functioning were the product of borderline intelligence, and not mental retardation.[300]

Moreover, to support his argument concerning reliance on the experts, Ferguson quotes from the opinion of the Alabama Court of Criminal Appeals on *direct appeal*.[301] Again, the pertinent opinions for this court's review under 28 U.S.C. § 2254(d) are the opinions of the Rule 32 trial court and the Alabama Court of Criminal Appeals on *collateral review proceedings*. Those courts reviewed all of Ferguson's allegations of mental retardation within the context of *Atkins*, and Alabama's post-*Atkins* definition of mental retardation. Ferguson simply has not provided clear and convincing evidence to overcome the factual determinations made by those courts, nor has he shown that the state courts unreasonably applied *Atkins* simply because the relevant evidence was presented as mitigation, and not in support of a constitutional claim.

In conclusion, Ferguson has failed to show that no fairminded jurist would have reviewed and adjudicated his *Atkins* claim like the state courts did in this case.

---

[300] *See* R. Vol. 5, Tab. 19, at 786-810; *id.*, Vol. 5, Tab. 20 at 833-46; *id.*, Vol. 6, at 847-63.

[301] *Id.* (quoting *Ex parte Ferguson*, 814 So. 2d at 978) (quotation omitted).

Ferguson's arguments in support of his claim for *habeas* relief are derived from the same evidence that was presented at trial and argued from an *Atkins* standpoint on collateral review. It was not unreasonable for the state courts to decide that Ferguson's arguments did not establish that he was mentally retarded under *Atkins,* because he could not show that he met even the broadest definition of mental retardation under Alabama law. This claim is due to be denied.

G.    **The Trial Judge Violated Ferguson's Constitutional Rights by Refusing to Consider Undisputed Mitigating Evidence**.[302]

Ferguson alleges that the trial judge violated the Eighth and Fourteenth Amendments by failing to consider, and give effect to, undisputed evidence of statutory and non-statutory mitigating circumstances.[303]    *See*, *e.g.*, *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987) (holding that the sentencer may not refuse to consider any relevant mitigating evidence). He asks this court to vacate his "death sentence and instruct that [he] be sentenced to life without parole."[304]

Ferguson identifies three statutory mitigating factors for which he contends there was "undisputed" evidence: *i.e.,* "extreme mental or emotional disturbance"; "extreme duress or domination by another person"; and, "lack of capacity to

---

[302] *See* Doc. no. 9, ¶¶ 119-137, at 63-75 (petition); doc. no. 15, ¶¶ 29-30, at 16 (reply brief).
[303] Doc. no. 9, at 63.
[304] *Id.* at 73 (alteration supplied).

189

appreciate the criminality of his conduct or to conform his conduct to the law."[305]

Ferguson's allegations concerning non-statutory mitigating factors include the same evidence he offers in support of the statutory mitigating factors, *and*, allegations concerning undisputed evidence of "his troubled childhood and history of mental retardation."[306]

Since Ferguson asserts that evidentiary proof of each of these factors was undisputed at trial, he concludes that the trial judge's refusal to apply the factors violated his constitutional rights.[307]   He also asserts that the Alabama Court of

---

[305] *Id.* at 63-64.  These factors are more accurately described in Ala. Code §§ 13A-5-51(2), (5) and (6) (1975), as follows:

> (2)  The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance,
>
> . . . .
>
> (5) The capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirement of law was substantially impaired,
>
> (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

[306] Doc. no. 9, at 69-73.  The statutory basis for presentation of this evidence is found in Ala. Code § 13A-5-52, which reads:

> In addition to the mitigating circumstances specified in 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character of record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

[307] Doc. no. 15, at 16.

190

Criminal Appeals, "in turn, did not adjudicate the merits of Mr. Ferguson's mitigating evidence either.  It simply adopted the findings of the lower court, findings that were in direct conflict with Supreme Court precedent."[308]  Ferguson requests a hearing to present his mitigating evidence.[309]

Ferguson's version of this claim's development and adjudication on direct appeal is incomplete.  Almost all of the arguments and evidence underlying the present *habeas* claim are *the same arguments and evidence* Ferguson presented to the Alabama Court of Criminal Appeals and to the Alabama Supreme Court on direct appeal.[310]  Contrary to Ferguson's contention, the Alabama Court of Criminal Appeals *did* adjudicate the merits of his claims on direct appeal, and dedicated eight pages of its opinion to an independent examination of the record, the sentencing judge's order, and Ferguson's argument.  *See Ferguson v. State*, 814 So. 2d 925, 959-67 (Ala. Crim. App. 2000).

Importantly, Ferguson never acknowledges the decision of the Alabama

---

[308] *Id.*

[309] *Id.*  Ferguson does not complain that he was deprived of a full and fair hearing at the penalty or sentencing phase of trial, nor does he assert that he was prevented from presenting any of the mitigating evidence he desired during those proceedings.

[310] *See* doc. no. 9 at 63-72 (petition); C.R. Vol. 9, Tab. 29, at 14-25 (direct appeal brief); CR. Vol. 10, Tab. 34, at 18-34 (brief in support of petition for writ of *certiorari*).  Ferguson did argue on direct appeal that there were other mitigating factors that the trial court failed to find, but since those additional factors are not raised in his *habeas* claim, they are immaterial and irrelevant to the present analysis.

