FILED

2014 Aug-15  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS DALE FERGUSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 3:09-cv-0138-CLS-JEO** |
| **RICHARD F. ALLEN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**MOTION TO ALTER OR AMEND JUDGMENT**

Petitioner Thomas Dale Ferguson, pursuant to Federal Rules of Civil Procedure 59(e), respectfully urges this Court to alter or amend its Judgment dated July 21, 2014 denying *habeas corpus* relief.  Mr. Ferguson states the following in support of this motion:

**I.      STANDARD OF REVIEW**

A court may alter or amend a judgment for four reasons: "(1) manifest errors of law or fact upon which the judgment is based; (2) newly discovered or previously unavailable evidence; (3) manifest injustice in the judgment; and (4) an intervening change in the controlling law." *McNair v. Campbell*, 315 F. Supp. 2d 1179, 1181-82 (M.D. Ala. 2004) (quotations and citations omitted).  As explained below, because the Court (1) failed to properly examine the sentencing judge's

weighing of aggravating and mitigating factors; (2) examined the state courts' rejection of Mr. Ferguson's *Atkins* claim using pre-*Atkins* evidence; (3) failed to consider the Supreme Court's decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014); and (4) upheld the state courts' impermissible selective weighing of evidence, reconsideration is necessary to correct manifest errors of law and fact.[1]

## II.     THE COURT ERRED IN ITS EXAMINATION OF THE SENTENCING JUDGE'S WEIGHING OF AGGRAVATING AND MITIGATING FACTORS.

Alabama's unique judicial override scheme has only narrowly escaped demise by Constitutional challenge.  *See Woodward v. Alabama*, 134 S. Ct. 405, 405 (2013) ("In the last decade, Alabama has been the only State in which judges have imposed the death penalty in the face of contrary jury verdicts." (Sotomayor, J., dissenting from denial of *certiorari*)).[2]  While the statute is still in effect, the Alabama Supreme Court has been clear that the statute passes Constitutional muster only when the statute's safeguards are followed.  *See, e.g.*, *Harris v. Alabama*, 513 U.S. 504, 514-15 (1995); *Ex parte Taylor*, 808 So. 2d 1215, 1218 (Ala. 2001)  ("Section 13A–5–47, Ala. Code 1975, provides that the trial judge must order and receive a detailed, written, pre-sentence investigation report; must

---

[1] By raising only these issues herein, Mr. Ferguson does not waive, and specifically preserves for appeal, all other issues raised in his Amended Petition for Writ of Habeas Corpus By a Prisoner in State Custody Under Sentence of Death (the "Amended Petition") (Doc. No. 9).

[2] The Supreme Court majority issued no opinion regarding denial of *certiorari*.

permit the parties to present arguments concerning aggravating and mitigating circumstances and the proper sentence to be imposed; and must enter specific written findings regarding the existence or nonexistence of each and every aggravating circumstance and mitigating circumstance offered by the parties. Section 13A–5–47(e) further provides that the trial judge must 'determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist.' In weighing the aggravating and mitigating circumstances, 'the trial court shall consider the verdict of the jury contained in its advisory verdict.'").

As explained below, where, as here, a sentencing judge fails to follow the statutory scheme for overriding a jury verdict, a sentence of death is per se arbitrary and capricious in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See id.* In order to implement the scheme correctly "the trial judge **must state specific reasons for giving the jury's recommendation the consideration he gave it**." *Taylor*, 808 So. 2d at 1219 (emphasis added). The Supreme Court has held that to pass muster under the Eighth and Fourteenth Amendments, a sentencing statute allowing for judicial override must be "carefully drafted." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976); *see also Harris*, 513 U.S. at 511 (requiring that a sentencing statute "adequately channels the sentencer's discretion"). Where, as happened in Mr. Ferguson's case, the sentencing judge

fails to follow the statute by not stating specific reasons for the weight he gave the jury's verdict and not stating the weight he gave each aggravating and mitigating factor, even a "carefully drafted" statute is meaningless. The result is an arbitrary and capricious sentence of death that violates the Constitution.

### A. THE SENTENCING JUDGE DID NOT DESCRIBE WHAT WEIGHT HE GAVE TO THE AGGRAVATING AND MITIGATING FACTORS IN VIOLATION OF ALABAMA LAW.

