UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| THOMAS DALE FERGUSON, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | CASE NO. 3:09-cv-0138-CLS-JEO |
| ) | |
| RICHARD F. ALLEN, Commissioner,) | |
| Alabama Department of Corrections, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION ON PETITIONER'S
RULE 59(e) MOTION**

This action is before the court on the motion filed by petitioner, Thomas Dale Ferguson, pursuant to Federal Rule of Civil Procedure 59(e), and asking the court to reconsider, and to alter, amend, or vacate the judgment denying *habeas corpus* relief from his state court convictions and death sentences. Doc. no. 18 (Motion to Alter or Amend Judgment).[1]

The facts leading to petitioner's convictions and sentences, as well as the procedural history of his case, were described in this court's previous memorandum opinion (*see* doc. no. 16 (Memorandum Opinion), at 6-18) and will not be reiterated here, except to state that petitioner

---

[1] *See also* doc. nos. 16 (Memorandum Opinion) and 17 (Final Judgment).

1

was indicted for four counts of capital murder in connection with the shooting deaths of Harold Pugh and his 11–year–old son Joey Pugh. The jury found Ferguson guilty of all counts charged in the indictment: two counts of murder made capital because the killings were committed during the course of a robbery in the first degree, *see* § 13A–5–40(a)(2), Ala. Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, *see* § 13A–5–40(a)(10), Ala. Code 1975; and one count of murder made capital because the victim was less than 14 years old, *see* § 13A–5–40(a)(15), Ala. Code 1975. The jury recommended, by a vote of 11–1, that Ferguson be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Ferguson to death by electrocution.

*Ferguson v. State*, 814 So. 2d 925, 933 (Ala. Crim. App. 2000) (alteration supplied).

Petitioner's present motion contends, among other things, that this court erroneously "examined the state courts' rejection of [his] *Atkins* claim using pre-*Atkins* evidence," and, "failed to consider the Supreme Court's decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014)." Doc. no. 18 (Motion to Alter or Amend Judgment), at 2 (alteration supplied); *see also id*. at 11-24.

# I. STANDARDS OF REVIEW

Even though the sole sentence of Federal Rule of Civil Procedure 59(e) specifically mentions only an alteration or amendment of a prior judgment,[2] it "has been interpreted as permitting a motion to vacate a judgment rather than merely amend it." 11 Wright, Miller & Kane, *Federal Practice and Procedure* § 2810.1, at

---

[2] "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e).

150 & n.1 (2012). The decision of whether to grant such a motion is committed to the sound discretion of the district court. *See, e.g.*, *American Home Assurance Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1238-39 (11th Cir. 1985). Generally speaking, however, "[t]he only grounds for granting [a Rule 59(e)] motion are newly-discovered evidence or manifest errors of law or fact." *United States v. Marion*, 562 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (*per curiam*) (alterations supplied)). The Rule may "not be used to relitigate old matters or to present arguments or evidence that could have been raised prior to judgment." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)). Moreover, a judgment should not be altered, amended, or vacated "if it would serve no useful purpose." 11 Wright, Miller & Kane, *supra* at 171 & n.24.

## II. SUMMARY OF BINDING PRECEDENT

The Supreme Court's 2002 opinion in *Atkins v. Virginia* held that "death is not a suitable punishment for a mentally retarded criminal." 536 U.S. 304, 321 (2002).[3]

---

[3] Prior to June 20, 2002 (the date on which *Atkins* was decided), the Supreme Court's opinion in *Penry v. Lynaugh*, 492 U.S. 302 (1989), provided the rule of decision in capital cases involving mentally retarded defendants. *Penry* held that the execution of such individuals did not *categorically* violate the Eighth Amendment's prohibition against cruel and unusual punishment, *provided* jurors had been instructed that they could consider, *and give mitigating effect to*, evidence of a defendant's mental retardation when determining the sentence to be imposed. *See id.* at 328 (O'Connor, J., Part

3

That landmark holding was based upon the Court's conclusion that deficits in the areas of "reasoning, judgment, and control of their impulses" did not allow "mentally retarded criminals" to act with "the level of moral culpability that characterizes the the most serious adult criminal conduct." *Id*. at 306.[4] Accordingly, the Court was

---

III (majority opinion)) (Justices Brennan, Marshall, Blackmun, and Stevens joined Justice O'Connor in Part III of the *Penry* opinion, thereby constituting a majority of the Court). The *Penry* judgment was based, at least in part, on Justice O'Connor's observation that there *then was* "insufficient evidence" of "a national consensus against execution of the mentally retarded." *Id*. at 340 (O'Connor, J., Part IV-C of opinion). Justice O'Connor spoke only for herself in Part IV-C of the *Penry* opinion. Four Justices (*i.e.*, Brennan, Marshall, Stevens and Blackmun) would have concluded that the execution of mentally retarded persons violated the Eighth Amendment. *See id*. at 343–50.