Supreme Court, the last state court to examine the merits of the claim on direct appeal.  In a lengthy and detailed opinion, that Court also independently examined the record, and upheld the Alabama Court of Criminal Appeals' affirmation of the trial court's sentencing determinations.  *See Ex parte Ferguson*, 814 So. 2d 970, 975-79 (Ala. 2001). In doing so, the Alabama Supreme Court affirmed the legal and factual findings made by the Alabama Court of Criminal Appeals, and expressly found that the intermediate appellate court had examined Ferguson's underlying allegations as being offered in support of both the statutory and non-statutory mitigating factors at issue.  *Id.*

With the understanding that the Alabama Supreme Court was the last state court to make a decision on the merits of this claim, analysis of Ferguson's *habeas* contentions shall, nonetheless, be organized by utilizing  the more detailed opinion of the Alabama Court of Criminal Appeals, while acknowledging any further discussion by the Alabama Supreme Court in its affirmation of the the intermediate state appellate court's opinion.

The pertinent portions of the Alabama Court of Criminal Appeals' opinion read as follows:

> Ferguson contends that the trial court erred in failing to consider and to find several statutory and nonstatutory mitigating circumstances. Because Ferguson did not object to the trial court's findings below, we

192

review these claims only for plain error.  See Rule 45A, Ala. R. App. P.

> "In *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors.  However, *Lockett* does not require that all evidence offered as mitigating evidence be found to be mitigating.  *Lockett* provides that a state may not exclude evidence that the defendant claims is mitigating.  This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."

*Ex parte Hart*, 612 So. 2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S. Ct. 2450, 124 L. Ed. 2d 666 (1993).

> "'While *Lockett* and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' "  *Ex parte Slaton*, 680 So. 2d 909, 924 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S. Ct. 742, 136 L. Ed. 2d 680 (1997), quoting *Bankhead v. State*, 585 So. 2d 97, 108 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993).  "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact."  *Harrell v. State*, 470 So. 2d 1303, 1308 (Ala. Crim. App. 1984), *aff'd*, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985).

> "'A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors.  *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.

Ct. 869, 874, 71 L. Ed. 2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65, 57 L. Ed. 2d 973 (1978)).   The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987); *Ex parte Henderson*, 616 So. 2d 348 (Ala. 1992); *Haney v. State*, 603 So. 2d 368 (Ala. Cr. App. 1991), *aff'd*, 603 So. 2d 412 (Ala. 1992), *cert. denied*, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993).  Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. *Carroll v. State*, 599 So. 2d 1253 (Ala. Cr. App. 1992), *aff'd*, 627 So. 2d 874 (Ala. 1993), *cert. denied*, 510 U.S. 1171, 114 S. Ct. 1207, 127 L. Ed. 2d 554 (1994).  *See also Ex parte Harrell*, 470 So. 2d 1309 (Ala.), *cert. denied*, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985).  Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.  *Morrison v. State*, 500 So. 2d 36 (Ala. Cr. App. 1985), aff'd, 500 So. 2d 57 (Ala. 1986), *cert. denied*, 481 U.S. 1007, 107 S. Ct. 1634, 95 L. Ed. 2d 207 (1987).'"

*Wilson v. State*, 777 So. 2d 856, 892 (Ala. Crim. App. 1999), quoting *Williams v. State*, 710 So. 2d 1276, 1347 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998).  The fact that the trial court does not list and make findings in its sentencing order as to the alleged nonstatutory mitigating circumstances offered by a defendant indicates only that it found some evidence not to be mitigating, not that it did not consider the evidence.  See, e.g., *Ingram v. State*, 779 So. 2d 1225 (Ala. Crim. App.

194

1999).

It is clear from the sentencing order in this case that the trial court properly considered all of the mitigating evidence Ferguson offered. The record reflects that Ferguson was not limited in any way regarding the evidence he presented or the arguments that he made.   In its sentencing order, the trial court treated each statutory mitigating circumstance listed in § 13A-5-51, Ala. Code 1975; made conclusions as to the existence or nonexistence of each circumstance; and made specific findings of fact regarding each circumstance.  Although the trial court did not list and make findings as to each nonstatutory mitigating circumstance offered by Ferguson, it did include a section in its sentencing order indicating that, in compliance with § 13A-5-52, Ala. Code 1975, it had considered the nonstatutory mitigation offered by Ferguson, and it specifically found the existence of two nonstatutory mitigating circumstances:  (1) that Ferguson had turned himself into police and had confessed to the crime; and (2) that the jury had recommended a sentence of life imprisonment without the possibility of parole.  Thus, we have no doubt that the trial court fully complied with *Lockett* and its progeny and considered all the evidence offered by Ferguson in mitigation.

We now turn to whether the trial court's findings regarding the existence or nonexistence of specific mitigating circumstances were proper.

First, Ferguson contends that the trial court erred in failing to find as statutory mitigation: (1) that he was under the influence of extreme mental or emotional disturbance, see § 13A-5-51(2), Ala. Code 1975; (2) that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, see § 13A-5-51(6); and (3) that he was acting under extreme duress or the substantial domination of another person, see § 13A-5-51(5).  Ferguson maintains that, in finding that these mitigating circumstances did not exist, the trial court improperly applied the standard of legal insanity by requiring him to "be so impaired as to be legally excusable from any criminal liability before it would consider giving mitigating effect" to

195

these circumstances.  (Ferguson's brief to this court, p. 11.)  He claims that the trial court's findings that he knew right from wrong, that he was not insane, and that he had exercised his own volition in participating in the crimes showed that the trial court had improperly applied the standard for an insanity defense when considering the mitigating circumstances.  In addition, he maintains that the trial court's findings were "flatly contradicted by the record," which, he says, further showed that the trial court applied the wrong standard.  We disagree.