The sentencing judge did not state whether he gave the jury's verdict any particular level of consideration or why, only that he "considered said mitigating factor," referring to the jury's 11-1 verdict of life without parole. (C. 140.)[3] Nor did the sentencing judge explain how he came to determine the minimal consideration he gave the jury's verdict. (C. 136-41.) Indeed, with respect to the jury's verdict, the sentencing judge stated only that "the Jury was allowed to hear an emotional appeal from the defendant's wife." (C. 140.) The sentencing judge did not explain the significance of the jury's hearing an "emotional appeal" (juries hear emotional appeals in many cases), or why he concluded the "emotional appeal" was so powerful that it alone resulted in a jury verdict by 11 to 1 in favor of life without parole and against the death penalty. (C. 140.) This failure to articulate his reasoning is particularly important since other mitigating or

---

[3] References to the trial court clerk's record will be denoted by (C. __). References to the trial transcript will be denoted by (R. __). References to the post-conviction clerk's record will be denoted by (PC __).

potentially mitigating factors were at play besides the jury's verdict, such as the fact that Mr. Ferguson (1) had no significant history of prior criminal activity, (2) "had a low I.Q., may be mildly retarded, and may be handicapped mentally," (3) turned himself in and confessed, and (4) had a history of problems during childhood.  (C. 137-40.)

The Alabama Court of Criminal Appeals requires that judges state specifically what weight they gave each of the factors they examined in reaching their decision to override a jury verdict.  In *Jackson v. State*, that court found that

> although the trial court explained its decision in weighing the other aggravating and mitigating circumstances, it is ***unclear what weight*** the trial court gave to the jury's verdict, and the order fails to state that the court considered the nonstatutory circumstances presented by Jackson or what weight these circumstances were accorded.

*Jackson v. State*, No. CR-07-1208, 2013 WL 1284376, at *102 (Ala. Crim. App. Mar. 29, 2013) (emphasis added).  The *Jackson* court remanded the case to the trial court "to reweigh the aggravating, statutory mitigating, and nonstatutory mitigating circumstances," and ordered the trial court to "***state what weight it accords to the jury's advisory verdict***."  *Id.* at *103 (emphasis added); *see also Ex parte Martin*, 931 So. 2d 759, 770-71 (Ala. 2004) (holding that the trial court's conclusory "explanation fails to allow the defendant the benefit of having the jury's verdict of life imprisonment without parole treated as a mitigating factor as required by *Ex parte Carroll*.").  The *Jackson* and *Martin* decisions indicate that a sentencing

order that fails to state what weight the judge afforded aggravating and mitigating factors violates Alabama's sentencing scheme.

As the Supreme Court recognized in *Harris*, "in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case." *Harris*, 513 U.S. at 515. The *Harris* court emphasized that the careful weighing of each factor specific to each case was central to upholding Alabama's judicial override scheme. Moreover, the Supreme Court was clear in *Gregg* that an arbitrary and capricious sentence of death can be avoided only "by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195.

The sentencing judge failed to explain what emphasis he gave each decisional criterion that went into his decision to override the jury, which goes against the spirit of *Harris*. Further, the sentencing judge violated the Alabama sentencing scheme by failing to state the reasons why he gave the jury's verdict the minimal weight he gave it. *See Taylor*, 808 So. 2d at 1219; *see also Jackson*, 2013 WL 1284376, at *103; *Martin*, 931 So. 2d at 770-71. Since the sentencing judge did not follow the safeguards of the sentencing scheme, and doing so is necessary to save it from unconstitutionality according to *Gregg*, the sentencing judge's decision resulted in an unconstitutional arbitrary and capricious sentence of death.

**B.    THIS COURT ERRED IN FAILING TO CONSIDER WHETHER THE SENTENCING JUDGE SHOULD HAVE DESCRIBED HOW HE WEIGHED EACH FACTOR.**