At the time Justice O'Connor wrote, however, only Congress and two states (Georgia and Maryland) had enacted legislation proscribing the execution of mentally retarded defendants. Even so, just such a consensus evolved during the thirteen years following the *Penry* decision. Eighteen states enacted legislation expressly providing that a sentence of death could not be carried out upon mentally retarded persons. That number did not count the statutory prohibitions on the execution of mentally retarded persons that had been enacted by Georgia, Maryland, and the United States Congress prior to the *Penry* decision, nor the fourteen states that had rejected capital punishment altogether. The weight of that evolving national consensus, together with the consistency of the direction of change, persuaded a majority of the members of the Supreme Court to abrogate *Penry*, and to hold in that the execution of mentally retarded defendants categorically violated the Eighth Amendment's prohibition against cruel and unusual punishment. *See Atkins v. Virginia*, 536 U.S. 304, 313-17 (2002).

[4] Specifically, Justice Stevens's opinion for the Court's majority stated that:

> Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. *Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants.* Presumably for these reasons, in the 13 years since we decided *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented by this case: whether such executions are "cruel and unusual punishments"

> not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender.

*Id*. at 321 (citation and internal quotation marks omitted).[5] That holding constituted "a new, substantive rule of constitutional law" and, for that reason, it was "made retroactive to cases on collateral review" on the date of the *Atkins* decision: June 20, 2002. *In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003).[6]

Even so, the *Atkins* opinion "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation" fell

---

prohibited by the Eighth Amendment to the Federal Constitution.

*Atkins*, 536 U.S. at 306-307 (emphasis supplied).

[5] The Eighth Amendment provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has stated that "[t]he basic concept underlying the Eighth Amendment is nothing less that the dignity of man"; consequently, the "Amendment must draw its menaing from the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958)) (alterations supplied); *see also Roper v. Simmons*, 543 U.S. 551, 572 (2005) ("By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of government to respect the dignity of all persons.").

[6] *See also Penry v. Lynaugh*, 492 U.S. at 330 (stating that, "if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity [discussed in *Teague v. Lane*, 489 U.S. 288, 301 (1989),] and would be applicable to defendants on collateral review") (O'Connor, J., unanimous opinion) (alteration supplied)); *In re Hill*, 437 F.3d 1080, 1082 (11th Cir. 2006) (holding that the new rule of constitutional law announced in *Atkins* "meets the requirement of 28 U.S.C. § 2244(b)(2)(A)" and, therefore, is retroactive to cases on collateral review); *In re Hicks*, 375 F.3d 1237, 1239 (11th Cir. 2004) (same).

5

within the protection of the Eighth Amendment, as applied to the states through the Fourteenth Amendment. *Bobby v. Bies*, 556 U.S. 825, 831 (2009).[7] Instead, *Atkins* left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986) (addressing the execution of insane persons)). In doing so, *Atkins* pointed to the following clinical standards:[8]

> The American Association on Mental Retardation [now known as the "American Association on Intellectual and Developmental Disabilities" (AAIDD)[9]] defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

---

[7] The Eighth Amendment's Cruel and Unusual Punishment Clause was incorporated into the Fourteenth Amendment's Due Process of Law Clause and, thereby, applied to the states by the Supreme Court's opinion in *Robinson v. California*, 370 U.S. 660 (1962); *see also Harmelin v. Michigan*, 501 U.S. 957 (1991); *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (*per curiam*); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947); 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law – Substance and Procedure* § 15.6(b), at 858-59 & n.38 (5th ed. 2012); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 6.3.3, at 504 & n.88 (3rd ed. 2006).

[8] *See Atkins*, 536 U.S. at 317 n. 22 ("The [various state] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, *supra*.") (alteration supplied).

[9] The name of the American Association on Mental Retardation was changed in 2007. *See, e.g.*, https://en.wikipedia.org/wiki/American Association on Intellectual and Developmental Disabilities.

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id*., at 42-43.

*Atkins*, 536 U.S. at 309 n.3 (alteration and footnote supplied, emphasis in original).