In its sentencing order, the trial court made the following findings regarding these circumstances:

"2. The Capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.  Does Not Exist.

"Although the clinical psychologist testified that the defendant had a low I.Q., may be mildly retarded, and may be handicapped mentally, he also testified he did not suffer from any delusions or was psychotic.  He knew right from wrong and was not insane.  He had the ability to make choices, had a good job, was married, had advanced in his job, and had opportunities.  There was no evidence that the defendant suffered from any extreme mental or emotional disturbances.

". . . .

"5. The defendant acted under extreme duress or under the substantial domination of another person.  Does Not Exist.

"Although the evidence supports the fact that the defendant was afraid of being killed by Mark Moore if he did not follow his instructions, there was no evidence that Mark Moore verbally had threatened the defendant with such actions or indicated such result to the defendant other

196

than the defendant's belief of this.  The defendant had a choice of not being involved in the killing and robbing of Harold and Joey Pugh.  And the people involved in this met several times before the crime was carried out and even after the killings the people involved met together. Mark Moore was not physically present when the defendant shot Harold and Joey Pugh.  In the defendant's statement, he at first indicated that Mark Moore was present, but all the evidence reflects that Mark Moore was not present at Cane Creek on the day of the occurrence of the killing of Harold and Joey Pugh.  And the defendant said he lied when he stated Moore was present.  The defendant indicated that he was very much in control of the events surrounding the killings and he further took part in the bank robbery later in Mississippi, and during one of the meetings he confessed he shot and killed Harold and Joey Pugh.  The contention by the defendant that he lacks the ability to weigh things, his intellect is low, he looked up to Mark Moore as a leader, relied on other people to get things done, is found by the Court to be simply an expression of the defendant's personality.  The evidence reflects that he was not insane and had a good job, had advanced in his job, was married, and had other opportunities.  Therefore, the Court finds that said mitigating circumstance does not apply.

"6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.  Does Not Exist.

"The defendant's action in or around the time of the killings indicate that he knew he was committing a criminal act, he tried to cover up his actions after the murders were committed."

(C. 138-39.)

197

Contrary to Ferguson's contention, merely because the trial court used the word "insane" in its sentencing order and found that Ferguson knew right from wrong does not mean that the court applied the standard of legal insanity to Ferguson's proffered mitigating evidence. After reviewing the record and the trial court's sentencing order, we conclude that the trial court did not require Ferguson to prove that he was legally insane in order to show that he was under the influence of an extreme mental or emotional disturbance, that his ability to appreciate the criminality of his conduct was substantially impaired, or that he was under extreme duress or the substantial domination of another person. The trial court merely found that the evidence presented by Ferguson — which was, at best, weak and conflicting — was unpersuasive. The trial court's findings are amply supported by the evidence.

At the sentencing hearing, Dr. James F. Chudy, a clinical psychologist hired by Ferguson to evaluate Ferguson for purposes of the sentencing hearing, testified that Ferguson was functioning in the borderline range of intelligence, but that he was not mentally retarded. He stated that this borderline intelligence could possibly impair Ferguson's "reasoning in social situations"; that it could affect his ability to "reason abstractly"; and that it could "diminish to a degree" his ability to appreciate the consequences of his actions. In addition, Dr. Chudy diagnosed Ferguson as having a "personality disorder" with borderline features. Dr. Chudy stated that this disorder could result in mood swings that could affect Ferguson's relationships. Dr. Chudy also stated that Ferguson may have some "transient or brief" psychotic periods where he is "out of touch with reality." However, in his written report, Dr. Chudy stated that Ferguson's claims of psychotic episodes — i.e., hearing voices that told him to do things to other people and having hallucinations of people and objects moving — were "difficult to substantiate" and that the accuracy of those claims "remains in question." Dr. Chudy also stated in his report that there were "no signs of disturbance in [Ferguson's] thinking"; that Ferguson was not psychotic; and that Ferguson's thinking was merely "illogical."

198

In rebuttal, the State called Dr. Stephen Rosen,[311] a clinical psychologist who had examined Ferguson before trial pursuant to a court order.  Dr. Rosen testified that Ferguson was in the borderline range of intelligence, but that he was not mentally retarded.  Dr. Rosen also testified that he believed Ferguson was malingering during the testing and that, although the test results showed that Ferguson had an IQ of 69, Dr. Rosen believed that had Ferguson put forth an effort when taking the IQ test, he would have scored in the middle to high 70s. Regarding the crime, Dr. Rosen said, Ferguson first told him that he did not do it and then said that he was an unwilling participant; by the end of the evaluation, however, Ferguson was claiming that voices had told him to commit the crime.  Dr. Rosen stated that during the evaluation Ferguson attempted to give him "the impression that he was more disturbed than in fact he was" by exaggerating and claiming symptoms he believed to be signs of a mental disorder — specifically, by claiming that he heard voices and saw "little green men [who] were laughing and telling him to do things."  Dr. Rosen, like Dr. Chudy, also diagnosed Ferguson as having a personality disorder and stated that the disorder could result in mood swings, antisocial traits, and perhaps some transient or temporary episodes where Ferguson is "out of touch with reality."