In its Memorandum Opinion, this Court notes that *Harris* holds that the Constitution is "not offended when a State further requires the sentencing judge to consider a jury's verdict and trusts the judge to give it proper weight." Memorandum Opinion at 55-56 (quoting *Harris*, 513 U.S. at 515). Indeed, as this Court recognized in its Opinion, the State, in creating a statutory scheme that allows a judge to override even a unanimous jury verdict to the contrary and impose the death penalty, ***trusts the judge to give the jury's verdict the proper weight***. *Id.* However, if the judge does not specify what weight he afforded each statutory and non-statutory mitigating factor, such trust is blind and subject to the arbitrary whim or caprice of the sentencing judge. While it may be true that under the statute, there is no bright-line rule for how much weight the judge is required to give mitigating and aggravating factors, the judge must do more than simply list off the factors and state in a conclusory manner that "the aggravating circumstances . . . outweigh[ ] the mitigating circumstances presented, and the mitigating factor that the jury recommended a sentence of life imprisonment without parole and the vote was 11 for life and 1 for death." (C. 140.) The Constitution demands more. Thus, while a circuit court is not bound by the jury's decision, it ***is*** bound to specify what weight it gives to each aggravating and

mitigating factor and to provide reasons for its weighing the factors as it does.  In other words, the court must at least "show its work."   The circuit court's sentencing order violates this rule.

The Alabama Court of Criminal Appeals failed to consider the absence of any description by the trial judge of what weight he gave each of the aggravating and mitigating factors.   Instead, the Alabama Court of Criminal Appeals only examined whether *Carroll* and *Tomlin* required the trial judge to give "considerable" or "great" weight to a jury's verdict.  *See Ferguson v. State*, 13 So. 3d 418, 432 (Ala. Crim. App. 2008).   Without addressing that aspect of the sentencing judge's decision, the Alabama Court of Criminal Appeals' determination was incomplete, resulting in a deprivation of Mr. Ferguson's rights under the Constitution.   Accordingly, this Court erred in failing to consider these aspects of the state courts' orders overriding the 11-1 jury verdict.

C. **THE SENTENCING JUDGE'S LACK OF EXPLANATION FOR HIS WEIGHING OF THE AGGRAVATING AND MITIGATING FACTORS, COMBINED WITH ALABAMA'S "UNIQUE" JUDICIAL OVERRIDE SCHEME AND PARTISAN JUDICIAL ELECTION SYSTEM, LED TO AN ARBITRARY IMPOSITION OF THE DEATH PENALTY.**

At the time the Supreme Court decided *Harris*, Alabama was one of only four states that allowed judicial override of jury sentencing determinations in death penalty cases.   *Woodward*, 134 S. Ct. at 407.   Indiana has since outlawed the practice altogether.  *Id.* at 408.  Delaware courts have used the override only once,

and the Delaware Supreme Court vacated that override.  *Id*. & n.5.  Florida courts have not overridden a jury sentencing verdict since 1999.  *Id*. & n.6.  The practice declined during the 1980s and 1990s, to the point that since 2000, there have been 27 life-to-death judicial overrides, ***and 26 of those occurred in Alabama***.  *Id*. at 407 & n.4 (noting that the 27th override was in Delaware, and that override was vacated by the Delaware Supreme Court).  "As these statistics demonstrate, Alabama has become a clear outlier."  *Id. at* 408; *see also Harris*, 513 U.S. at 524 (Stevens, J., dissenting) ("Alabama stands alone among the States in its refusal to constrain its judges' power to condemn defendants over contrary jury verdicts.").

        The reason for the anomalous behavior of Alabama judges, the Justices say, is clear: "Alabama judges, who are elected in partisan proceedings, appear to have succumbed to electoral pressures."  *Id*. (citing Equal Justice Initiative, The Death Penalty in Alabama: Judge Override, at 16 (2011), *available at* http://www.eji.org/files/Override_Report.pdf ("Override Report")).  Indeed, the Supreme Court has long recognized that judges in partisan elections are under constant pressure to appear tough on crime and "profess their fealty to the death penalty."  *Harris*, 513 U.S. at 519-20 & n.5 (Stevens, J., dissenting).  Judges in Alabama regularly run in partisan elections on platforms of sentencing criminal defendants to long jail terms and imposing the death penalty, and there is a statistically significant correlation between judicial override and election years.

*Woodward*, 134 S. Ct. at 408-09.  One judge in Alabama even admitted that "voter reaction does have some impact, especially in high profile cases."  *Id.* at 409 (internal quotation marks omitted).

As a result, in *Woodward*, Justices Sotomayor and Breyer noted that "Alabama's sentencing scheme has led to curious and potentially arbitrary outcomes," which "do not seem to square with our Eighth Amendment jurisprudence" in *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976).  *Woodward*, 134 S. Ct. at 409-10.[4]  Justice Sotomayor also noted that the Alabama sentencing scheme likely violates the Sixth Amendment right to jury trial under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002).  *Id. at* 410.