As the Court observed, each of the foregoing clinical definitions required

> not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id*. at 318 (footnotes omitted).

**A.     A Change in Diagnostic Terminology**

Within five years after the *Atkins* opinion, however, the clinical standards used by psychiatrists, psychologists, and other mental-health-care professionals to diagnose and classify persons who fit the definitional constructs quoted above shifted away from the use of such terms as "mental retardation" and "mentally retarded individuals." Relevant health-health professionals now prefer the labels "intellectual disability" and "intellectually disabled individuals." *See*, *e.g.*, "Rosa's Law," Pub. L. No. 111-256, 124 Stat. 2643 (2010).[10] The transition in terminology was discussed in an influential article authored in 2007 by the members of the AAIDD's Committee on Terminology and Classification, who observed that the understanding lying at the heart of the shift in terminology was

> the understanding that this term ["intellectual disability"] covers the same population of individuals who were diagnosed previously with mental retardation in number, kind, level, type, and duration of the disability and the need of people with this disability for individualized services and supports. Furthermore, every individual who is or was eligible for a diagnosis of mental retardation is eligible for a diagnosis of intellectual disability.

Schalock *et al.*, *The Renaming of* Mental Retardation: *Understanding the Change*

---

[10] Rosa's Law amended ten federal statutes — *i.e.*, the Higher Education Act of 1965, the Elementary and Secondary Education Act of 1965, the Rehabilitation Act of 1973, the Health Research and Health Services Amendments of 1976, the Public Health Service Act, the Health Professions Education Partnerships Act of 1998, the National Sickle Cell Anemia, Cooley's Anemia, Tay-Sachs, and Genetic Diseases Act, the Genetic Information Nondiscrimination Act of 2008, and Public Law 110-154 — by striking any references to such terms as "mental retardation" and "mentally retarded individuals," and substituting the terms "intellectual disability" and "an individual with an intellectual disability," respectively. *See* Pub. L. No. 111-256, 124 Stat. 2643 (2010).

*to the Term* Intellectual Disability, 45 Intellectual & Developmental Disabilities 116 (2007) (alteration supplied); *see also id*. at 120 (same).[11]

## B.    The Supreme Court's Opinion in *Hall v. Florida*

The shift in diagnostic terminology was legally noted in the Supreme Court's May 27, 2014 opinion in *Hall v. Florida*, – U.S. –, 134 S. Ct. 1986 (2014), which observed that the change had been approved and used in the fifth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5"): "one of the basic texts used by psychiatrists and other experts" in the field. *Id*. at 1990. *Hall's* significance does not lie solely in its recognition of the shift in diagnostic nomenclature, however, but in those portions of the opinion emphasizing that the statistical fact of a "standard error of measurement" negates the argument that an IQ score of 70 is a bright-line cutoff for determining when a capital defendant is "intellectually disabled," *as well as* in those passages stressing that lower courts should consider all evidence pertinent to a defendant's assertion of an intellectual disability, including assessments of any deficits in the defendant's adaptive functioning abilities.[12]

---

[11] The opinion in *Hall v. Florida*, 134 S. Ct. 1986 (2014), recognized that the change in terminology from "mental retardation" to "intellectual disability" was "approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts." *Id*. at 1990 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013)).

[12] The *amicus* brief of the American Psychiatric Association stated: "the relevant clinical

### 1. The "standard error of measurement"

The Supreme Court's opinion in *Hall v. Florida* observes that:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that *IQ test scores should be read not as a single fixed number but as a range.* See D. Wechsler, The Measurement of Adult Intelligence 133 (3d ed. 1944) (reporting the range of error on an early IQ test). Each IQ test has a "standard error of measurement," *ibid.*, often referred to by the abbreviation "SEM." *A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself.* See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in measurement theory"). *An individual's IQ test score on any given exam may fluctuate for a variety of reasons.* These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. See American Association on Intellectual and Developmental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual); A. Kaufman, IQ Testing 101, pp. 138–139 (2009).
>
> *The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies.* See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the

---

authorities all agree that an individual with an IQ score above 70 may properly be diagnosed with intellectual disability if significant limitations in adaptive functioning also exist." *Hall v. Florida*, 134 S. Ct. 1986, 1995-96 (2014) (quoting APA Brief at 15-15); *see also id*. at 1995 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score") (quoting DSM-5, at 37)).

measured score falls within a given score range, while 2 SEM provides a 95% confidence level that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM–5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75 (70 ± 5)"); APA Brief 23 ("For example, the average SEM for the WAIS–IV is 2.16 IQ test points and the average SEM for the Stanford–Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error)"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. See Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289–291, 318 (D. Saklofske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

*Hall v. Florida*, 134 S. Ct. at 1995-96 (emphasis supplied).