"The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict."  *Wesley v. State*, 575 So. 2d 108, 121 (Ala. Crim. App. 1989), rev'd on other grounds, 575 So. 2d 127 (Ala.1990).  Moreover,

"'[w]e fully recognize that "[a] factfinder is not bound by expert testimony 'even if all of the witnesses are presented by only one side.'"  *Ellis v. State*, 570 So. 2d 744, 752 (Ala. Cr. App. 1990).  "In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is

---

[311] The state court opinion wrote that Dr. Rosen's given name is "Stephen", but the record reflects that Dr. Rosen's given name is "C. Van."

uncontroverted." *Jefferson County v. Sulzby*, 468 So. 2d 112, 116 (Ala. 1985).  "An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted.  See *Kroger Co. v. Millsap*, 280 Ala. 531, 196 So. 2d 380 (1967).  Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues." *Williams v. City of Northport*, 557 So. 2d 1272, 1273 (Ala. Civ. App. 1989), cert. denied, 498 U.S. 822, 111 S. Ct. 71, 112 L. Ed. 2d 45 (1990).  "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." *Harrell v. State*, 470 So. 2d 1303, 1308 (Ala. Cr. App. 1984), affirmed, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985).'"

*Perkins v. State*, 808 So. 2d 1041, 1137 (Ala. Crim. App. 1999), quoting *Carroll v. State*, 599 So. 2d 1253, 1272 (Ala. Crim. App. 1992), aff'd, 627 So. 2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S. Ct. 1207, 127 L. Ed. 2d 554 (1994).

As to Ferguson's claim that he was under the influence of an extreme mental or emotional disturbance and that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, although both Dr. Chudy and Dr. Rosen diagnosed Ferguson with a personality disorder, neither concluded that Ferguson was suffering from an extreme mental or emotional disturbance or that Ferguson's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, and neither related Ferguson's general diagnosis to the events in this case.  Both described the disorder as merely causing "mood swings" that might lead to "possible problems" with his environment and in his relationships, and both found his claims of psychotic episodes to be unsubstantiated and questionable.  In addition, although evidence showed that Ferguson had an IQ of 69, there was no evidence that Ferguson was mentally retarded (See Part XVI.C. of this opinion, *infra*), and Dr. Rosen stated that he believed Ferguson

purposely attempted to perform poorly on the IQ test and that had Ferguson put forth an effort, his IQ would have been somewhere in the middle to high 70s.

Moreover, contrary to Ferguson's contention that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired because he says, he "had been drinking and smoking marijuana" on the day of the killings, we find that the trial court's findings in this regard were amply supported by the record. "Voluntary intoxication will not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating the criminality of his conduct." *Williams v. State*, 710 So. 2d 1276, 1346 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala 1997), cert. denied, 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998). Although there was evidence that Ferguson had been drinking and smoking marijuana on the day of the murders, there was no evidence that Ferguson's level of intoxication was so great that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired. Rather, there was ample evidence, including, as the trial court correctly noted, Ferguson's attempts to cover up the crime, to show that Ferguson was not so intoxicated as to substantially impair his ability to appreciate the criminality of his conduct or to conform his conduct to the law. Accordingly, the trial court did not err in not finding that Ferguson was laboring under an extreme mental or emotional disturbance or that Ferguson's ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired.

As to Ferguson's claim that he was under the substantial domination of Mark Moore when he committed the murders, we likewise find that the trial court did not err in finding that this circumstance did not exist. Although both experts testified that Ferguson was "easily influenced" and Ferguson's wife, Karen Ferguson, testified that Ferguson always did what Mark Moore told him to do, as

201

the trial court correctly noted, Moore was not present at the time of the murders, and there was no evidence, other than Ferguson's assertion, that Moore had ever threatened Ferguson.  In fact, Mrs. Ferguson testified that the relationship between Moore and Ferguson was not a threatening one, but a loving one, like that of a father and son.  Thus, the trial court's finding that Ferguson was not acting under extreme duress or under the substantial domination of Mark Moore was amply supported by the evidence.  Thus, the trial court did not err in failing to find that Ferguson was under extreme duress or the substantial domination of another person.

> . . . .

Ferguson contends that the trial court erred in not finding as a nonstatutory mitigation circumstance that Ferguson was mentally retarded.  He maintains that there was "substantial evidence" of his mental retardation which, he says, the trial court ignored by "ma[king] no mention of this fact or its mitigating value" in its sentencing order.  (Ferguson's brief to this court, p. 15.)

Initially, we note that the trial court did refer to the evidence of Ferguson's low intelligence in several parts of its sentencing order — in its findings of fact from the sentencing phase of the trial, in reference to the statutory mitigating circumstances argued by Ferguson, and in reference to the nonstatutory mitigation offered by Ferguson.  As stated above, although the trial court did not list this circumstance in its specific findings of nonstatutory mitigating circumstances, "the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating." *Wilson v. State*, 777 So. 2d 856, 892 (Ala. Crim. App. 1999), quoting *Williams v. State*, 710 So. 2d 1276, 1347 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998).