When viewed in light of the dissent in *Woodward*, the *Harris* court's emphasis on weighing each criterion individually, the *Gregg* court's focus on the importance of the careful drafting of the sentencing statute, and the Alabama appellate courts' decisions in *Jackson*, *Taylor*, and *Martin*, the sentencing judge's

---

[4] There is also a stark racial component to the use of judicial overrides that the Justices do not explore in their dissent.  *See* Override Report at 17-18 ("Each year in Alabama, less than 35% of all murders involve white victims, yet 75% (73) of the cases where judges overrode jury life verdicts to impose death involved white victims. While just 6% of all murders in Alabama involve black defendants and white victims, in 31% of Alabama override cases, the trial judge condemned a person of color to death for killing someone white.").  While race is not directly at issue here (although economic and mental disabilities are), these statistics demonstrate the arbitrary and capricious way in which judicial override is applied in Alabama.

conclusory and unenlightening sentencing order indicates that his decision to sentence Mr. Ferguson to death was arbitrary and capricious in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  The sentencing judge failed to describe the weight, if any, he gave any of the factors in making his decision and gave almost no explanation as to why he did not follow the jury's verdict.  Reading the judge's sentencing order, one can only assume that "the judge imposed the death penalty on [Mr. Ferguson] only because he disagreed with the jury's assessment of the facts," which is an arbitrary way of deciding to sentence a person to death.  *Woodward*, 134 S. Ct. at 411.

In denying the Petition, this Court did not consider the sentencing judge's failure to follow the Alabama statute as required by *Harris* and *Gregg*, and the sentencing judge's failure to explain the weight, if any, he gave the aggravating and mitigating factors in overriding the jury's 11-1 verdict.  The sentencing judge's failures resulted in an arbitrary and capricious imposition of the death penalty.  For these and the other reasons stated above, this Court should reconsider its decision.

### III.     THE COURT ERRED IN HOLDING THAT MR. FERGUSON IS NOT ENTITLED TO AN EVIDENTIARY HEARING ON HIS MENTAL CAPACITY UNDER *ATKINS v. VIRGINIA*.

The Court erred in finding that Mr. Ferguson is not entitled to an evidentiary hearing on his mental capacity under *Atkins v. Virginia*, 536 U.S. 304 (2002).

Prior to *Atkins*, capital defendants could present evidence of mental retardation[5] only as a mitigating circumstance.  In *Atkins*, the United States Supreme Court held that mentally retarded individuals cannot be executed.  *Id*. at 318.  Thus, after *Atkins*, evidence of mental retardation took on an especially heightened role, operating as a categorical bar on execution rather than only as a mitigating factor. As explained below, when a court considers only pre-*Atkins* evidence to find that a defendant is not mentally retarded under *Atkins*, that court unreasonably applies the law and unreasonably determines the facts—which is precisely that the state courts did here.  Reconsideration is necessary.

Mr. Ferguson has raised a colorable claim of mental retardation and he is entitled to an evidentiary hearing.  Specifically, Mr. Ferguson presented substantial evidence demonstrating that he possesses significant intellectual deficits, as evidenced by his school records and IQ testing.  Mr. Ferguson also presented substantial evidence demonstrating that he has significant defects in adaptive functioning.  As the United States Supreme Court unequivocally held in *Hall v. Florida*, 134 S. Ct. 1986 (2014), a proper mental retardation evaluation takes both deficits into account and considers them jointly, and any test that contains a mandatory IQ cutoff violates the Eighth Amendment and thus is unconstitutional.

---

[5] The terminology has changed since the Supreme Court's decision in *Atkins* and the disability is now termed "intellectual disability."  *Hall*, 134 S. Ct. at 1990. However, we use the term "mental retardation" to maintain consistency with the terminology used throughout these proceedings.

Nonetheless, in assessing Mr. Ferguson's claim of mental retardation, the state courts—and this Court—relied on the Alabama Supreme Court's decision in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), which requires an IQ of 70 or below for an individual to be considered mentally retarded. This bright-line cut-off is unconstitutional under *Hall*, also making reconsideration necessary. The application of this bright-line cut-off also led to the unreasonable and unsupported conclusion that Mr. Ferguson does not suffer from significant impairments to his adaptive functioning—aptly demonstrated by this Court's observation that key evidence on that issue—namely, the assessments performed by the mental heath experts at the trial phase—was of "serious concern" and "deficien[t]." Memorandum Opinion at 184-85.