### 2. Consideration of additional evidence of intellectual disability

Moreover, *Hall* held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error" — *i.e.*, a score between 70 and 75 or lower[13] — "*the defendant must be able to present additional evidence of*

---

[13] This diagnostic range is drawn from *Atkins*, which noted that mental-health professions had "estimated that between 1 and 3 percent of the population has *an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation* [*intellectual disability*] *definition*." *Atkins*, 536 U.S. at 309 n.5 (emphasis and alteration supplied, citation omitted).

*intellectual disability, including testimony regarding adaptive deficits*." *Hall*, 134 S. Ct. at 2001 (alteration and emphasis supplied).

> Intellectual disability is a condition, not a number. See DSM–5, at 37. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability. See APA Brief 17 ("Under the universally accepted clinical standards for diagnosing intellectual disability, the court's determination that Mr. Hall is not intellectually disabled cannot be considered valid").
>
> . . . .
>
> It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment. See DSM–5, at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score"). The Florida statute, as interpreted by its courts, misuses IQ score on its own terms; and this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishments Clause.

*Hall*, 134 S. Ct. at 2001.

### 3. *Hall* emphasized preexisting principles

Neither of the foregoing points from the *Hall* opinion was a novel addition to

federal law. Instead, both had been anticipated in the *Atkins* opinion, even though neither issue had been elaborated as extensively as in *Hall*. For example, when discussing the "Wechsler Adult Intelligence Scales" test — the standard instrument for assessing intellectual functioning — the *Atkins* opinion observed that the test was

> scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. It is estimated that between 1 and 3 percent of the population has *an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition*.

*Atkins*, 536 U.S. at 309 n.5 (citations omitted, emphasis supplied). Thus, *Atkins* clearly rejected an IQ score of 70 as a mandatory cutoff score for determining whether an individual was mentally retarded/intellectually disabled, in favor of a range of five points from 70 to 75, corresponding to the standard error of measurement elaborated in *Hall*.

Moreover, the clinical standards of the American Association on Intellectual and Developmental Disabilities (formerly known as the "American Association on Mental Retardation") and American Psychiatric Association that were quoted in *Atkins* required not only evidence of subaverage intellectual functioning, but also evidence of significant limitations in adaptive skills. Again, therefore, the *Hall*

13

opinion merely elaborated a point previously addressed in *Atkins*.

4. **The Supreme Court's opinion in *Moore v. Texas***

The Supreme Court's March 28, 2017 opinion in *Moore v. Texas*, – U.S. –, 137 S. Ct. 1039, 2017 WL 1136278 (2017), also emphasized principles announced in *Atkins* and elaborated in *Hall*: *e.g.*, even though both of those opinions had left to the states "the task of developing appropriate ways to enforce" the constitutional restriction on executing intellectually disable convicts, the states' discretion was not "unfettered." 2017 WL 1136278, at *9 (quoting *Hall*, 134 S. Ct. at 1998). "As we instructed in *Hall*, adjudication of intellectual disability should be 'informed by the views of medical experts.' That instruction cannot sensibly be read to give courts leave to diminish the force of the medical community's consensus." *Id*. at *4 (quoting *Hall*, 134 S. Ct. at 2000[14]). In summary, the Supreme Court's opinion in *Moore v. Texas* stated:

> *Hall* instructs that, where an IQ score is close to, but above, 70, courts must account for the test's "standard error of measurement." . . . As we explained in *Hall*, the standard error of measurement is "a statistical fact, a reflection of the inherent imprecision of the test itself." . . . "For purposes of most IQ tests," this imprecision in the testing instrument "means that an individual's score is best understood as a range of scores on either side of the recorded score . . . within which one may say an individual's true IQ score lies." . . . A test's standard error of

---

[14] *See also Hall*, 134 S. Ct. at 1993 (observing that "this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability").

14

measurement "reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score." . . .

Moore's score of 74, adjusted for the standard error of measurement, yields a range of 69 to 79, . . . as the State's retained expert acknowledged . . . . Because the lower end of Moore's score range falls at or below 70, the [Texas Court of Criminal Appeals] had to move on to consider Moore's adaptive functioning.