Moreover, contrary to Ferguson's contention, we find no evidence in the record indicating that Ferguson was mentally retarded.  In fact, both Ferguson's expert, Dr. Chudy, and the State's expert, Dr. Rosen,

stated unequivocally that Ferguson was not mentally retarded. Although there was evidence that Ferguson had an IQ of 69 and was in the borderline range of intelligence, Dr. Rosen testified that the results of Ferguson's IQ test were deceptive because, Dr. Rosen said, Ferguson had purposefully not put an effort into the test in order to appear more troubled than he really was. Dr. Rosen stated that it was his belief that had Ferguson made an effort when taking the test, his IQ would have been in the middle to upper 70s. Clearly, the trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was mentally retarded.

Ferguson contends that the trial court erred in failing to find that his "traumatic childhood" was a nonstatutory mitigating circumstance. He maintains that there was "compelling evidence" that he had had a difficult relationship with his mother, that he had suffered a severe emotional trauma as an adolescent when he discovered that the person he believed to be his father was really his stepfather, that he was suicidal, and that he "cried often" as a result of his troubled background.

As stated above, "[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." *Harrell v. State*, 470 So. 2d 1303, 1308 (Ala. Crim. App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985). Although there was evidence that Ferguson may have had a difficult childhood, there was also testimony that Ferguson's difficult life was made more difficult by his own actions and that the allegedly "significant emotional trauma" of finding out that his father was really his stepfather was not, as he claimed, "a full scale trauma." Accordingly, the trial court did not err in finding that Ferguson's "problems during his childhood [were] not a mitigating factor." (C. 140.)

          . . . .

Because it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented by

203

> Ferguson in mitigation, that the trial court did, in fact, consider all the evidence presented by Ferguson, and that the trial court's findings are supported by the evidence, we find no error in the trial court's findings regarding the statutory and nonstatutory mitigating circumstances.

*Ferguson v. State*, 814 So. 2d 925, 959-67 (Ala. Crim. App. 2000) (alterations in original, footnote supplied).

Ferguson dedicates his *habeas* petition to allegations that the *trial judge's* sentencing order reflects that he ignored undisputed (*i.e.*, unrebutted) evidence supporting the mitigating circumstance advocated by Ferguson.[312]   While he acknowledges the opinion of the Alabama Court of Criminal Appeals for the first time in the *reply brief* filed in this court, he erroneously argues that the intermediate state appellate court simply adopted the trial court's order without adjudicating his claim on the merits.[313]   Ferguson never acknowledges the Alabama Supreme Court's affirmation of the intermediate appellate court's decision.  *See Ex parte Ferguson*, 814 So. 2d 970, 975-79 (Ala. 2001).

Thus, none of Ferguson's *habeas* pleadings and argument focus upon the historic factual findings made by the Alabama Court of Criminal Appeals as part of its independent examination of the record, or the Alabama Supreme Court's affirmation of those findings.

---

[312] Doc. no. 9, at 63-73.

[313] Doc. no. 15, at 16.

As a result, Ferguson has not disputed the factual and legal findings made by the Alabama Court of Criminal Appeals, and then affirmed by the Alabama Supreme Court, much less argued that those findings were unreasonable in light of the evidence before the state courts.  Ferguson also has not offered clear and convincing evidence to overcome the presumption of correctness owed to those findings.[314]  The same findings show that it was not unreasonable for the state appellate courts to affirm the trial judge's sentencing order, on the ground that he had properly considered the categories of statutory and non-statutory mitigating evidence, but concluded that the evidence supporting each category was weak and conflicting.  In short, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination."  *Wood v. Allen,* 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)) (alteration in original).

Further, the verb "consider" is not synonymous with "accept."  There are important semantical and legal distinctions between "consideration" of evidence that

---

[314] Even if this court were to take into account Ferguson's allegations that the intermediate state appellate court made the same errors as the *trial court* (*i.e.*, both courts failed to consider "undisputed," or "unrefuted," evidence of the mitigating evidence at issue), he still would not be entitled to relief.  The historic factual findings made by the trial court and the state appellate court's independent findings are accurate.  It was not unreasonable for the state court to find that these facts revealed conflicting evidence regarding each mitigating factor at issue and/or that the evidence offered in support of the factors was weak.

205

is offered as a basis for a sentence less than death, and "acceptance" of that evidence: a term here used in the sense of finding that the evidence proffered in mitigation of sentence *establishes*, or *proves* the "existence of" the factual proposition for which it is offered. *Acceptance* "is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).[315]

Ferguson also does not deny that the Alabama Court of Criminal Appeals correctly identified the Supreme Court's seminal decision in *Lockett v. Ohio*, 438 U.S. 586 (1978), and its progeny, which require only that sentencing authorities not be precluded by law from "considering" a broad range of evidence offered by a defendant as a basis for a sentence less than death. *See id*. at 604 ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from **considering**, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the

---

[315] The full context of the statement from *Atkins* that is quoted in text reads as follows:

> Although Atkins argues that the trial judge did not *consider* non-statutory factors, it is more correct to say that the trial judge did not *accept* — that is, give much weight to — [petitioner's] nonstatutory mitigating factors. Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors.