### A. COURTS CANNOT RELY SOLELY ON PRE-*ATKINS* EVIDENCE IN DETERMINING WHETHER A PETITIONER QUALIFIES FOR RELIEF UNDER *ATKINS*.

It is an unreasonable application of *Atkins* to consider only information produced prior to the *Atkins* decision in determining whether a petitioner meets the definition of mentally retarded as accepted by *Atkins*. Stated differently, courts cannot rely solely on pre-*Atkins* evidence in determining whether a petitioner qualifies for relief under *Atkins*.

Mr. Ferguson was convicted and sentenced to death in 1998, four years before the 2002 decision in *Atkins*. The Alabama Court of Criminal Appeals

affirmed Mr. Ferguson's conviction and sentence in 2000, *Ferguson v. State*, 814 So. 2d 925 (Ala. Crim. App. 2000), and the Alabama Supreme Court affirmed that decision in 2001—all before *Atkins*.  *Ex parte Ferguson*, 814 So. 2d 970 (Ala. 2001).  The United States Supreme Court denied Mr. Ferguson's petition for writ of certiorari on March 4, 2002, Ferguson v. Alabama, 535 U.S. 907 (2002)—over two months before it decided *Atkins* on June 20, 2002.

On February 23, 2003, Mr. Ferguson filed a timely petition requesting relief under Rule 32 of the Alabama Rules of Civil Procedure.  (PC 4-144.)  In his Rule 32 petition, Mr. Ferguson argued that he is mentally retarded and that his execution thus violates the Eighth Amendment.  (*See id*.)  On May 19, 2005, the Alabama Assistant Attorney General filed a notice of appearance and a motion to summarily dismiss Mr. Ferguson's Rule 32 petition.  (PC 183-84).  In response, Mr. Ferguson sought to modify his sentence to life imprisonment without parole, as recommended by 11 of 12 members of the jury.  ***Mr. Ferguson requested a hearing on the State's motion for dismissal and on his motion to modify the sentence***.  (PC 313-14.)

On October 12, 2006, the Attorney General's Office submitted a 98-page "proposed order" to the circuit court.  (PC 339-437.)  ***Without holding a hearing on the Rule 32 issues***, the presiding circuit court judge adopted the State's proposed order on October 18, 2006, thereby summarily dismissing Mr.

Ferguson's Rule 32 petition and denying both the motion to modify Mr. Ferguson's sentence and Mr. Ferguson's request for a hearing. (PC 441-505.) On April 4, 2008, a divided panel of the Alabama Court of Criminal Appeals affirmed the trial court's denial of Mr. Ferguson's Rule 32 petition. *Ferguson v. State*, No. CR-06-0327, 2008 WL 902901 (Ala. Crim. App. Apr. 4, 2008), *reh'g denied*, May 23, 2008. The Alabama Supreme Court denied Mr. Ferguson's certiorari petition, without comment, on January 16, 2009. ***Thus, based solely on the paper record from pre-Atkins proceedings, the circuit court and the Alabama Court of Criminal Appeals determined that Mr. Ferguson is not mentally retarded***.

The state courts unreasonably applied *Atkins* when they only considered information produced prior to the *Atkins* decision in determining whether Mr. Ferguson meets the definition of mental retardation as accepted under *Atkins*. Indeed, as the Eleventh Circuit observed less than one month ago, in *Atkins*, the Supreme Court

> highlighted the fact that there is a difference between using mental retardation as a mitigating factor (a balancing inquiry) and categorically excluding mentally retarded persons from the death penalty altogether (a categorical prohibition) such that pre-*Atkins* it could have been detrimental to a defendant's case to present thorough evidence of mental retardation: "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."