*Moore*, 2017 WL 1136278, at *10 (citations omitted).

### III. DISCUSSION

Ferguson contends in the following passages copied from his Rule 59(e) motion that this court erred when evaluating his *Atkins* claim by considering only evidence that had been produced by his attorneys prior to the Supreme Court's opinion in that case.

> It is an unreasonable application of *Atkins* to consider only information produced prior to the *Atkins* decision in determining whether a petitioner meets the definition of mentally retarded as accepted by *Atkins*. Stated differently, courts cannot rely solely on pre-*Atkins* evidence in determining whether a petitioner qualifies for relief under *Atkins*.
>
> Mr. Ferguson was convicted and sentenced to death in 1998, four years before the 2002 decision in *Atkins*. The Alabama Court of Criminal Appeals affirmed Mr. Ferguson's conviction and sentence in 2000, *Ferguson v. State*, 814 So. 2d 925 (Ala. Crim. App. 2000), and the Alabama Supreme Court affirmed that decision in 2001 — all before *Atkins*. *Ex parte Ferguson*, 814 So. 2d 970 (Ala. 2001). The United States Supreme Court denied Mr. Ferguson's petition for writ of certiorari on March 4, 2002, *Ferguson v. Alabama*, 535 U.S. 907 (2002) — over two months before it decided *Atkins* on June 20, 2002.

15

Doc. no. 18 (Motion to Alter or Amend Judgment), at 13-14.

Upon reconsideration, this court agrees. This court's prior memorandum opinion overlooked the significance of the Eleventh Circuit's July 30, 2013 opinion in *Burgess v. Commissioner, Alabama Department of Corrections*, 723 F.3d 1308 (11th Cir. 2014), which observed that *Atkins*

> highlighted the fact that there is a difference between using mental retardation as a mitigating factor (a balancing inquiry) and categorically excluding mentally retarded persons from the death penalty altogether (a categorical prohibition) such that pre-*Atkins* it could have been detrimental to a defendant's case to present thorough evidence of mental retardation: "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."

*Id*. at 1317 (quoting *Atkins*, 536 U.S. at 320-21); *see also Bobby v. Bies*, 556 U.S. 825, 829 (2009) ("[M]ental retardation for purposes of *Atkins*, and mental retardation as one mitigator to be weighed against aggravators, are discrete issues." (alteration supplied)).

> In other words, *Atkins* gave defendants an incentive to definitively demonstrate mental retardation, rather than simply demonstrate low intellectual functioning. Accordingly, "evidence presented pre-*Atkins* may not in every case be conducive to an *Atkins* inquiry and may not enable a court to make reasonable factual determinations relating to mental retardation for purposes of the Eighth Amendment." *Burgess*, 723 F.3d at 1317 (emphasis added). Indeed, in *Atkins*, the Supreme Court remanded for a hearing on the question of whether *Atkins* was in fact mentally retarded ***for purposes of the Eighth Amendment***, even though a jury had already heard evidence regarding mental retardation

16

during the penalty phase. *Atkins*, 536 U.S. at 321.

Doc. no. 18 (Motion to Alter or Amend Judgment), at 16 (all emphasis in original).

## IV. ORDER ON MOTION

Accordingly, defendant's Motion to Alter or Amend Judgment is **GRANTED IN PART** and **DENIED IN PART**. It is **ORDERED**, **ADJUDGED**, and **DECREED** that Part V.F. of this court's prior memorandum opinion addressing the claim that "Ferguson Was Improperly Denied a Hearing on His Mental Capacity Under Atkins v. Virginia" (*i.e.*, doc. no. 16, at 146-189) be, and the same hereby is, rescinded, vacated, and held for naught.

The attorneys for petitioner, Thomas Dale Ferguson, are ORDERED to inform this court and opposing counsel, on or before the close of business on Wednesday, July 19, 2017, of the date upon which they reasonably anticipate being prepared to proceed to an evidentiary hearing on petitioner's assertion that he is categorically excluded from eligibility for the imposition of the death penalty as a result of intellectual disability. Respondent must file a response no later than Wednesday, July 26, 2017.

In all other respects, it is **ORDERED**, **ADJUDGED**, and **DECREED** that petitioner's motion to alter or amend this court's previous judgment be, and the same hereby is, **OVERRULED** and **DENIED**.

17

**DONE** and **ORDERED** this 27th day of June, 2017.

                                                  _____
                                                  United States District Judge