*Atkins*, 965 F.2d at 962 (alteration supplied, emphasis in original) (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 308, (1990)).

defendant proffers as a basis for a sentence less than death.") (italics in original, boldface emphasis added, footnotes omitted, alteration supplied); *see also*, *e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (reiterating that *Lockett* held only that "the sentencer in capital cases must be permitted to *consider* any relevant mitigating factor") (emphasis supplied).[316]

Neither *Lockett* nor its progeny says anything about "acceptance" of evidence offered in mitigation of the sentence to be imposed, in the sense of finding that the evidence *establishes*, or *proves*, the "existence" of the factual proposition for which it is offered.  *See*, *e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to *consider* and give effect to evidence offered in mitigation, *but it does not dictate the effect that must be given once the evidence is considered*; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.") (emphasis supplied).

In summary, all that the Constitution requires is "a full hearing," at which "defense counsel is given a fair opportunity to present mitigating evidence"; and, when that is done, federal *habeas* review "becomes highly deferential."  *Atkins*, 965 F.2d at 962 (citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)).  In

---

[316] *Eddings* also added this consideration:  "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."  *Id*. at 113-14 (emphasis in original).

other words, the state trial judge's "findings on mitigating factors are presumed to be correct, and will be upheld if they are supported by the record." *Id*. (citing 28 U.S.C. § 2254(d), and *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986)).

Ferguson received a full hearing at which his defense attorneys had a fair opportunity to present mitigating evidence. The language in the opinion of the Alabama Court of Criminal Appeals affirming the trial judge's sentencing order satisfies this court that Ferguson's evidence, as it bore upon both statutory and non-statutory mitigating circumstances, was *considered*. This court is equally satisfied with the Alabama Supreme Court's analysis of the intermediate state appellate court's factual and legal findings regarding that evidence. Ultimately, the state courts did not *accept* Ferguson's argument that such evidence was mitigating when weighed against the aggravating circumstances of the case, but those courts were not constitutionally required to do so. The state courts' findings are supported by the record.

When, as in this case, it is shown that "a full hearing has been held in which the defense counsel is given a fair opportunity to present mitigating evidence, [federal habeas] review becomes highly deferential." *Atkins*, 965 F.2d at 962 (citing *Palmes*, 725 F.2d at 1523 (alteration supplied). The Eleventh Circuit's decision in *Schwab*, *supra*, made that quite clear when holding that,

> while sentencing courts may not refuse to consider evidence offered in
> mitigation, they need not decide that the facts established by that
> evidence have mitigating force in the context of the case.   The
> Constitution requires that the sentencer be allowed to consider and give
> effect to evidence offered in mitigation, *but it does not dictate the effect
> that must be given once the evidence is considered*; *it does not require
> the sentencer to conclude that a particular fact is mitigating or to give
> it any particular weight*.

451 F.3d at 1329 (emphasis supplied).  *See also Harich v. Wainwright*, 813 F.2d

1082, 1101 (11th Cir. 1987) (observing that the Supreme Court's decisions in *Skipper*

*v. South Carolina*, 476 U.S. 1 (1986), *Eddings v. Oklahoma*, 455 U.S. 104 (1982),

and *Lockett v. Ohio*, 428 U.S. 586 (1978), require *only* "that the defendant be allowed

to *present* all relevant mitigating evidence to the sentencing jury or court . . . .  These

cases do not require that the sentencing body *accept* the conclusion that the evidence

constitutes a mitigating circumstance or that the mitigating circumstances outweigh

the aggravating circumstances.") (emphasis supplied), *adopted in relevant part sub*

*nom. Harich v. Dugger*, 844 F.2d 1464, 1468-69 (1988) (*en banc*), *partially*

*abrogated on other grounds by Davis v. Singletary*, 119 F.3d 1471, 1481-82 (11th

Cir. 1997).

     For the foregoing reasons, Ferguson cannot show that he is entitled to either

an evidentiary hearing in this court, or *habeas* relief from the state court's rejection

of this claim on the merits.  The claim is due to be denied.

## H.   Execution by Lethal Injection Constitutes Cruel and Unusual Punishment.[317]

Ferguson contends that his "execution by lethal injection would constitute cruel and unusual punishment."[318]   He describes Alabama's lethal injection protocol as consisting of "a three drug cocktail including sodium thiopental, a barbituate to induce unconsciousness, pancuronium bromide or pavulon to induce paralysis, and potassium chloride to stop the heart."[319]

He complains that sodium thiopental "presents a significant risk of inflicting pain that is inconsistent with the Eighth Amendment."[320]   Ferguson explains that, while sodium thiopental is used to induce unconsciousness and, therefore, prevent a condemned person from experiencing the pain associated with the administration of the remaining drugs, it "often acts as an *ultra-short* barbituate and *may wear off* and lead to consciousness and an excruciatingly painful death" by suffocation and cardiac arrest while the condemned is "in a paralytic state."[321]   He also complains that "the method of administration of the lethal injection is also unconstitutionally flawed [because t]he personnel . . . are often unqualified [to administer sodium

---

[317] *See* doc. no. 9, ¶¶ 138-142, at 73-75 (petition); doc. no. 15, ¶¶ 31-40, at 16-21 (reply brief).

[318] Doc. no. 9, at 73.

[319] *Id.*, at 74-75 (alteration supplied).

[320] *Id.* at 74.