*Burgess v. Commissioner, Alabama Dep't of Corrections*, 723 F.3d 1308, 1317 (11th Cir. 2014) (quoting *Atkins*, 536 U.S. at 320-21).[6]  *See also Bobby v. Bies*, 556 U.S. 825, 829 (2009) ("mental retardation for purposes of *Atkins*, and mental retardation as one mitigator to be weighed against aggravators, are discrete issues").   In other words, *Atkins* gave defendants an incentive to definitively demonstrate mental retardation, rather than simply demonstrate low intellectual functioning.   Accordingly, "evidence presented pre-*Atkins* may not in every case be conducive to an *Atkins* inquiry and may not enable a court to make reasonable factual determinations relating to mental retardation ***for purposes of the Eighth Amendment***."  *Burgess*, 723 F.3d at 1317 (emphasis added).  Indeed, in *Atkins*, the Supreme Court remanded for a hearing on the question of whether Atkins was in fact mentally retarded for purposes of the Eighth Amendment, even though a jury had already heard evidence regarding mental retardation during the penalty phase. *Atkins*, 536 U.S. at 321.

Mr. Ferguson "is entitled to the same relief."  *Burgess*, 723 F.3d at 1318.  In finding that Mr. Ferguson was not entitled to Rule 32 relief, the state courts denied Mr. Ferguson an evidentiary hearing and instead decided to weigh evidence presented at Mr. Ferguson's 1998 trial—evidence presented without the benefit

---

[6] Like Mr. Ferguson, the petitioner in *Burgess* was sentenced to death after the trial judge rejected the jury's recommendation (by a vote of 8 to 4) of a sentence of life without parole.  *Burgess*, 723 F.3d at 1311.

and import of *Atkins*.   Their weighing of that pre-*Atkins* evidence was an

unreasonable application of  *Atkins*, and Mr. Ferguson is entitled to an evidentiary

hearing on his claim of mental retardation.

>   **B.   THIS COURT ERRED IN UPHOLDING THE STATE COURT'S ADHERENCE TO A STRICT IQ CUT-OFF SCORE FOR PURPOSES OF DETERMINING MENTAL RETARDATION UNDER *ATKINS*, WHICH IS UNCONSTITUTIONAL UNDER *HALL*.**

In assessing Mr. Ferguson's claim of mental retardation, the state courts—

and this Court—relied on *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002),[7] which

defines mental retardation as (1) significantly subaverage intellectual functioning

(i.e., an IQ of 70 or below); (2) significant substantial deficits in adaptive behavior;

and (3) the manifestation of these problems must have occurred during the

developmental years, i.e., before the age of 18.   In assessing Mr. Ferguson's IQ

scores for purposes of this test, the circuit court and Court of Criminal Appeals

found that Mr. Ferguson was not mentally retarded because his IQ "lies somewhere

in the mid 70's to lower 80's and is best classified as borderline to low average

intellectual functioning," thus, "the *Atkins* decision does not affect Ferguson's

death sentence."[8]   This Court cited those findings with approval.   Memorandum

---

[7] This Court went so far as to call *Ex parte Perkins* "the broadest definition of mental retardation under Alabama law."   Memorandum Opinion at 189.   As explained herein, because *Ex Parte Perkins* is unconstitutional in light of *Hall*, it cannot be the "broadest definition of mental retardation" as a matter of law.

[8] As explained below, the conclusion that Mr. Ferguson's IQ was too high to substantiate a mental retardation claim led the courts to pay lip service to the

Opinion at 169.  As explained below, this adherence to a strict cut-off score for purposes of assessing Mr. Ferguson's mental retardation claim under *Atkins* is unconstitutional under the Supreme Court's recent opinion in *Hall v. Florida*, 134 S. Ct. 1986.

In *Hall*, the Court considered whether Florida law, which defines mental retardation to require an IQ test score of 70 or less, violated the Eighth Amendment.  There, the petitioner had received nine IQ evaluations spanning 40 years, with scores ranging from 60 to 80, but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80. *Id*. at 1992.  After the sentencing court rejected the claim of mental retardation, the Florida Supreme Court held that the 70-point threshold was constitutional.  *Id*.

The Supreme Court reversed, finding that Florida's rule "disregards established medical practice" by "tak[ing] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," and by "rel[ying] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise."  *Id*. at 1995.  As the Court explained, "IQ test scores should be read not as a single fixed number but as a

evidence of Mr. Ferguson's significantly impaired adaptive functioning.  Indeed, this Court found the evidence on that issue concerning, but nonetheless found the state courts' findings supported by the record. This was error.

range" in order to account for the "standard error of measurement" (the "SEM").