[321] *Id.*

thiopental]."[322]

The basic premise of Ferguson's argument is flawed, however, because Alabama no longer uses sodium thiopental as one of the three drugs administered in every execution.  As explained by the Eleventh Circuit in *Powell (Williams) v. Thomas*, 641 F.3d 1255 (11th Cir. 2011):

> In late April [2011], the Alabama Department of Corrections . . . announced plans to alter its lethal injection protocal for Williams' execution.  Specifically, it would be replacing the first drug in its lethal injection protocol — sodium thiopental  — with another anesthetic — pentobarbital.   That decision resulted from a heavily publicized, nationwide shortage of sodium thiopental.  Alabama . . . selected pentobarbital as a replacement to ensure that it could continue to carry out executions regardless of sodium thiopental's availability.

*Id.* at 1256 (alterations supplied).

Respondent also contends that "[t]his ground for relief is not appropriately within this Court's habeas jurisdiction."[323]   Respondent states that, "[i]n *Hill v. McDonough*, 547 U.S. 573, 579-83, . . . (2006), the United States Supreme Court held that manner of execution claims *of the sort raised by Ferguson* are properly addressed in a proceeding brought under 42 U.S.C. § 1983."[324]   Respondent does not explain what is meant by his use of the phrase "of the sort raised by Ferguson."

---

[322] *Id.* at 74-75 (alterations supplied).

[323] Doc. no. 12, at 59 (alteration supplied).

[324] *Id.* (alteration and emphasis supplied).

211

Ferguson counters that neither the *Hill* opinion, nor its predecessor, *Nelson v. Campbell*, 541 U.S. 637 (2004), supports "Respondent's position."[325]  Instead, he asserts that those opinions support his contention that this claim sounds in *habeas,* because "he is challenging the use of lethal injection *as a general matter*."[326]  He points to the following sentence from his petition as proof:  "'Alabama's method of execution by lethal injection violates constitutional standards.'"[327]

The question of whether an Eighth Amendment lethal injection claim is properly considered in an action under 42 U.S.C. § 1983, or in the context of a 28 U.S.C. § 2254 *habeas* appeal, was addressed by the Supreme Court in *Nelson v. Campbell*, 541 U.S. 637 (2004), and its progeny, *Hill v. McDonough*, 547 U.S. 573 (2006).  In *Nelson*, the Court avoided "the difficult question of how to categorize method-of-execution claims generally," because the state conceded at oral argument that § 1983 was "an appropriate vehicle" in that particular case, inasmuch as the petitioner was challenging whether a pre-execution vein cut-down procedure, instituted to enable prison officials to administer the three drug protocol, constituted deliberate indifference.  *Nelson*, 541 U.S. at 644.  Nonetheless, the *Nelson* Court did ponder the question, and suggested that a method-of-execution civil rights suit "does

---

[325] Doc. no. 15, at 17.

[326] *Id.* at 18 (emphasis supplied).

[327] *Id.* (quoting doc. no. 9, at 74).

not directly call into question the 'fact' or 'validity' of the sentence itself — by

simply altering its method of execution, the State can go forward with the sentence."

*Id.* On the other hand, "a constitutional challenge seeking to permanently enjoin the

use of lethal injection may amount to a challenge to the fact of the sentence itself,

[thus sounding in habeas]." *Id.*

Two years later, in *Hill v. McDonough*, the Supreme Court adopted a similar

approach. In that case, the petitioner challenged the constitutionality of a three-drug

protocol utilized by the State of Florida. *Hill*, 547 U.S. at 576. The petitioner

> alleged that the first drug injected, sodium pentothal, would not be a
> sufficient anesthetic to render painless the administration of the second
> and third drugs, pancuronium bromide and potassium chloride. There
> was an ensuing risk, Hill alleged, that he would remain conscious and
> suffer severe pain as the pancuronium paralyzed his lungs and body and
> the potassium chloride caused muscle cramping and a fatal heart attack.
> . . . The complaint sought an injunction "barring the defendants from
> executing Plaintiff in the manner they currently intend."

*Id.* at 578 (citations omitted). Hill also conceded that "'other methods of lethal

injection the Department could choose to use would be constitutional[.]'" *Id.* at 580

(alteration supplied, citation omitted).

In determining whether Hill's lawsuit could proceed as a § 1983 action, or must

be considered in a *habeas* appeal, the Court looked to the cases of *Heck v. Humphrey*,

512 U.S. 477 (1994), and *Edwards v. Balisok*, 520 U.S. 641 (1997), as relevant

precedent for answering the question of "whether a grant of relief to the inmate would necessarily bar the execution"?  *Hill*, 574 U.S. at 583.

> In those cases the question is whether "the nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the confinement or sentence. *Balisok*, *supra*, at 645, 124 S. Ct. 2117. . . . [T]he injunction Hill seeks would not necessarily foreclose the State from implementing the lethal injection sentence under present law, and thus it could not be said that the suit seeks to establish "unlawfulness [that] would render a conviction or sentence invalid." *Heck*, *supra*, at 486, 114 S. Ct. 2364.  Any incidental delay caused by allowing Hill to file suit does not cast on his sentence the kind of negative legal implication that would require him to proceed in a habeas action.

*Hill,* 547 U.S. at 583 (first alteration supplied, other alterations in original).

Ferguson asserts that his claim is appropriate for *habeas* review because, "[u]nlike *Hill*, he is challenging the use of lethal injection as a general matter."[328] This court finds that Ferguson's attack on one drug out of the three-drug protocol, and the potential for negligent administration, fits most neatly within the context of a suit under 42 U.S.C. § 1983.