*Id.* The Court explicitly called out Alabama's "strict IQ score cutoff at 70" as a test that ***does not*** account for the SEM, and recognized that "[t]he rejection of the strict 70 cutoff in the vast majority of States and the consistency in the trend towards recognizing the SEM provide strong evidence of consensus that our society does not regard this strict cutoff as proper or humane." *Id.* at 1996, 1998 (internal citation omitted). As the Court concluded, "[b]y failing to take into account the SEM and setting a strict cutoff at 70, Florida goes against the unanimous professional consensus," and that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2001.

Here, the state courts—and this Court—ignored Mr. Ferguson's 69 IQ score[9] in favor of his higher scores of 77, 71, and 87. Although this Court found that "[t]he Rule 32 court's opinion expressly recognized that any IQ test score should be considered in light of the standard error of measurement which is generally +/- 5," that finding cannot be squared with the evidence or with *Hall*. Indeed, had the state courts taken the SEM into account, then Mr. Ferguson's accepted IQ scores of

_____

[9] As explained in the Amended Petition, the courts' rejection of that score based upon supported malingering was a conclusion not supported by the facts and thus was unreasonable.

71 and 77 "f[ell] within the test's acknowledged and inherent margin of error" and thus supported a finding that Mr. Ferguson is mentally retarded.  Reconsideration is necessary.

### C.   THE COURTS' ADHERENCE TO A BRIGHT-LINE IQ SCORE CUT-OFF LED TO A SHORT-SIGHTED, SELECTIVE, AND ERRONEOUS WEIGHING OF THE EVIDENCE ON THE ISSUE OF ADAPTIVE FUNCTIONING.

Because the state courts found that Mr. Ferguson is not mentally retarded in light of his 71, 77, and 87 IQ scores, they paid scant attention to the issue of adaptive functioning.  As the Court of Criminal Appeals stated, it considered adaptive functioning only "***briefly***" because Mr. Ferguson's IQ scores of 71, 77, and 87 precluded a finding of mental retardation.  That "brief" assessment, which was the product of a selective weighing of the evidence, resulted in an "unreasonable determination of the facts in light of the evidence presented at the [s]tate court proceeding[s]."  28 U.S.C. § 2254(d)(2).

The Eleventh Circuit has held that

> significant or substantial deficits in adaptive behavior are defined as concurrent deficits or impairments ***in present adaptive functioning*** in at least two of the following skill areas:  communications, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

*Thomas v. Allen*, 607 F.3d 749, 754 (11th Cir. 2010) (emphasis added).  It is beyond dispute that Mr. Ferguson was denied the opportunity to present evidence

of his *present adaptive functioning skills*.  As this Court notes in the Memorandum Opinion, "unlike the examination of Ferguson's adaptive functioning skills as a child, which was clearly relied upon by school officials when making placement decisions during his years of formal public education, *such concentration is clearly absent for the time period in which Ferguson was on trial*."  Memorandum Opinion at 185.  For this reason, and this reason alone, reconsideration is necessary.

Moreover, the state courts' conclusion that Mr. Ferguson did not have defects in adaptive functioning was unreasonable in light of the evidence. According to the state courts, Mr. Ferguson did not have defects in adaptive functioning because he "was able to seek out and maintain employment," had been married for five years, and was "a street-wise criminal" who "gave a statement to investigators in which he repeatedly attempted to deceive and mislead authorities to the extent of his involvement with the murders."   These cherry-picked examples—*selected as a means to achieve an end*—*i.e.*, to support the predetermined conclusion that Mr. Ferguson is not mentally retarded, ignored the vast weight of the evidence, which showed deficits or impairments in the following areas:

*Communications*: Mr. Ferguson has a severe speech problem, making it difficult for him to communicate.  (PC 10.)

***Self Care***:  Mr. Ferguson exhibited poor hygiene and grooming.  (R. Vol. 7, at 201-02.)

***Home Living:*** Mr. Ferguson's wife handled most matters during their marriage and told him what to do because he did not understand things very well. (R. Vol. 5, Tab. 19, at 821.)

***Social/interpersonal skills***: Even as an adult, Mr. Ferguson frequently played with children and only felt "truly comfortable" when surrounded by children.  (PC 77-78).  Moreover, Mr. Ferguson is easily confused by group activities (PC 10) and has always been easily led.  (PC 13).  Finally, Mr. Ferguson exhibited difficulty responding to social cues, such as making eye contact and smiling and laughing appropriately, (R. Vol. 7, at 201-02), and had trouble socializing in appropriate ways.  (R. Vol. 8 at 328.)