If that is a correct characterization of his claim, this court lacks jurisdiction to entertain it, because "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection *procedures*." *Thompkins v. Secretary, Department. of Corrections*, 557 F.3d 1257, 1261 (11th Cir. 2009) (emphasis supplied) (citing *Hill*,

---

[328] Doc. no. 15, at 18.

214

547 U.S. 573 at 579-83).

On the other hand, the absence of a request for injunctive relief, and the absence of a concession that the State could constitutionally implement its lethal injection protocol by other means, hints at a more permanent attack, which necessarily sounds in *habeas*.   To the extent that Ferguson's claim may properly sound in *habeas*, it is procedurally defaulted.   Alabama implemented lethal injection as a form of execution on July 1, 2002, approximately four months after Ferguson's conviction became final on direct review.   *See* Ala. Code § 15-18-82.1; *Ferguson v. Alabama*, 535 U.S. 907 (2002).   Ferguson filed his *pro se* Rule 32 petition on February 24, 2003;[329] and, even though he was represented soon thereafter by two post-conviction attorneys, he never raised this claim during the three and one-half years his Rule 32 petition was litigated in the state trial court and on collateral appeal. Any attempt to raise such a claim now by means of a subsequent Rule 32 petition would be futile, as it would be deemed barred under applicable Alabama procedural rules governing post-conviction proceedings.   Accordingly, the claim is procedurally defaulted for purposes of federal *habeas* review, and it is due to be dismissed.

Even if the claim were not procedurally defaulted, however, it is without merit. The Supreme Court affirmed the denial of an action brought by a death row inmate

---

[329] Rule 32 C.R. Vol. 12, Tab. 40, at 4-144.

215

claiming that Kentucky's use of a three-drug lethal injection protocol consisting of sodium thiopental, pancuronium bromide, and potassium chloride posed an unacceptable risk of significant pain and, therefore, constituted cruel and unusual punishment under the Eighth Amendment, in *Baze v. Rees*, 533 U.S. 355 (2008). The prisoner was not arguing that Kentucky's lethal injection scheme as properly performed was unconstitutional, but that the risk of improperly administering the lethal drugs used in the scheme was constitutionally unacceptable. *Id*. at 49. Even so, the Court held that, "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id*. at 50 (alteration supplied). The Court also noted that thirty states (including Alabama), as well as the federal government, used the same three-drug protocol, and that the combination was believed to be "the most humane available." *Id*. at 53.

In short, the specific three-drug protocol attacked by Ferguson is the same combination that was addressed in *Baze*. Moreover, in that case, the Supreme Court noted that Alabama had adopted even more stringent safeguards than Kentucky to ensure that an inmate is indeed unconscious after the administration of sodium thiopental. "In Alabama, a member of the execution team 'begin[s] by saying the condemned inmate's name. If there is no response, the team member will gently

216

stroke the condemned inmate's eyelashes. If there is no response, the team member

will then pinch the condemned inmate's arm.'" *Baze*, 553 U.S. at 119-120

(alterations supplied).

> These checks provide a degree of assurance . . . that the first drug has
> been properly administered. They are simple and essentially costless to
> employ, yet work to lower the risk that the inmate will be subjected to
> the agony of conscious suffocation caused by pancuronium bromide and
> the searing pain caused by potassium chloride.

*Id*. at 121.

Furthermore, in *Wellons v. Hall*, 554 F.3d 923 (2009), the Eleventh Circuit

examined a Georgia petitioner's *habeas* claims that challenged

> the constitutionality of Georgia's use of the three-drug protocol method
> of execution by lethal injection. He argues that the three-drug protocol
> violates the Eighth Amendment's prohibition against cruel and unusual
> punishment and that the district court erred in denying an evidentiary
> hearing on his Eighth Amendment claim.  Both of these claims have
> been foreclosed by *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.
> Ed. 2d 420 (2008), in which the United States Supreme Court upheld a
> similar three-drug lethal injection protocol as not constituting cruel and
> unusual punishment under the Eighth Amendment.

*Wellons*, 554 F.3d at 942.

Since the three-drug protocol Ferguson complains about in his petition is

identical to the method approved in *Baze v. Rees*, it follows that, pursuant to *Baze* and

*Wellons*, Ferguson's constitutional claim is without merit.

217

Moreover, as previously noted, Alabama no longer utilizes sodium thiopental in its three-drug protocol, and the Eleventh Circuit found that its replacement, pentobarbital, does not violate the Eighth Amendment. *Powell (Williams) v. Thomas*, 641 F.3d 1255, 1258 ("The replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol, and we conclude that such an amendment does not violate the Eighth Amendment under the cases cited by Williams."). *See also*, *Mann v. Palmer*, 713 F.3d 1306, 1313-1314 (11th Cir. 2011) (relying on *Baze v. Rees* and *Powell* to affirm the district court's dismissal of Mann's civil rights complaint that the use of pentobarbital in Florida's three drug protocol violated the Eighth Amendment).

In summary, to the extent that this claim is beyond the scope of federal *habeas* review, it is due to be dismissed. To the extent it sounds in *habeas*, it is procedurally defaulted. In the alternative, it ultimately is without merit and due to be denied.

## VI. CONCLUSION

All claims in Ferguson's petition for writ of *habeas corpus* are due to be dismissed or denied. All requests for an evidentiary hearing also are due to be denied. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

218

**DONE** this 21st day of July, 2014.

_____
United States District Judge