***Self-direction***: Again, Mr. Ferguson's wife handled most matters during their marriage and told him what to do because he did not understand things very well.  (R. Vol. 5, Tab. 19, at 821.)  Mr. Ferguson also is easily led.  (PC 10.)

***Functional academic skills***: Mr. Ferguson has an "inability to learn" and is confused by group activities.   (PC 10.)  Indeed, his school records are replete with evidence of his inability to learn, including placement in classes for the mentally retarded and learning disabled and the repeated failing of classes—"particularly those in which he was placed in a regular classroom setting."  (R. Vol. 7 at 213.)

*Work*: Mr. Ferguson never held a job for more than a year and earned less money with each successive position.  (PC 93.)  In fact, at the time of the alleged offense, Mr. Ferguson had been working a menial job for six or seven months for a paltry $6.00 an hour.  (*Id.*)

It was unreasonable for the state courts to ignore this evidence—which demonstrates Mr. Ferguson's long record of limitations in *seven* areas—merely because Mr. Ferguson had a job, was married, and had made statements to the police in a supposed attempt to mislead or deceive them.  Indeed, the Eleventh Circuit recently affirmed this Court's finding that the petitioner had significant defects in adaptive behavior even though he made allegedly manipulative statements to his social worker, and even though he "worked at a farm performing manual labor and driving a tractor." *Thomas*, 607 F.3d at 759.  As the court explained,  "mentally retarded persons can drive cars and hold menial jobs." *Id.*

### D.   MR. FERGUSON'S DEFICITS MANIFESTED THEMSELVES BEFORE AGE 18.

The record is replete with evidence that Mr. Ferguson's problems manifested before the age of 18.  (*See, e.g.*, R. Vol. 7 at 128-36, 164 (during Mr. Ferguson's early school years, he had speech problems, scored 77 on an IQ test, and was placed into classes for the mentally retarded);  R. Vol. 7 at 156-64 (age 12, Mr. Ferguson scored 71 on an IQ test and was placed into classes for the mentally handicapped);  R. Vol. 7 at 202, 213 (as he neared age 17, Mr. Ferguson was

failing most of his classes, exhibited poor grooming and hygiene, had trouble working independently, could not respond appropriately to social cues such as laughing and smiling, and had trouble making eye contact)).  Notably, the state courts never addressed this issue, *see Ferguson v. State*, 13 So.2d at 435-36, making their decisions (or, more appropriately, the lack thereof) on this point unreasonable in light of the facts.  Likewise, this Court erred in finding that Mr. Ferguson's deficits did not manifest themselves before age 18.  In so finding, the Court found that because Mr. Ferguson is not mentally retarded, there could have been no manifestation before age 18.  Memorandum Opinion at 186-87.  That reasoning improperly conflates the issues, and essentially reads the third prong of the mental retardation test out of existence.  Accordingly, reconsideration is necessary.

## CONCLUSION

For these reasons, Petitioner Thomas Dale Ferguson respectfully moves this Court to grant his motion to alter or amend pursuant to Rule 59(e), amend the Memorandum Opinion accordingly, and grant *habeas corpus* relief in this case.

Respectfully submitted,

/s/ T. Thomas Cottingham
T. Thomas Cottingham
ASB-7254-G69T
Winston & Strawn LLP
100 North Tryon Street

Suite 2900
Charlotte, NC 28202
Phone: (704) 350-7700
Fax: (704) 350-7800
Email: tcottingham@winston.com

Counsel for Petitioner Thomas Dale
Ferguson

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2014, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following: Kevin W. Blackburn, Esq., Assistant Attorney General, Office of the Attorney General, 11 South Union Street, Montgomery, AL 36130-0515.

Respectfully submitted,

/s/ T. Thomas Cottingham
T. Thomas Cottingham
ASB-7254-G69T
Winston & Strawn LLP
100 North Tryon Street
Suite 2900
Charlotte, NC 28202
Phone: (704) 350-7700
Fax: (704) 350-7800
Email: tcottingham@winston.com

Counsel for Petitioner Thomas Dale Ferguson